# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

*Roderick Napoleon Harris*,
TDCJ No. 999573

Petitioner,

v.

*Bobby Lumpkin*, Director, Texas
Department of Criminal Justice,
Correctional Institutions Division,

Respondent

Civil No. 3:20-CV-3702-C

Death Penalty Case

## Petition for Writ of Habeas Corpus
## filed under 28 U.S.C. § 2254

**Michael Mowla**
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Petitioner

## I.      Identity of Parties, Counsel, and Judges

Roderick Napoleon Harris, Petitioner

Michael Mowla, attorney for Harris (§ 2254 proceedings)

Brad Lollar, attorney for Harris (trial)

Douglas Parks, attorney for Harris (trial)

Michael Howard, attorney for Harris (trial)

Calvin Johnson, attorney for Harris (pretrial)

John Tatum, attorney for Harris (direct appeal)

Benjamin Wolff (OFCW), attorney for Harris (state habeas)

Gwendolyn Payton (Kilpatrick Townsend), attorney for Harris (state habeas)

John Neeleman (Kilpatrick Townsend), attorney for Harris (state habeas)

Annica Bianco (Kilpatrick Townsend), attorney for Harris (state habeas)

Brad Levenson (OFCW), attorney for Harris (state habeas)

Robert Romig (OFCW), attorney for Harris (state habeas)

Sam Farina-Henry (OFCW), attorney for Harris (state habeas)

Ryan Carlyle Kent (OFCW), attorney for Harris (state habeas)

Bobby Lumpkin, Director, TDCJ-ID

John Creuzot, Dallas Co. District Attorney

Craig Watkins, Dallas Co. District Attorney (prior)

Susan Hawk, Dallas Co. District Attorney (prior)

Faith Johnson, Dallas Co. District Attorney (prior)

Kevin Brooks, Dallas Co. Assistant District Attorney

Patrick Kirlin, Dallas Co. Assistant District Attorney

Rachael Jones, Dallas Co. Assistant District Attorney

David Alex, Dallas Co. Assistant District Attorney

Grace Shin, Dallas Co. Assistant District Attorney

Justin Lord, Dallas Co. Assistant District Attorney

Shelly Yeatts, Dallas Co. Assistant District Attorney

Rebecca Ott, Dallas Co. Assistant District Attorney

Jaclyn O'Connor, Dallas Co. Assistant District Attorney

Justin Johnson, Dallas Co. Assistant District Attorney

Ken Paxton, Attorney General of Texas

Judge Michael Snipes, Crim. Dist. Ct. No. 7, Dallas Co. (trial)

Judge Theresa Hawthorn, 203rd Dist. Ct., Dallas Co. (recused)

Judge Stephanie Fargo, Crim. Dist. Ct. No. 7, Dallas Co. (state habeas proceedings)

Judge Chika Anyiam, Crim. Dist. Ct. No. 7, Dallas Co. (state habeas proceedings)

Judge Cathy Cochran, Texas Court of Criminal Appeals

Judge Sharen Keller, Texas Court of Criminal Appeals

Judge Barbara Hervey, Texas Court of Criminal Appeals

Judge Cheryl Johnson, Texas Court of Criminal Appeals

Judge Michael Keasler, Texas Court of Criminal Appeals

Judge Elsa Alcala, Texas Court of Criminal Appeals

Judge Lawrence Meyers, Texas Court of Criminal Appeals

Judge Paul Womack, Texas Court of Criminal Appeals

Judge Tom Price, Texas Court of Criminal Appeals

## II.    Table of Contents

I.      Identity of Parties, Counsel, and Judges ........................................................ 2

II.     Table of Contents ............................................................................................ 4

III.    Table of Authorities ........................................................................................ 8

IV.     Appendix ........................................................................................................ 12

V.      Confinement, Restraint, and Requested Relief ............................................. 13

VI.     Procedural History .......................................................................................... 13

        1.    Indictment, trial, conviction, and death sentence............................... 13

        2.    The Judgment and sentence are affirmed on direct appeal ................ 14

        3.    The state habeas Application, FFCL, and denial ................................ 14

VII.    General Facts .................................................................................................. 28

        1.    Guilt/Innocence Phase......................................................................... 28

        2.    Punishment Phase ............................................................................... 29

VIII.   Grounds for Relief .......................................................................................... 30

        1.    Ground 1: The state court's decisions that Harris did not
              receive ineffective assistance of trial counsel because trial
              counsel failed to investigate evidence that Harris: (1)
              suffers from Fetal Alcohol Spectrum Disorders; and (2) was
              exposed to toxic levels of lead in utero and as a child were:
              (i) contrary to, or involved an unreasonable application of
              clearly established federal law as determined by the
              Supreme Court; and (ii) based on an unreasonable
              determination of the facts in light of the evidence presented
              in the state proceeding (State Habeas Claims 1-A & 1-B) .................. 30

              A.   Layout of this Ground ................................................................ 30

              B.   Facts supporting this Ground .................................................... 31

                   i.   The State Habeas Court's decision ................................. 31

                   ii.  Evidence about FASD/ARND......................................... 35

4

iii.  Evidence about lead exposure and the multiplying effect of exposure to several neurotoxins .......................................................... 45

C.   Standards under 28 U.S.C. § 2254(d) ......................................... 52

D.   Standards for ineffective assistance of counsel ......................... 54

E.   Because due process prevents the relitigation bar of 28 U.S.C. § 2254(d) from applying, the state court adjudication of Harris's application resulted in a decision that violated due process. ............................... 56

i.   28 U.S.C. § 2254(d)'s relitigation bar is a form of issue preclusion ................................................... 56

ii.  The due process clause limits a federal court's power to apply preclusion ......................... 60

iii.  The state court adjudication of Harris's application resulted in a decision obtained in violation of due process .......................................... 61

iv.  The habeas corpus framework in Texas ...................... 63

v.  Harris was deprived of notice and a meaningful opportunity to be heard in the state court proceeding ................................................. 65

F.   The state court decision (FFCL) did not adjudicate the merits of the *Strickland* claim as it relates to the failure to investigate Harris's In-Utero Exposure to Alcohol and exposure to lead because it misconstrued the nature of the claim ......................................... 73

G.   The state court decision (FFCL) on the Strickland claim on the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is based upon an unreasonable determination of facts in light of the evidence presented ............................................. 76

H.   The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is contrary to Strickland because it applied a prejudice standard that is incompatible with *Strickland*'s

prejudice prong .......................................................................... 79

I.    The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead was an unreasonable application of *Strickland* and its progeny because it unreasonably discounted mitigating evidence based upon the absence of a nexus to criminal behavior .......................................... 81

J.    The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol involved an unreasonable application of *Strickland* and its progeny because it deferred "strategic" decisions by trial counsel that were not made after a thorough investigation .............................................................. 85

K.    The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is contrary to or involved an unreasonable application of *Strickland* because the decision concluding that there was no prejudice was based on discrete findings for each piece of mitigating evidence considered in isolation and failed to consider the effect of the totality of the mitigating evidence omitted by trial court's deficient representation as a whole .............................................................................. 86

L.    Conclusion ............................................................................. 88

2.    Ground 2: The state court's decision that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was: (i) contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; and (ii) based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding (State Habeas Claim 3) ....................................... 90

A.    Facts relevant to this Ground ..................................... 90

      i.    Testimony about the stun-belt during the trial ...................................................................... 90

        ii.  Testimony about the stun-belt during the habeas hearing ........................................................ 92

        iii.  The state court decision.................................................. 92

  B.   *Deck* prohibits a jury seeing a defendant in restraints or have knowledge of the restraints at any time unless there is a finding of a "special need" by the court ........................................................................ 94

  C.   The state court's decision (FFCL) that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court .............................. 95

  D.   The state court's decision that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding .................................................................. 100

  E.   Harris met the burden of rebutting the presumption of correctness by clear and convincing evidence per 28 U.S.C. § 2254(e)(1) .............................................. 103

IX.   Conclusion and Prayer........................................................ 105

X.   Verification.......................................................................... 106

XI.   Certificate of Service........................................................... 106

## III.    Table of Authorities

**Cases**

*Allen v. McCurry*, 449 U.S. 90 (1980).........................................................................58

*Andrew v. Patterson Motor Freight, Inc.*, No. 6:13-CV-814, 2014 U.S.Dist.LEXIS 151234 (W.D.La. Oct. 23, 2014)..............................................82

*Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018), cert. denied, 139 S.Ct. 595 (2018) ...............................................................................................................88

*Barnett v. Natl. Contl. Ins. Co.*, No. 3:17-CV-153-JWD-EWD, 2019 U.S.Dist.LEXIS 3766 (M.D.La. Jan. 8, 2019) ....................................................82

*Bell* v. *Cone*, 535 U.S. 685 (2002) .........................................................................54, 57

*Bobby v. Van Hook*, 558 U.S. 4 (2009) .........................................................................55

*Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) ..............................................................75

*Carey* v. *Musladin*, 549 U.S. 70 (2006) ...............................................................52, 53

*Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002) .....................................................74

*Chambers v. Mississippi*, 410 U.S. 284 (1973)............................................................94

*Cullen* v. *Pinholster*, 563 U.S. 170 (2011) ...........................................................54, 75

*District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) ...............................................................................................61, 62, 63

*Ex Parte Carnes*, 579 S.W.2d 249 (Tex.Crim.App. 1979) ..........................................64

*Ex parte Davis*, 947 S.W.2d 216 (Tex.Crim.App. 1996)..............................................63

*Ex parte Harris*, No. WR-80,923-01, 2020 Tex.Crim.App.Unpub.LEXIS 590 (Tex.Crim.App. Dec. 16, 2020) (per curium) ...........................17, 18, 28, 32

*Ex parte Menchaca*, 854 S.W.2d 128 (Tex.Crim.App. 1993) ................................96, 97

*Ex parte Rieck*, 144 S.W.3d 510 (Tex.Crim.App. 2004) ..............................................63

*Green v. Georgia*, 442 U.S. 95 (1979) .........................................................................94

*Greene v. Fisher*, 565 U.S. 34 (2011) ..........................................................................58

*Greene v. Georgia*, 519 U.S. 145 (1996).....................................................................57

*Hansberry v. Lee*, 311 U.S. 32 (1940) .......................................................... 60

*Harrington v. Richter*, 562 U.S. 86 (2011) ............................................... 53, 58, 73, 75

*Harris v. Nelson*, 394 U.S. 286 (1969) ......................................................... 62

*Harris v. State*, No. AP-76,810, 2014 Tex.Crim.App.Unpub.LEXIS 517 (Tex.Crim.App. May 21, 2014) (unpublished) .................................................. 14

*Harris v. Texas*, 574 U.S. 1080 (U.S. 2015) ................................................. 14

*Harris v. Texas*, No. 20-8462, 2021 U.S.LEXIS 5350 (U.S. 2021) ............................. 28

*Henderson v. Cockrell*, 333 F.3d 592 (5th Cir. 2003) ....................................... 74

*Holbrook v. Flynn*, 475 U.S. 560 (1986) ................................................. 96, 97

*Illinois v. Allen*, 397 U.S. 337 (1970) ..................................................... 96

*In re Harris*, 491 S.W.3d 332 (Tex.Crim.App. 2016) ......................................... 17

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326 (Fed. Cir. 2001) ............................ 58

*Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978) .................................... 58

*Jones v. Jones*, 163 F.3d 285 (5th Cir. 1998) .............................................. 74

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461 (1982) ..................................... 61

*Kyles v. Whitley,* 514 U.S. 419 (1995) ...................................................... 87

*Lance Meadors v. D'Agostino*, No. 18-01007-BAJ-EWD, 2020 U.S.Dist.LEXIS 201471 (M.D.La. Oct. 29, 2020) ..................................... 82, 83

*Langley v. Prince*, 926 F.3d 145 (5th Cir. 2019) (en banc) ................................. 58, 59

*Malchi v. Thaler*, 211 F.3d 953 (5th Cir. 2000) ........................................... 34

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985) ........................ 60

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ................................................ 57

*Miller-El* v. *Dretke*, 545 U.S. 231 (2005) ................................................. 54

*Montana v. United States*, 440 U.S. 147 (1979) ........................................... 58, 59

*Montoya v. Johnson*, 226 F.3d 399 (5th Cir. 2000) ......................................... 55

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ....................... 63

*Myers v. Neal*, 975 F.3d 611 (7th Cir. 2020) ......................................... 87, 88

*Parker v. Dugger*, 498 U.S. 308 (1991) ...................................................... 57

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................... 56, 81

*RecoverEdge L.P. v. Pentecost, et al.*, 44 F.3d 1284 (5th Cir. 1995) ........... 58

*Richards v. Jefferson Cty., Ala.*, 517 U.S. 793 (1996) .......................... 60, 61

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ............................. 87

*Roach v. Hughes*, No. 4:13-CV-00136, 2016 U.S.Dist.LEXIS 192835 (W.D.Ky. March 9, 2016) ................................................................. 82

*Robertson v. State*, 187 S.W.3d 475, 484-486 (Tex.Crim.App. 2006) ................. 96, 97

*Rogers v. Quarterman*, 555 F.3d 483 (5th Cir. 2009) ................................ 55

*Ruppel v. Kucanin*, No. 3:08-CV-591, 2011 U.S.Dist.LEXIS 67503 (N.D.Ind. June 20, 2011) ................................................................ 82

*Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003) ................................ 56

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................... passim

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ................................................ 61

*Tennard v. Dretke.* 542 U.S. 274 (2004) ................................................ 83

*Thompson v. Keohane*, 516 U.S. 99 (1995) ............................................. 104

*Townsend v. Sain*, 372 U.S. 293 (1963) ................................................. 63

*Ward v. Carnival Corp.*, No. 17-24628-CV, 2019 U.S.Dist.LEXIS 41022 (S.D.Fla. March 14, 2019) .............................................................. 83

*Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996) ..................................... 87

*White v. Thaler*, 610 F.3d 890 (5th Cir. 2010) ........................................ 87

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................... 55, 56, 86, 105

*Williams v. State*, 662 S.W.2d 344 (Tex.Crim.App. 1983) ................... 96, 97

*Wilson v. Corcoran*, 562 U.S. 1 (2010) .................................................. 59

*Wilson v. Sellers*, 138 S.Ct. 1188 (2018)......................................................... 32

*Wong v. Belmontes*, 558 U.S. 15 (2009)............................................................ 56

**Statutes**

28 U.S.C. § 2241................................................................................................. 59

28 U.S.C. § 2254........................................................................................... passim

Tex. Code Crim. Proc. Art. 11.071................................................................ 63, 64

Tex. Penal Code § 19.03.................................................................................... 13

**Other Authorities**

National Association for Public Defense, Assessment of the Texas Office
    of Capital and Forensic Writs................................................................ 66

Standards for the Mitigation Function of Defense Teams in Texas Death
    Penalty Cases (2015).............................................................................. 66

Texas Bar's Guidelines and Standards for Texas Capital Counsel (2006)
    ................................................................................................................ 66

## IV.    Appendix

- Judgment and sentence (App.0001-0003)

- Order, *Ex parte Harris*, No. WR-80,923-01, 2020 Tex.Crim.App.Unpub.LEXIS 590 (Tex.Crim.App. Dec. 16, 2020) (per curium) (App.0004-0008)

- Findings of Fact and Conclusions of Law signed March 31, 2020 (App.0009-0157)

- Declaration of Dr. S. Thomas Dydek (Nov. 19, 2021) (App.0158-0163)

Under 28 U.S.C. § 2254, Petitioner Roderick Harris files this Petition for Writ of Habeas Corpus in a death penalty case:

## V.   Confinement, Restraint, and Requested Relief

1.      Harris is illegally confined and restrained of his liberty by Bobby Lumpkin, acting in his capacity as Director of the Texas Department of Criminal Justice, Institutional Division ("TDCJ"). Harris is confined under a Judgment of Conviction by Jury ("Judgment") and sentence of death entered in *State v. Harris*, No. F09-00409-Y (Crim. Dist. Ct. No. 7, Dallas Co.) on May 21, 2012. (RR66.107; CR.709-711, App.0001-0003).[1] Harris requests that the Judgment and sentence be overturned, and the case remanded to the trial court for a new trial.

## VI.   Procedural History

### 1.   Indictment, trial, conviction, and death sentence

2.      On June 2, 2009, Harris was indicted for Capital Murder under Tex. Penal Code § 19.03(a)(2): on or about March 17, 2009, Harris intentionally caused the death of Alfredo Gallardo by shooting him with a firearm while attempting Robbery. (CR1.7). Voir dire occurred January 9 through March 26, 2012. (RR9-RR52). Harris pleaded "not guilty" to the allegations in the indictment. (RR58.6-7). On May 8, 2012, the trial began. (RR58.17). On May 11, 2012, the jury found Harris guilty of Capital Murder as charged in the indictment. (RR60.126).

---

[1] The Clerk's Record from trial is cited as "CR(volume number)(page number)." The Reporter's Record from the trial is cited as "RR(volume number) and page or exhibit number. The Clerk's Record from the state habeas proceeding is cited as "CR-Habeas(page number). The Reporter's Record from the state habeas proceeding is cited as "RR(volume number)-Habeas and page or exhibit number.

3.      On May 14, 2012, the punishment phase began. (RR62.19). On May 21, 2012, the jury reached its verdict, answering "Yes" to Special Issue One and "No" to Special Issue Two. (RR66.103-104). Harris was sentenced to death. (RR66.107).

## 2.  The Judgment and sentence are affirmed on direct appeal

4.      On May 21, 2014, the Texas Court of Criminal Appeals ("TCCA") affirmed the Judgment and death sentence. *Harris v. State*, No. AP-76,810, 2014 Tex.Crim.App.Unpub.LEXIS 517 (Tex.Crim.App. May 21, 2014) (unpublished). Harris filed a petition for writ of certiorari, which was denied on January 12, 2015. *Harris v. Texas*, 574 U.S. 1080 (U.S. 2015).

## 3.  The state habeas Application, FFCL, and denial

5.      On June 11, 2014, the state habeas application (CR-Habeas.17-137) ("Application") and its Appendix with 27 exhibits were filed. (CR-Habeas.138-499; CR-Habeas.504-1058). Six claims were asserted:

- **Claim 1:** Harris received ineffective assistance of counsel ("IAC") because trial counsel failed to investigate and present certain mitigation evidence (CR-Habeas.16-69)

  - **Claim 1-A:** Harris received IAC because trial counsel failed to investigate and present evidence that Harris suffers from Fetal Alcohol Spectrum Disorder ("FASD") (CR-Habeas.20-34);

  - **Claim 1-B:** Harris received IAC because trial counsel failed to investigate and present evidence that Harris was exposed to toxic levels of lead as a child (CR-Habeas.34-41);

  - **Claim 1-C:** Harris received IAC because trial counsel failed to retain and present testimony from experts to explain the mitigating impact of Harris's life history (CR-Habeas.41-69);

14

- **Claim 2:** Harris received IAC because trial counsel failed to rebut the State's evidence of Harris's gang affiliation by presenting testimony from a gang expert (CR-Habeas.70-75);

- **Claim 3:** Harris received IAC because trial counsel failed to object to testimony informing the jury that Harris was restrained (CR-Habeas.75-83);

- **Claim 4:** Harris was denied due process by trial counsel's failure to object to the admission of forensic evidence concerning Carlos Gallardo (CR-Habeas.84-94);

- **Claim 5:** Harris was denied due process by trial counsel's failure to object to prejudicial and cumulative testimony concerning the crime scene and Harris's shooting at officers, and to prejudicial and inadmissible evidence seized from the Ford (CR-Habeas.95-103); and

- **Claim 6:** Harris's constitutional rights were violated by the trial court's refusal to instruct the jury that a vote by one juror would result in a life sentence (CR-Habeas.104-111).

6.     On December 10, 2014, the State filed its general denial to Claims 1-5 and argued that Claim 6 was not cognizable. (CR-Habeas.1092-1108). On January 20, 2015, the State filed a proposed order designating issues ("ODI"), which sought an ODI finding that controverted, previously unresolved factual issues existed with respect to the *Strickland* allegations. (CR-Habeas.1109-1111). On February 6, 2015, the court adopted the proposed ODI. (CR-Habeas.1110). The same day, Harris filed a proposed ODI. (CR-Habeas.1112-1115).

7.     On March 17, 2015, the State filed a motion seeking disclosure of Harris's trial counsel's casefile seeking "most, if not all, of the contents." (CR-Habeas.1124-1133). The trial court entered a joint discovery order on March 23, 2015, permitting Harris's counsel to review the State's file. (CR-Habeas.1137). On March

15

24, 2015, Harris filed a response. (CR-Habeas.1137). On April 6, 2015, the trial court ordered Harris to disclose to the State those parts of the casefile relevant to *Strickland* allegations. (CR-Habeas.1152). The trial court amended its order directing disclosure to occur by May 1, 2015 and required Harris to provide a privilege log describing nonresponsive items. (CR-Habeas.1153). On April 10, 2015, the trial court granted the State's motion for access to its trial expert's psychological evaluation that was under seal. (CR-Habeas.1151).

8.      On April 21, 2015, Harris filed a motion for leave to file a writ of prohibition in the TCCA, requesting that the Court issue an emergency stay of the trial court's order directing disclosure of his casefile to the State and a writ instructing the trial court to withdraw the order. Motion for Leave to File Emergency Application for Writ of Prohibition, *In re Harris*, No. WR-80,923-02 (Tex.Crim.App. Apr. 21, 2015). On April 28, 2015, the State filed a motion in the TCCA requesting that it stay the trial court's scheduled evidentiary hearing set to begin on May 18, 2015 until it resolved the motion for leave. Motion for Stay of Article 11.071 Evidentiary Hearing, *In re Harris*, No. WR-80,923-02 (Tex.Crim.App. Apr. 28, 2015).

9.      On April 28, 2015, Harris filed an emergency motion to stay the trial court's order requiring disclosure of his casefile. (CR-Habeas.1154-1157). On April 30, 2015, the TCCA stayed the order directing disclosure of the casefile and the evidentiary hearing pending further order and permitted the State and trial court to file a response. Order, *In re Harris*, No. WR-80,923-02 (Tex.Crim.App. April 30, 2015).

16

10.     On April 30, 2015, the trial court ordered Harris's consulting trial expert to provide her raw data to the State's expert. (CR-Habeas.1159). No motion related to this order is in the record.

11.     On June 1, 2015, the State filed a response to the motion for leave in the TCCA. State's Response, *In re Harris*, No. WR-80,923-02 (Tex.Crim.App. June 1, 2015). On May 26, 2016, the TCCA issued a published order denying leave to file the application for a writ of prohibition, concluding Harris had not provided authority that expressly prohibits the trial court from ordering him to disclose portions of his casefile that are responsive to allegations of IAC. *In re Harris*, 491 S.W.3d 332 (Tex.Crim.App. 2016).

12.     In October 2016, Harris provided the State a copy of his casefile and a privilege log for items withheld. Emergency Motion to Stay Lower Court Proceedings at 4, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018). On February 17, 2017, the trial court entered an order setting an evidentiary hearing for May 30, 2017. *Id*. On March 20, 2017, Judge Frizell resigned. *Id*. at 5. On March 24, 2017, the State emailed the court coordinator requesting the hearing date be removed pending appointment of a new judge. *Id*. The email does not appear in the state court record. On November 1, 2017, Governor Abbott appointed Stephanie Fargo to Criminal District Court No. 7. *Id*. at 7. Negotiations between the parties and court regarding the scheduling of the evidentiary hearing commenced. *Id*. at 7110. On December 1, 2017, the trial court held a status conference, during which OCFW counsel explained that it was recruiting pro bono counsel to assist it due to staffing deficits. *Id*. at 10.

The trial court set a hearing date for May 29, 2018. *Id*. at 11. On December 8, 2017, the trial court held a telephonic status conference during which OCFW represented it was likely a firm would be taking over Harris's case. *Id*.

13.     On April 5, 2018, 54 days before the start of the habeas hearings (RR2-Habeas), attorney Gwendolyn Payton moved to appear pro hac vice on behalf of Harris. (CR-Habeas.1266-1271). On April 13, 2018, the trial court granted in part an *ex parte* motion by Harris for authorization to retain Dr. Charles Rotramel as an expert. (CR-Habeas.1276). On April 16, 2018, Harris filed a motion to continue the hearing based upon pro bono counsel's workload, the absence of institutional knowledge of Harris's case by co-counsel OCFW, and the unavailability of Harris's expert witness Joan Mayfield. (CR-Habeas.1277-1289). The motion was unopposed by the State. Motion to Stay Lower Court Proceedings at 12, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018); *Id*. at Exhibit I. On April 19, 2018, the State filed a motion for exchange of witness lists. (CR-Habeas.1290-1293).

14.     On April 30, 2021, the trial court denied continuance of the evidentiary hearing except with respect to Dr. Mayfield. (CR-Habeas.1296). On May 2, 2018, the trial court directed the parties to exchange witness lists 20 days before the hearing. (CR-Habeas.1297).

15.     On May 1, 2018, Harris filed a motion to reconsider the denial of continuance. This motion is not in the record transmitted to the TCCA but is an exhibit to the Motion to Stay Lower Court Proceedings at Exhibit K, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018).  Harris alleged that OCFW could

not conduct the hearing for budgetary and personnel reasons, and as a result, transitioned the case to Gwendolyn Payton of Kilpatrick Townsend. This motion alleged that a continuance served the interest of judicial economy and fairness because counsel was admitted by that court on April 26, 2018, and had less than a month to prepare on the ineffective assistance of counsel allegations designated by the trial court. Harris asserted it was impossible that any lawyer could competently conduct the hearing under those circumstances. On May 4, 2018, the trial court denied Harris's request to reconsider denial of a continuance. (CR-Habeas.1300-1301). In the order, the trial court considered these facts in how it decided: (1) the application had been pending since June 11, 2014; (2) the first hearing was set for May 18, 2015, which was stayed until May 25, 2016 pending the resolution of the issue in the TCCA; (3) Ben Wolff of OFCW had assured the trial court that he had obtained the assistance from the attorneys with Kilpatrick Townsend sometime in November 2017, which "would most assuredly result in the case being heard sooner rather than later"; (4) on December 1, 2017, the trial court informed the parties that if the court reset the hearing to May 2018, there would be no further requests for continuances; and attorneys with Kilpatrick Townsend filed their motions to appear pro hac vice on April 5, 2018, knowing that the hearing was set for May 29, 2018. (CR-Habeas.1300-1301).

16.     On May 8, 2018, Harris filed a motion to disqualify the Dallas County District Attorney's Office on the ground that its First Assistant DA Mike Snipes was the presiding judge during the trial. (CR-Habeas.1302-1316). The State responded on

19

May 9, 2018, alleging that Snipes was screened from the case. (CR-Habeas.1317-1324). On May 10, 2018, the State filed its witness list. (CR-Habeas.1334).

17.     On May 11, 2018, Harris filed an emergency motion to stay the proceeding until August 27, 2018, arguing that OCFW did not have sufficient resources to prepare for the hearing. Emergency Motion to Stay Lower Court Proceedings at 3, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. May 11, 2018). The motion asserted a stay was necessary to afford due process. *Id*. at 26.

18.     On May 15, 2018, the State filed a motion to quash subpoenas requested by Harris the day before on May 14, 2018, seeking to depose Brad Lollar, Doug Parks, Mike Howard, Brendan Ross, Patrick Kirlin, Dr. Christine Reed, and Dr. Jed Falkowski. The State alleged that the trial court had not ordered depositions and the subpoenas were not issued per Texas law or properly served. (CR-Habeas.1336-1401). On May 18, 2018, Harris filed a response. (CR-Habeas.1402-1413). On May 16, 2021, Harris filed a Motion to Reschedule Hearing because Kilpatrick Townsend wanted to conduct the depositions. (CR-Habeas.1423-1437)

19.     On May 21, 2018, the TCCA denied Harris's emergency request for a continuance. *Harris*, No. WR-80,923-01 (Tex.Crim.App. May 21, 2018, Notice). Also on May 21, 2018, the State filed an objection to Harris's presentation of attorney Richard Burr as an expert on IAC. (CR-Habeas.1414-1422). On May 22, 2018, Harris filed a motion to inspect trial exhibits. (CR-Habeas.1439-1443). On May 24, 2018, Harris filed a response to the State's objection to presentation of expert testimony,

explaining his testimony will establish prevailing professional norms applicable to capital representation. (CR-Habeas.1484-1493).

20.     On May 29, 2018, Harris filed motions to conduct: (1) MRI testing on Harris to assess the impact of FASD and lead exposure (CR-Habeas.1520-1527); and (2) bone lead testing on Harris. (CR-Habeas.1528-1537).

21.     The evidentiary hearing began on May 29, 2018. Attorneys from Kilpatrick Townsend appeared, but attorney of record OCFW did not. (RR2-Habeas.2). The trial court denied Harris's motion disqualify the Dallas County DA's Office (RR2-Habeas.8-12) and also denied the State's objection to Burr's testimony. (RR2-Habeas.20). Harris's witnesses Pamela Maddox (Harris's mother), Shamy Conley (Harris's cousin), and Laura Sovine (social worker testifying about Harris's life history) testified (RR2-Habeas.30-126). The trial court terminated the hearing that day upon Payton's representation at a bench conference that the remainder of Sovine's direct testimony will address habeas counsel's ineffectiveness in preparing for the hearing. (RR3-Habeas.6). After the hearing that day, the State filed a motion to order counsel of record OCFW to appear for the hearing. (CR-Habeas.1504-1519).

22.     On May 30, 2018, OCFW Director Wolff told the court that habeas counsel has a duty to make a record about their limitations. (RR3-Habeas.11). The State urged its motion that an OCFW attorney appear, calling Wolff's intent "purposeful nonappearance" and the intent of counsel to "hold this Court hostage." (RR3-Habeas.12). The trial court expressed concern about whether Wolff agreed with the strategy to allege unpreparedness. (RR3-Habeas.16-17). Wolff represented Harris

21

consented to the representation by Kilpatrick Townsend, who are acting as OCFW's agents. (RR3-Habeas.19-21). Then Harris's witnesses Julian Davies (FASD expert) and Thomas Dydek (lead exposure expert) testified. (RR3-Habeas.25-163).

23. On May 31, 2018, State's witnesses Christine Reed (forensic psychologist) and Brad Lollar (trial counsel) testified. (RR4-Habeas.25-151). Harris filed a motion requesting that all proceedings be conducted on the record, noting that substantive legal arguments were made through email without being preserved for review by the TCCA or federal courts. (CR-Habeas.1538-1542).

24. On June 1, 2018, Harris's witness Dr. Courtney Robinson (education expert) testified. (RR5-Habeas.5-71). The trial court granted Harris's request to conduct MRI and bone lead testing. (CR-Habeas.1542-1543; RR5-Habeas.73).

25. On July 16, 2018, Harris's witness Joan Mayfield (neuropsychologist) (RR6-Habeas.10-69) and State's witnesses Jed Falkowski (neuropsychologist) and Brad Lollar (RR6-Habeas.70-167) testified.

26. On September 10, 2018, Harris's witnesses Sovine and Antoinette McGarrahan (neuropsychologist) (RR7-Habeas.10-140) and State's witness Mike Howard (trial counsel) (RR7-Habeas.144-191) testified. Harris filed an affidavit of gang expert John Hagedorn, which was withdrawn because of lack of redaction. (CR-Habeas.1860-1878)

27. On September 11, 2018, State's witness Doug Parks testified. (RR8-Habeas.10-95). On September 12, 2018, Harris's witness Richard Burr (IAC expert)

testified (RR9-Habeas.6-15, 69-140), as did State's witness Brendan Ross (mitigation specialist) (RR9-Habeas.16-63).

28.     On September 19, 2018, Harris refiled a redacted copy of gang expert John Hagedorn's affidavit. (CR-Habeas.2357-2371). On November 16, 2018, the State filed an affidavit from Assistant District Attorney Justin Lord opinion about cross-examination of John Hagedorn had he testified at trial. (CR-Habeas.2643-2660). The State also filed a motion to close evidence and for the parties to submit proposed FFCL. (CR-Habeas.2732-2734). Harris responded to the motion on November 19, 2018, and moved for an order that evidence remain open to allow MRI testing and submit an affidavit analyzing the results and the parties submit proposed FFCL no later than January 18, 2019. (CR-Habeas.2736-2743). The response admitted the existence of barriers to conducting bone lead testing that made it difficult to estimate when it could be completed. (CR-Habeas.2739). On November 26, 2018, the trial court denied the State's motion to close evidence, granted Harris's cross-motion to leave evidence open, and did not impose deadlines. (CR-Habeas.2744).

29.     On November 30, 2018, the State filed a motion asking the trial court to withdraw its prior order granting bone lead testing. (CR-Habeas.2748-2750). Harris filed an opposition on December 4, 2018, explaining that although they were unable to arrange bone lead testing, bone lead testing on his mother Pamela Maddox showed bone lead concentration 30% higher than the average predicted concentration for a person her age. (CR-Habeas.2752-2755).

30.    On January 23, 2019, the State filed notice that Judge Fargo—who had presided over the habeas proceeding and evidentiary hearing—joined the Dallas County DA's Office and would be screened from the case. (CR-Habeas.2761-2762). Judge Chika Anyiam began presiding.

31.    On June 12, 2019, Harris submitted additional evidence (CR-Habeas.2763-2854) per the November 26, 2018, order: Dr. Lewine's Neuroscientific Report on Quantitative MRI Volumetrics and Diffusion Tensor Imaging (CR-Habeas.2766-2793); Dr. Wu's Imaging Clinical Correlation Report, Quantitative Volumetric Analysis, and Diffusion Tensor Imagine Analysis (CR-Habeas.2795-2828); and a rebuttal affidavit from Dr. Davies. (CR-Habeas.2830-2854).

32.    On July 11, 2019, the State filed a motion for access to the MRI testing data. (CR-Habeas.2861-2863) and a motion to strike the bone lead test results for Ms. Maddox and the affidavit of Dr. Davies, arguing that the evidence contravened the November 26, 2018 order specifying issues on which additional evidence could be submitted. (CR-Habeas.2865-2869). On July 19, 2019, before Harris filed a response, the trial court: (1) granted the State's motion to strike the bone lead test results for Pamela Maddox and the affidavit of Dr. Davies, (2) denied the State's motion for access to the MRI testing data, (3) ordered Harris to file evidence related to the MRI testing by July 26, 2019, (4) ordered the State to submit rebuttal evidence within 45 days of July 26, 2019, and (5) ordered the parties to submit proposed FFCL within 30 days of July 26, 2019 if Harris did not submit additional evidence or within 30 days of the submission of rebuttal evidence by the State. (CR-Habeas.2885-2886). On July

22, 2019, Harris filed an opposition to the State's motion to strike evidence. (CR-Habeas.2887-2891).

33.    On August 23, 2019, the State filed a motion to reset the deadlines in the July 26, 2019 order, alleging it was unaware of the order until August 22, 2019 because it was sealed and not available on the public docket. (CR-Habeas.2892-2895). On August 26, 2019, the court ordered the State to submit rebuttal evidence by September 16, 2019 and for the parties to submit proposed FFCL by October 16, 2019. (CR-Habeas.2900).

34.    On September 16, 2019, the State filed an affidavit by Dr. Joshua Shimony, neuroradiologist at Washington University School of Medicine, as rebuttal evidence to Harris's MRI-related evidence. (CR-Habeas.2901-3030).

35.    On October 23, 2019, the parties filed proposed FFCL. (State's FFCL at CR-Habeas.3038-3162, Harris's FFCL at 3163-3402). On March 3, 2020, the court issued an order noting that Harris's proposed FFCL contained references to evidence that was either stricken that Court stated it would not consider unless relied upon by other experts, specifying the affidavits or reports of Dr. Natalie Brown, Julian Davies, Ferne Commings, Charles Rotramel, Shirley Cook, Lisa Escobedo, Michael Harris, Ramon Maddox, Sr., Ramon Maddox, Jr., Eric Propes, Kenneth Propes, and Willie Propes. (CR-Habeas.3403). The trial court gave Harris two weeks to file new proposed FFCL not exceeding 150 pages. (CR-Habeas.3403).

36.    On March 16, 2020, Harris filed revised proposed FFCL. (CR-Habeas.3407-3572). On March 17, 2020, Harris filed a response to the trial court's

order asserting that it eliminated substantial references to the affidavits referenced by the court and requested that the court consider the original proposed FFCL and the identified affidavits. (CR-Habeas.3573-3585). Harris argued that his experts relied on the affidavits identified and the court should consider them independently notwithstanding that because affidavits are admissible in habeas corpus hearings and the State was free to call the witnesses at the hearing for cross-examination. (CR-Habeas.3575-3581).

37.    On March 31, 2020, the convicting court signed the Findings of Fact and Conclusions of Law ("FFCL") that almost verbatim copy the State's proposed findings, recommending that relief be denied. (CR-Habeas.3586-3734) (App.0009-0157).

38.    On October 8, 2020, Harris filed objections to the FFCL in the TCCA. Objections to the Trial Court's (FFCL), *Harris*, No. WR-80,923-01 (Tex.Crim.App. Oct. 8, 2020). Harris argued that he was denied due process because: (1) the trial court denied a continuance of the hearing to permit counsel to prepare, which caused counsel to rely upon affidavit testimony that the court refused to consider was thus unable to present expert and lay testimony about FASD and its impact on his life and the crime; and to develop expert testimony about whether trial counsel met the standard of care in death penalty trial representation based on an independent review of the record; to present mitigating facts and expert testimony regarding his difficult life circumstances, *id*. at 7-8; (2) the trial court refused to permit Harris to present evidence he had been sexually molested by his stepfather as a father, *id*. at 9-14; (3) the judge who adjudicated the facts did not hear the evidence, including oral

testimony, *id*. at 14-15; (4) the trial court adopted the State's proposed FFCL verbatim, *id*. at 15-16; (5) the judge did not read the State's proposed FFCL before adopting them because they contain the same citation and typographical errors as the proposed FFCL and substantive inaccuracies, *id*. at 16-23; and (6) the trial court refused to consider relevant testing and expert opinion absent justification or explanation, *id*. at 23-25.

39.     Harris also objected that the FFCL regarding his *Strickland* allegations were erroneous because the FFCL: (1) did not identify the professional standards of competency by which trial counsel's performance was to be measured, *id*. at 26-29; (2) applied an erroneous standard of "outrageousness" for determining deficiency, *id*. at 30-31; (3) applied an erroneous standard for prejudice by requiring a showing of a preponderance of the evidence, *id*. at 31-33; (4) concluded that trial counsel could not be ineffective for failing to act on information related to Harris's mother consumption of alcohol during pregnancy, *id*. at 33-41; (5) failed to consider evidence related to trial counsel's knowledge of Harris's childhood exposure to lead, *id*. at 41-49; (6) concluded that trial counsel were not deficient for failing to develop a social history based on trial counsel's assertions they were concerned about the risk that damaging information could be discovered from the expert's files or the expert could not testify because of hearsay objections and developing a social history of the client is not the standard of care, *id*. at 49-53; (7) failed to consider evidence related to the effects of systemic racism on Harris, including the school-to-prison pipeline, *id*. at 53-58; (8) relied on trial counsel's ad hoc rationalizations for failing to consult a gang expert

and applying an erroneous prejudice standard, *id*. at 58-65; (9) credited trial counsel's justifications for not objecting to testimony regarding Harris's wearing of a stun belt, *id*. at 65-71; and (10) concluded Harris was not prejudiced by trial counsel's failure to object to the admission of various evidence at during the guilt/innocence phase, *id*. at 71-73.

40.    On December 16, 2020, the TCCA adopted the FFCL and denied relief. *Ex parte Harris*, No. WR-80,923-01, 2020 Tex.Crim.App.Unpub.LEXIS 590 (Tex.Crim.App. Dec. 16, 2020) (per curium) (App.0004-0008). The TCCA expressly adopted the FFCL, making them the relevant state court decision for the relitigation bar of 28 U.S.C. § 2254(d).

41.    On June 28, 2021, Harris filed a petition for writ of certiorari, which was denied on November 1, 2021. *Harris v. Texas*, No. 20-8462, 2021 U.S.LEXIS 5350 (U.S. 2021).

## VII.   General Facts
### 1.   Guilt/Innocence Phase

42.    On March 17, 2009, Harris shot and killed Alfredo Gallardo while robbing Alfredo and his family. Harris was tried only for the death of Alfredo, but he also shot and killed Alfredo's brother, Carlos Gallardo. Three members of the Gallardo family described how Harris entered their home, held them at gunpoint, and tried to rob them before struggling with Alfredo and Carlos, during which both were shot and killed. (RR58.37-151). Alfredo's son, Omar Gallardo, fled and notified a security guard, who called the police. (RR58.27-37). Officers from the Dallas Police Department arrived as Harris exited the Gallardo home. Several officers testified

about the apprehension of Harris. (RR58.151-241; RR59.8-48, 146-159). Police officers, crime scene technicians, and lab analysts testified about the collection and analysis of evidence found at the scene. (RR59.49-103, 127-145, 159-261; RR60.52-75). Medical examiners testified about the wounds and causes of death for Alfredo and Carlos. (RR59.261-302).

43.    The defense presented one witness, recalling Alfredo's daughter Yahaira Gallardo, who testified that her father was wearing a white T-shirt when he was shot. (RR60.69-81).

### 2. Punishment Phase

44.    The State presented evidence of extraneous offenses Harris allegedly committed during middle and high school (RR62.27-38, 72-93), as a juvenile in Atlanta (RR62.94-118), and juvenile and young adult in the Dallas area. (RR62.119-225; RR63.125-136). The State then presented evidence of Harris's previous affiliation with a street gang. (RR62.43-70). The State also accused Harris of committing an armed robbery on February 15, 2009 (RR62. 229-273; RR63.11-125), and a robbery-murder on March 3, 2009 (RR63.137-316; RR64.24-118).

45.    The defense case consisted of three parts: first, trial counsel sought to undermine a witness's photographic identification of Harris as the shooter in the unsolved armed robbery from February 15, 2009. (RR64.155-215). Second, counsel presented testimony from Harris's mother Pamela Maddox, stepfather Ramon Maddox, Sr., half-brother Ramon Maddox, Jr., and maternal cousin Shamy Conley about Harris's upbringing, childhood, learning disability, and drug use. (RR64.215-293; RR65.29-63, 70-118). Third, experts testified about prison conditions (RR65.170-

92), risk factors for delinquent behavior (RR65.152-170), Harris's drug addictions (RR65.119-146), and TDCJ's inmate classification system (RR65.193-233).

46.     The State presented rebuttal evidence about Harris's behavior at the Dallas County Jail (RR65.261-84) and the impact of Alfredo's death on his family (RR65.285-295, 308-316). An investigator with the Dallas County DA's Office testified about phone calls made by Harris while incarcerated. (RR65.295-308; RR66.10-23).

## VIII.  Grounds for Relief

1.  <u>Ground 1</u>: **The state court's decisions that Harris did not receive ineffective assistance of trial counsel because trial counsel failed to investigate evidence that Harris: (1) suffers from Fetal Alcohol Spectrum Disorders; and (2) was exposed to toxic levels of lead in utero and as a child were: (i) contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; and (ii) based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding (State Habeas Claims 1-A & 1-B)**

### A.  Layout of this Ground

47.     Because the FASD and related Alcohol-Related Neurodevelopmental Disorder ("ARND") arise from Harris's exposure to alcohol while in-utero, Harris combines these the facts and arguments in this Ground.  Further, as discussed below, Harris's exposure to lead in utero and as a child not only exposed him to the dangerous neurotoxin, but when combined with his FASD and ARND and neurotoxins in cigarettes while in-utero, a multiplying effect of injuries from exposure to these dangerous neurotoxins occurred.  This multiplying effect is further explained by Dr. Dydek, who testified about this during the state habeas hearing and also as explained in his attached declaration. (App.0158-0163). And, because the issues of FASD/ARND and lead were part of Claim 1 below, to avoid confusion and repeated

arguments, Harris combines the FASD/ARND and lead issues in this Ground as Grounds 1A and 1B.

48.     Harris begins by stating the relevant facts supporting this Ground, including citing relevant parts of the FFCL, followed by evidence presented during the habeas proceeding. Second, Harris provides the relevant standards under 28 U.S.C. § 2254(d) and for IAC under *Strickland*. Third, Harris argues that because due process prevents the relitigation bar of 28 U.S.C. § 2254(d) from applying, the state court adjudication of Harris's application resulted in a decision that violated due process.

49.     Then, Harris argues the exceptions to the relitigation bar under §2254(d)(1) & (2), that the state court decision misconstrued the nature of the claim, is based upon an unreasonable determination of facts in light of the evidence presented,  applied a prejudice standard that is incompatible with Strickland's prejudice prong, unreasonably discounted mitigating evidence based upon the absence of a nexus to criminal behavior, deferred "strategic" decisions by trial counsel that were not made after a thorough investigation and was based on discrete findings for each piece of mitigating evidence considered in isolation and failed to consider the effect of the totality of the mitigating evidence omitted by trial court's deficient representation as a whole.

### B.  Facts supporting this Ground
#### i.  The State Habeas Court's decision

50.     Relevant here, the TCCA denied relief on the IAC allegations on the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead.

*Harris*, 2020 Tex.Crim.App.Unpub.LEXIS 590, at *2-3. (App.0005-0006). Thus, the FFCL are the reasoned decision of the state court for purposes of 28 U.S.C. § 2254(d). *See Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018) (explaining procedure when state court decision is reasoned). The trial court adopted the State's prosecution's proposed findings almost verbatim, with three differences: (1) the trial court removed references to the court's "personal knowledge and experience;" (2) in FN9, the trial court added the sentence, "The Court acknowledges that Ms. Sovine may have had a draft of the affidavit" (CR-Habeas.3668; App.0091); and (3) the trial court combined proposed ¶¶ 88 and 89; 155 and 156; and 193 and 194. The FFCL adopted the same citation and typographical errors that appear in the State's proposed findings. *See* Objections to the Trial Court's Findings of Fact and Conclusions of Law at 16–21, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. Oct. 7, 2020). Thus, the state court "decision" regarding the *Strickland* allegations is the litigation position of the State.

51.     Regarding allegations that trial counsel failed to investigate Harris's in-utero exposure to alcohol, the state court purported to deny relief, but limited its adjudication to the failure to present evidence that Harris suffered from Alcohol-Related Neurodevelopmental Disorder ("ARND"). The state court found that trial counsel's failure to present evidence of ARND was not deficient because: (1) trial counsel's decision not to call an expert who had examined Harris was a strategy decision (CR-Habeas.3635, ¶96); (2) the ARND diagnosis primarily accounts for underlying conditions that the jury heard some evidence about (this reason conflated deficient performance with prejudice) (CR-Habeas.3656, ¶189); and (3) trial counsel's

neuropsychological expert advised them Harris had little or no cognitive impairment based on her evaluation (CR-Habeas.3656, ¶190).

52.   The state court also found that even assuming deficient performance, Harris failed to show prejudice: (1) the weight and credibility of ARND evidence, if presented at trial as presented in the state habeas proceeding, would have had diminished value because of other evidence (CR-Habeas.3658, ¶196); (2) the jury already knew Harris had a childhood diagnosis of ADHD, was in special education, had childhood mental health problems, and experienced other adverse childhood conditions (CR-Habeas.3658, ¶197); (3) the jury could have concluded that Harris's impairments related to in-utero exposure to alcohol had resolved prior to trial (CR-Habeas.3658-3659, ¶198); (4) there is no direct link between ARND and Harris's criminal behavior (CR-Habeas.3659, ¶199); and (5) the evidence would have opened the door to other damaging evidence unrelated to ARND (CR-Habeas.3659, ¶200).

53.   With respect to the allegations that trial counsel failed to investigate their client's childhood exposure to lead, the state court purported to deny relief, but limited its adjudication to their failure to present evidence that Harris was affected by toxic levels of lead. The state court held that Harris's counsel's failure to present evidence of toxic lead exposure was not deficient; however, all of the court's reasons conflated deficient performance with prejudice. The court reasoned trial counsel were not deficient because: (1) a toxicologist's opinion that Harris was likely exposed to toxic levels of lead as a child was a weak claim that would have diminished trial counsel's credibility before the jury, (CR-Habeas.3665, ¶228); (2) evidence of exposure

to toxic lead levels would have been harmful to the defense sentencing case with respect to the future dangerousness issue and was inconsistent with the defense team's theme, (CR-Habeas.3665, ¶229); (3) evidence of exposure to toxic levels of lead was "unsupported," (CR-Habeas.3666, ¶230); and (4) expert opinion evidence of exposure to toxic lead levels would have opened the door to other damaging evidence from a State's expert, (CR-Habeas.3666, ¶231).

54.     The state court found that even assuming deficient performance, Harris had not shown prejudice because the expert testimony would have been that Harris more likely than not had been exposed to lead. (CR-Habeas.3666, ¶234).

55.     Finally, Harris points out that although the TCCA noted that "[S]ome of (Harris's) claims are multifarious and overlapping..." *Harris*, *id*. at *2 (App.0005), this notation has no relevance to habeas corpus applications or petitions. "Multifarious" is primarily a briefing construct, and habeas applications or petitions are pleadings, not briefs. Habeas pleadings must identify legal bases for claims, and the Application did so. *See Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000) ("Federal habeas relief cannot be had absent the allegation by a plaintiff that he or she has been deprived of some right secured to him or her by the United States Constitution or the laws of the United States."). Further, the TCCA's explicit adoption of the FFCL make them the "decision" for determining whether an exception to § 2254(d)'s relitigation bar applies and whether plenary review of the claims are necessary.

## ii. Evidence about FASD/ARND

56.     FASD is a term for several diagnoses caused by maternal consumption of alcohol during pregnancy. (CR-Habeas.142, ¶11). The mother's drinking leads to prenatal brain damage in the embryo or fetus. *Id*. FASD includes three closely related diagnoses: Fetal Alcohol Syndrome ("FAS"), Partial Fetal Alcohol Syndrome ("Partial FAS"), and Alcohol Related Neurodevelopmental Disorder (ARND). *Id*. These conditions do not vary in severity of the associated brain damage but are distinguished by variations in the external damage attributed to the disorder (*e.g.,* facial abnormalities, growth deficits). *Id*. Damage to the central nervous system can be severe regardless of the specific condition diagnosed. *Id.*; (RR3-Habeas.37-39).

57.     By the time of Harris's trial, FASD had a worldwide diagnostic history of about 40 years. (CR-Habeas.142, ¶¶12-13). Experts were qualified to diagnose the central nervous system damage to Harris as "consistent with FASD." Research and available data included (CR-Habeas.153-157, ¶30):

- 1973: FAS was first recognized in the U.S. by researchers at the University of Washington. Articles about it were published in the medical journal *Lancet*.

- 1977: the National Institute of Alcohol Abuse and Alcoholism ("NIAAA") issued an advisory that six or more drinks per day put a pregnant woman at risk of producing a child with birth defects. Later research would determine that much less exposure also could cause FASD conditions.

- 1978: FASD (then called FAS) was an integral part of a specially commissioned report to Congress—the *Third Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*—published by DHHS and the NIAAA. After more than 250 published cases, it was clear that FASD was one of several identifiable disorders associated with maternal alcohol abuse.

35

- 1979: over 600 cases of FAS had been reported worldwide. In *Fetal Alcohol Syndrome and Fetal Alcohol Effects*, Dr. Ernest Abel reported cases of FAS numerous countries in Europe, South America, Africa, and Australia and the U.S.

- 1980: Research Society on Alcoholism issued the first diagnostic guidelines for FAS with three diagnostic criteria: "A pattern of characteristic facial features, pre-postnatal deficit in height and weight, and central nervous system damage."

- 1981: DHHS and NIAAA provided more information in the *Fourth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*. The Surgeon General issued a national health advisory recommending that pregnant women or women considering pregnancy should not use alcohol because of possible harm to the child. The Surgeon General noted adverse effects "with only 1 ounce/day of absolute alcohol or 2 drinks and risk of FAS in children of heavy drinkers."

- 1982: information appeared in the fourteenth edition of the Merck Manual. Therein, the *Merck Manual* noted that "the most serious consequence [of drinking alcohol during pregnancy] is mental retardation."

- 1983: *Fifth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome* was issued and contained more information about FAS.

- 1984: updated edition of Dr. Abel's treatise, *Fetal Alcohol Syndrome and Fetal Alcohol Effects*, became one of the first medical textbooks to summarize the mechanisms and laboratory research on the effects of alcohol in laboratory animals and selected cases.

- 1985: the first nonmedical book on FAS—*A Poison Stronger Than Love* by Shkilnyk—further brought the condition to the public's attention.

- 1987: information on FAS was published in the *Sixth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*.

- 1988: the Alcoholic Beverage Labeling Act, PL 100-690, was enacted, which mandated the Surgeon General's warning label on alcoholic beverage containers.

- 1989: *The Broken Cord* by Michael Dorris was published, a book on FAS and its impact on a family. Dorris cited 165 articles and books and three videos about the dangers of drinking during pregnancy. The book was popular and is still referred to as a "classic" in FASD literature about describing the long-term behavioral and developmental effects of prenatal alcohol exposure.

- 1990: Congress received more information in the *Seventh Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*.

- 1992: the 16th edition of the *Merck Manual* included FAS, noting that it was "the leading known cause of mental retardation." It also noted the "severe behavioral effects," "varying degrees of mental retardation," and "abnormal neurobehavioral development" associated with the condition.

- 1993: DHHS/NIAAA published the *Eighth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*.

- 1995: *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention and Treatment*, edited by Kathleen Stratton, was published. This Institute of Medicine ("IOM") textbook consolidated the research and practical knowledge on FAS and provided a uniform basis for diagnosis.

- 1995: the 17th edition of the *Merck Manual* was published, which noted the behavioral effects of FAS as "varying degrees of mental retardation and abnormal neurobehavioral development."

- 1996: a publication by IOM formalized "FASD" by publishing diagnostic criteria for five conditions: FAS with confirmed prenatal exposure, FAS without confirmed prenatal exposure, Partial FAS, ARND, and Alcohol Related Birth Defects, which focused on damage to organs, limbs, and the skeleton. The CDC published results of a study led by Dr. Streissguth at the University of Washington on secondary disabilities associated with FASD, which focused on the developmental trajectory of individuals with FASD. Findings included that those with FASD were at a high risk to commit crimes, abuse substances, and have mental health histories that included inappropriate sexual behaviors. Adults with FASD were at an extremely high risk of difficulty living independently. Secondary disabilities arose in the context of environmental adversity and lack of protective factors.

- 1997: *Fetal Alcohol Syndrome: A Guide for Families and Communities* by Streissguth was published by DHHS and NIAAA, which contained a developmental view of FASD and referenced the secondary disabilities study that had been published.

- 2000: DHHS/NIAAA published the *Tenth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*.

- 2001: Craig Lesley's *Storm Riders* published, which focuses on Lesley's adopted son who suffers from FASD and the condition's effects.

- 2004: CDC published a detailed diagnostic manual for FASD that quantified diagnosis and resolved ambiguities from the 1996 IOM publication.

58.     FASD was widely used as mitigating evidence at the time of Harris's trial, as multiple authors had written about its application in criminal trials. *Id*. Numerous cases had presented FASD as a relevant, mitigating factor at the punishment stage. (CR-Habeas.157-158 at ¶31, citing 23 cases decided before Harris's trial that presented FASD as mitigation evidence).

59.     Under the 2004 CDC criteria, a diagnosis of FAS requires three present factors: (1) facial abnormalities (*e.g.,* small palpebral fissures or eye slits, smooth philtrum, or groove  between the bottom of the nose and upper lip, and thin upper lip); (2) a growth deficit at any point in life; and (3) central nervous system abnormality. (CR-Habeas.143, ¶13). A central nervous system abnormality is measured structurally (neuroimaging), neurologically (seizures, gait problems), or functionally (neuropsychological testing). *Id.*

60.     If there is confirmation of prenatal exposure to alcohol, a diagnosis of Partial FAS or ARND can be reached. *Id*. Partial FAS diagnosis requires central

nervous system abnormality with one or more facial abnormality. *Id.* ARND requires only a central nervous system abnormality. *Id.* ARND involves a pattern of brain impairments associated with prenatal alcohol injuries. (RR3-Habeas.37-39).

61.    Brain damage from FASD can cause functional deficits and impaired neurocognitive functioning. (CR-Habeas.143, ¶14). Injuries include brain and neurological and include growth deficiencies, brain damage, and small height or weight. (RR3-Habeas.37-39). Basic FASD deficits are "primary disabilities" and include deficits in attention, learning, memory, language development, logical thinking, impulse inhibition, and behavior control. *Id.* Only about 10% of those with FASD have IQ scores at or below 70, and a score above 70 may mask other significant cognitive deficits that—when considered together—have a substantial negative impact on adaptive and social functioning. *Id.* This is because individuals with FASD generally perform best in structured, familiar settings where they can rely on external guidance rather than their own judgment. (CR-Habeas.143, ¶15). Thus, IQ test scores reflect performance of one with FASD in a situation that favors them, meaning a controlled, structured setting. *Id.* However, when an individual with FASD has little or no direction, adaptive deficits are exposed. *Id.* These deficits are associated with executive dysfunction, which is controlled by the prefrontal cortex of the brain. *Id.* Neuroimaging studies show that the prefrontal cortex is sensitive to the teratogenic effects of maternal alcohol use during pregnancy. *Id.*

62.    Deficits in cognitive functioning attributed to FASD often result in "secondary disabilities." (CR-Habeas.144, ¶16). Secondary disabilities arise from

interaction between neurological executive dysfunction and traumatic environmental experiences in childhood. *Id.* Those with FASD have deficits in social skills and social judgment, an executive function. *Id.* When faced with a stressful situation, those with FASD frequently react with ineffective coping responses. *Id.* These secondary disabilities reflect maladaptive coping reactions to environmental stress and usually can result in mental health disorders, school disruption, substance abuse, criminal behavior, confinement, poor work history, and struggling to live independently as an adult. *Id.* Nearly two-thirds of juveniles with FASD will commit a crime at least once in their lives. *Id.* Epidemiological studies estimate that 5% of the U.S. population are afflicted with FASD, including 16-23% of those in the criminal justice system. *Id.*

63.     Although effects of secondary disabilities can be mitigated with early intervention like developmental disabilities services, and nurturing, stable, and protective caregiving, the risk of secondary disabilities associated with FASD increases in the absence of a diagnosis early in childhood. (CR-Habeas.144, ¶17). Diagnosis of FASD is typically conducted in children prior to of puberty, which can alter facial structures and obscure abnormalities that existed. *Id.* Most children with FASD—like those with Partial FAS or ARND—do not display external manifestation of FASD nor are intellectually disabled. *Id.*

64.     Thus, many individuals "slip through the cracks" and are never diagnosed with FASD, and never receive professional intervention that could ameliorate social and adaptive deficits. *Id.* As an undiagnosed youth grows older, adults are likely to attribute poor judgment, impulse control, and decision-making to

40

willful misconduct rather than to the cognitive impairments of FASD. *Id.* Diagnosis of FASD in those over 18 becomes difficult because of the absence or destruction of educational and medical records that chronicled childhood deficits. *Id.*

65.     During the punishment phase, trial counsel elicited testimony from Harris's mother Pamela Maddox, that she drank alcohol, smoked cigarettes, and smoked marijuana during the first six weeks of her pregnancy with Harris. (RR64.222-224). Trial counsel had this information prior to trial, as mitigation investigator Ross conducted interviewed Maddox in November 2011 during which she admitted to consuming alcohol prior to discovering that she was pregnant with Harris. Ms. Maddox drank several glasses of wine on the weekends during the first six weeks of pregnancy. (CR-Habeas.314, ¶7). This was fortified wine with alcohol by volume of 13-18%. (RR3-Habeas.47). However, mothers tend to understate the alcohol they drink while pregnant due to the social stigma. (RR3-Habeas.50). There is no "safe level" of alcohol for a fetus, and the CDC and Surgeon General recommend that pregnant mothers not drink alcohol. (RR3-Habeas.50-51). She also smoked marijuana and cigarettes during this time. *Id.* She was unaware that she was pregnant until she went to the hospital with pneumonia-like symptoms. (*Id.* at ¶6).

66.     Harris was born at full-term and was a normal weight, he was "severely depressed" immediately after delivery by Cesarean section. (CR-Habeas.146, ¶21). There was fetal distress since the umbilical cord was wrapped around his neck and body, which led to decelerations in his fetal heart rate. (RR3-Habeas.51). Harris required resuscitation for about two minutes. (RR3-Habeas.51). His Apgar score (how

41

he looked at 5 minutes of age) was initially three and increased to eight after five minutes of treatment. *Id.* Apgar is a scoring method that assesses the health of newborns immediately after birth. The score is compiled from adding individual scores for the infant's respiratory effort, heart rate, skin color, response to a catheter in the nostril, and muscle tone. Scores for these factors range from zero to two points, and the scores are summed. The highest score is 10. A newborn with a score between zero and three needs immediate resuscitation. (CR-Habeas.146, ¶21). Further, pregnancy-induced hypertension was diagnosed as the etiology behind Harris's neonate distress, which can be caused by prenatal alcohol exposure. *Id.*

67.     As Dr. Davies explained, Harris did not have high risk indications of brain damage from a perinatal problem. His Apgar score was normal. The hospital course was uncomplicated.  Harris went home in a typical time frame.  He did not show the type of neurological symptoms that an infant who experienced significant brain damage due to birth asphyxia shows.  His birth measures were in the normal range.  In using a weighing process that weights potential etiologies for Harris's condition, this leaves ARND. (RR3-Habeas.51-52, 57-58, 72, 76, 92).

68.     Harris's WAIS-IV full scale score is 84 and is not in the intellectually disabled range. (RR3-Habeas.62-63). However, the sub-scores show a "significant split" of a 15-point difference between his verbal comprehension index and his perceptual reasoning index (verbal and nonverbal problem-solving skills). This gap between these domains of IQ is frequently encountered in FASD patients.  (RR3-Habeas.62-63). Further, at age two, Harris was in a car accident and suffered a facial

laceration and loss of consciousness. He was examined in the emergency room but was not admitted into the hospital.  (RR3-Habeas.52).

69.     Harris's family explained his struggles with neurodevelopmental disorders, social skill deficits, and behavioral problems, which are also reflected in his school records and arose from executive functioning problems. (CR-Habeas.147-148, ¶¶22-23). At about age seven, Harris was diagnosed with ADHD, and diagnosed with diagnosis in a 1991 psychological evaluation. (CR-Habeas.148-147,  150-151, ¶¶ 23, 27). Harris struggled with learning disabilities. (CR-Habeas.147-148, ¶¶22-23). In 1994, he was diagnosed with dysthymia, ADHD, and "developmental problems in Arithmetic, Expressive Writing, and Reading." (CR-Habeas.148-149, ¶23). In 2000, testing showed inadequate coping defenses, anxiety, and interpersonal skill deficits. (CR-Habeas.147-148, ¶22). In 2003, he was diagnosed with depression, anxiety, and ADHD. (*Id.* at ¶23). Harris's record shows deficits in executive function, mood regulation, social skills, and adaptive coping. (*Id.* at ¶¶22-23). Harris's family history from both his maternal and paternal sides show significant loading for mood disorders, bipolar disorder, and schizophrenia, and when combined with prenatal alcohol exposure, it made Harris "doubly vulnerable to have mood disorder type outcomes." (RR3-Habeas.58-59). Further, the fact that not every test score was significantly impaired does not rule out FASD because a hallmark of brain injury due to alcohol is significant variability. (RR3-Habeas.61).

70.     Further, MRI evidence explained by Dr. Lewine shows that Harris has a small cavum septum pellucidum, a cavity between the membranous leaves of the

septum pellucidum, which is the thin, triangular, vertical double membrane separating the anterior horns of the left and right lateral ventricles of the brain. This may reflect abnormal fetal brain development seen at an increased rate with traumatic brain injury. The Diffusion Tensor Imaging (DTI) data, an MRI technique that uses anisotropic diffusion to estimate the white matter (axonal) organization of the brain, showed markedly abnormal, with 25 fiber tract regions with abnormally low FA values, FA meaning the measurement used in DTI that ranges from 0—the isotropic movement of water molecules (cerebrospinal fluid)—to 1, the anisotropic movement of water molecules (fiber bundles). (CR-Habeas.2766-2769). And Dr. Wu's report (CR-Habeas.2795-2828) concluded that Harris's DTI scan pattern is consistent with brain abnormalities like lead exposure and traumatic brain injury. (CR-Habeas.2801).

71.     Harris's results on the Hooper Visual Orientation Test (a visual-spatial integration test) fell more than 1 standard deviation below the mean. (CR-Habeas.150, ¶25-26). His scores on testing with the Wechsler Memory Scale-4, California Verbal Learning Test, Rey Complex Figure Tests fell 1 to 2.5 standard deviations below the mean. *Id.* Harris's scores on the Wisconsin Card Sorting Test and Boston Naming Test (tests of executive function) fell 1 to 3 standard deviations below the mean. *Id.* These deficits are highly suggestive of frontal lobe brain damage, with damage also in the temporal and parietal lobes. *Id.* These neuropsychological deficits mirror deficits observed in individuals with FASD and qualify as a central nervous system abnormality required for a diagnosis of FASD. (CR-Habeas.161, ¶40).

44

Harris was also diagnosed with two neurodevelopmental disorders that occur in individuals with FASD, and such disorders typically are caused by brain damage. (CR-Habeas.159, ¶35).

72.   The lead issue will be discussed below, but as Dr. Davies explained, Harris was exposed to lead in utero and as a child.  Davies described a multiplying effect between the alcohol and lead exposure since prenatal alcohol exposure may make an infant more vulnerable to the effects of lead exposure.  (RR3-Habeas.53-54).

### iii. Evidence about lead exposure and the multiplying effect of exposure to several neurotoxins

73.   Harris was also exposed to toxic levels of lead. As Dr. Dydek concluded: (1) Harris was more likely than not exposed to excessive levels of lead in utero and as a small child; and (2) early life lead exposure can result in violent behavior in adult. (RR3-Habeas.153-154; App.0159).

74.   Exposure to lead can have many adverse health effects and can negatively affect several organ systems in the human body, including the gastrointestinal, immune, and reproductive systems, as well as the central nervous system. (CR-Habeas.176). The most significant effects of lead exposure on children are on the brain and central nervous system, which can affect the child's IQ and may lead to higher incidences of ADHD. There is often a lack of impulse control in lead-exposed children, so they tend to perform poorly in school because they cannot focus on their studies. (RR3-Habeas.133-134; App.0159).

75.   Children are far more sensitive to lead exposure than adults because children are more likely to ingest more lead than adults and the effects of lead

ingestion are more pronounced in children. Even before birth, fetuses in utero can absorb lead from the mother. Unborn children and young children do not have the same protections of the central nervous system that adults do.  The development of the central nervous system does not fully happen until somewhere between 8-10 years old. Before this time, children are more susceptible because more lead can get into the child's brain versus the same level of exposure to an adult. Children are far more likely to be playing on the floor or outside in the dirt. If there's lead contamination of the soil or if the house does, they are more likely to get it on their hands.  Further, children have more hand-to-mouth activity than adults. Children also may have nutritional deficiencies like insufficient calcium or iron in the diet, which may lead to increased lead absorption. (RR3-Habeas.134-135; CR-Habeas.175-175; App.0159-0160).

76.     One of the primary routes of exposure to lead is through the ingestion of contaminated dirt, soil, and household dust. Because children spend more time on the ground while playing or crawling, they are more likely to ingest or inhale lead particulates. Children often ingest dirt either intentionally or by placing their contaminated hands and toys in their mouths. Once a child ingests contaminated material, the absorption of lead into the blood is five-to-ten-times greater than in adults. Children are more likely to have nutritional deficits in certain minerals like iron or calcium, which facilitates greater absorption of lead. The central nervous systems of young children are not fully developed, so it is more likely that lead in the bloodstream of children will reach—and negatively affect—sensitive brain tissues.

Adults who were exposed to high levels of lead as children exhibit damage to both grey and white matter in the brain. (CR-Habeas.175-176).

77.     Lead exposure may damage the frontal lobes, parietal lobes, basal ganglia, cerebellar hemisphere, and cerebellar vermis. Lead exposure on the central nervous system may also cause low IQ and deficits in cognitive functioning and academic skills. Lead exposure may also cause higher incidences of ADHD. (CR-Habeas.176).

78.     In adults, 90-95% of lead is stored in the bone because calcium (the major constituent of bone) and lead are similar chemically, so the body cannot tell the difference. Lead may substitute for calcium in the bone. Thus, if a woman is exposed to lead in her lifetime and becomes pregnant, her fetus develops a skeleton, which is made of calcium and other minerals. In a woman who was not exposed to lead, calcium leaves her bones and into her blood stream, then into the fetus. This calcium builds the fetal bone structure. But if the woman has lead in her bones, it gets into her bloodstream then into the fetal blood supply. The lead that accumulates in the bones of adults can reenter the bloodstream through a process known as "bone resorption," which occurs during pregnancy. This is how unborn children are exposed to lead. There is no "safe level" of lead exposure. Lead has no use in the body and is a toxic substance. (RR3-Habeas.135-137; CR-Habeas.175; App.0160).

79.     In addition to causing ADHD and lack of impulse control, in-utero or childhood exposure to lead may lead to increases in delinquent and violent behavior and rates of criminality when the children become teenagers and young adults. There

are at least 24 peer-reviewed studies on this topic. Most show statistically significant associations between early lead exposure and later delinquent or violent behaviors. It is more likely than not that a child exposed to lead in-utero or as a young child has a strong risk factor for later violent, antisocial, or delinquent behavior. (RR3-Habeas.136-139; App.0160).

80.    For fifty years, the RSR Corporation ("RSR") lead smelting facility operated in West Dallas, just west of present-day Downtown Dallas. (CR-Habeas.762-763, Agency for Toxic Substances and Disease Registry ("ATSDR") Public Health Assessment). Secondary smelting operations like this recover lead from preexisting sources like batteries, cables, pipes, and other metals. The smelting facility in West Dallas primarily recovered lead from recycled automobile batteries. (CR-Habeas.814-815; EPA Superfund Record of Decision). Although the facility was originally located outside Dallas city limits, the area was annexed by Dallas in the 1950s. (CR-Habeas.764). Soon, residences, schools, and a major housing project were constructed nearby. Despite this growth, air emissions from the smelter continued without control until 1968. In 1971, the smelter was purchased by RSR. Over the next 13 years, RSR was ordered to upgrade its emissions control devices because of enforcement actions and lawsuits brought by the City of Dallas, the State of Texas, and the Texas Air Control Board. (CR-Habeas.765). A 1983 lawsuit alleged damages from the air emissions of lead, and RSR was ordered to remove and replace contaminated soil, implement a comprehensive plan for remediation, and screen children for lead blood levels. *Id*. In February 1984, RSR ceased operation of the smelter and sold it to the

Murmur Corporation. *Id.* Also in 1984, Dallas denied Murmur's application for an operating permit. Remedial work consisting of the removal of contaminated soils began in 1984 through 1985. (CR-Habeas.765). A second removal effort began in 1991 by the EPA, and in 1993, the EPA proposed listing the RSR site and surrounding area on the National Priorities List of Superfund sites. (CR-Habeas.766). Air emissions from the smelter deposited lead in the areas surrounding it, primarily in the areas north and northeast of the site. (CR-Habeas.766). Contamination also occurred because of the use of battery chips (plastic pieces of battery casings from the smelting activities) as residential fill and paving material. Slag, a toxic byproduct of the smelting operation, was also used as residential fill in the area and deposited in nearby landfills. (CR-Habeas.766).

81.    Shirley Cook, Harris's grandmother, grew up about half a mile from the RSR smelter. (CR-Habeas.303). When she was growing up in the 1940s and 1950s, there were no air pollution controls on the smelter. This caused massive emissions of lead that caused her bones to contain lead.  Ms. Cook remembers smelling the RSR plant's emissions in the air. (CR-Habeas.303-304). The emissions smelled like "tar or sulfur, something bad like that." *Id.* Physical particles from the emissions landed in the neighborhood and were visible on the windshields and hoods of cars. *Id.* Ms. Cook saw black plastic chips in the driveways of houses in the Pueblo Street neighborhood where she grew up. (RR3-Habeas.144-146; CR-Habeas.304; App.0161).

82.    Ms. Cook gave birth to Harris's mother, Pamela Maddox, in 1967. The home in which Ms. Maddox grew up in had black plastic chips that Ms. Maddox

discovered when digging in the yard. (CR-Habeas.304). The smelter operated during Ms. Maddox's childhood when she would have been most at risk of ingesting toxic levels of lead. (CR-Habeas.175-177). As a child, Ms. Maddox played in the dirt at the house. (CR-Habeas.304-305). When Ms. Cook became pregnant with Ms. Maddox in 1967, that lead would have passed on to Ms. Maddox. And it is likely that Ms. Maddox accumulated a significant amount of lead in her bones that transferred in utero to Harris. (CR-Habeas.176-178).

83.     When Ms. Maddox gave birth to Harris in 1984 at age 17, she was living in the same home. About a year after Harris's birth, Ms. Maddox and Harris moved a few houses down the street to live with Ms. Maddox's sister Sherry. (CR-Habeas.313-314). Ms. Maddox and Harris lived in public housing in Oak Cliff for a while, during which Harris visited Ms. Cook's house several times per week. (CR-Habeas.314). When Harris was about four, he and his mother moved into Ms. Cook's house where they lived for about four years. *Id.* Thus, Harris spent the first several years of his life in the area, and most of his first decade in a 14-square-mile area of West Dallas that was declared a Superfund site as explained above due to lead contamination from the smelting facility. (CR-Habeas.176-177; App.0160-0161).

84.     Lead would have been in Ms. Maddox's body when she became pregnant with Harris, and she passed it on to him. (CR-Habeas.176-177). As a young child, Harris played on the ground and in dirt at his grandmother's and mother's house, like many children. (CR-Habeas.304, 314).  Ms. Cook and Ms. Maddox recall that Harris played in the dirt and put dirt and dirty toys in his mouth. (CR-Habeas.304,

314). Soils within a half mile radius of the smelter were found to have very high levels of lead due to air emissions from the RSR smelter. (CR-Habeas.765-767). Harris and his mother caught crawdads in the ditch near their house, which they consumed. CR-Habeas.324).

85.    Harris used to play in Tipton Park, which was contaminated by lead. He attended school at Amelia Earhart Learning Center, which also was contaminated by lead.  (RR3-Habeas.144-146; App.0161). These childhood activities exposed Harris to more lead contamination. Harris therefore was exposed to lead not  only through his mother and grandmother, but also directly as a child. (CR-Habeas.314-315, 324; App.0161-0162).

86.    Harris also suffers from FASD and ARND. While pregnant with Harris, Ms. Maddox also smoked cigarettes and used marijuana. These are more risk factors for violent or criminal behavior. Other complications from the use of cigarettes are slow fetal development, and the carbon monoxide in the smoke may keep the developing baby from getting enough oxygen.  (App.0161-0162).

87.    The combination of exposure to lead, FASD/ARND, and toxins in cigarettes and marijuana may have caused a multiplying effect since these substances are very harmful to a fetus, and lead is harmful to a young child. This combined exposure may have made Harris more vulnerable to the consequences of the lead exposure. Fetal alcohol, fetal lead exposure, and fetal exposure to toxins in cigarettes affect the fetal brain. These toxic agents adversely effect the differentiation of neuroblasts, development of synapses, growth of myelin in nerve

cells, and apoptosis of neurons in the developing fetal brain. Fetal alcohol, fetal lead exposures, and maternal smoking cause a wide range of neurobehavioral problems in the child including deficits in IQ, attention problems, increase impulsivity, and deficits in executive functioning. With Harris, exposures to these toxins in utero and as a young child have been associated with increased violent and criminal behavior. Maternal alcohol consumption during pregnancy affects nearly all areas of the developing brain of a fetus. Exposure to lead and toxins in cigarettes would have affected the same areas of Harris's brain. (App.0161).

88. The exposure Harris had to these toxins before he was born and to lead for years after birth presented him with at least an additive amount of health risk. This issue should have been explored both at trial and during the habeas proceeding. It would have been helpful if I had been put in contact with the other experts, especially Dr. Davies, so that we could have discussed the issues regarding the multiplying effect that I raise in this declaration. Whether the effects of these exposures are more than additive (synergistic) is a topic of current neurobehavioral research. (App.0161-0162).

89. Like Dr. Davies, Dr. Dydek recommends that Harris be evaluated by a neuropsychologist with training and expertise in exposure of children to these multiple toxins, in utero and when young, and report on how this exposure affected his adult behavior, and specifically his violent behavior. (App.0163).

## C. Standards under 28 U.S.C. § 2254(d)

90. Under 28 U.S.C. § 2254(d), a state prisoner may not obtain relief on any claim adjudicated on the merits in state court proceedings unless the adjudication:

(1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. To determine whether the adjudication was a decision contrary to or involved an unreasonable application of clearly established Federal law as determined by this Court, a court must consider whether the "state-court decision... correctly identifie[d] the governing legal rule...[and] applie[d] it reasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 405-408 (2000); *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011) ("[u]nder § 2254(d), a (federal) habeas court must determine what arguments or theories supported or could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). "[A] legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court," which means the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.  *Carey* v. *Musladin*, 549 U.S. 70, 74, 77 (2006).

91.    In a court's assessment of whether the decision was "contrary to, or involved an unreasonable application of, clearly established federal law" under § 2254(d)(1), "the record under review" is "limited to the record that was before the state court that adjudicated the claim on the merits"; "[i]f a claim has been adjudicated on the merits by a state court," "evidence introduced in federal court has

53

no bearing on § 2254(d)(1) review." *Cullen* v. *Pinholster*, 563 U.S. 170, 180-185 (2011). However, under *Martinez* v. *Ryan*, 566 U.S. 1, 12-13 (2012), a federal habeas petitioner may establish cause to excuse a procedural default as to an ineffective assistance of counsel ("IAC") claim by showing: (1) state habeas counsel was constitutionally deficient in failing to include the claim in his first state habeas application, and (2) the underlying IAC claim is "substantial," meaning that it has "some merit." *See Trevino* v. *Thaler*, 569 U.S. 413, 428-429 (2013).

92.    A determination of a factual issue made by the state habeas court is presumed correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El* v. *Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable," and "[d]eference does not by definition preclude relief."); *Bell* v. *Cone*, 535 U.S. 685, 693 (2002) (The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.").

### D. Standards for ineffective assistance of counsel

93.    Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), to prove IAC, a petitioner must show that: (1) trial counsel's performance was deficient, which requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial

whose result is reliable. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000).

94.    To satisfy the first *Strickland* prong (deficient performance), the petitioner must show that counsel's representation "fell below an objective standard of reasonableness," which requires the petitioner to overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Wiggins v. Smith*, 539 U.S. 510, 521-523 (2003) (The first *Strickland* prong requires an objective review of the reasonableness of trial counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of trial counsel at the time); *Strickland*, 466 U.S. at 687-691; *see also Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) ("No particular set of detailed rules for trial counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.").

95.    To satisfy the second *Strickland* prong (prejudice), a petitioner must establish a reasonable probability that but-for the objectively unreasonable misconduct of trial counsel, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694 (A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding); *Wiggins*, 539 U.S. at 534.

96.    To determine whether a petitioner was prejudiced during the punishment phase of a capital trial, a court must reweigh all the evidence in

aggravation against the totality of available mitigating evidence (had trial counsel chosen a different course). *Wiggins*, 539 U.S. at 534; *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). The burden is on the petitioner to show a "reasonable probability" that the result of the punishment phase would have been different. *Wong*, 558 U.S. at 27.

97.    In considering IAC claims that the TCCA addressed on its merits, this Court considers whether the TCCA could have reasonably concluded that the complaints about trial counsel's performance failed to satisfy either *Strickland* prong. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). If the ground was not addressed on its merits, this Court's review is de novo. *Id.*; *Wiggins*, 539 U.S. at 534; *Porter v. McCollum*, 558 U.S. 30, 39 (2009) Federal habeas court must conduct de novo review of the allegedly deficient performance of trial counsel because the state habeas court failed to address the issue under *Strickland*).

### E. Because due process prevents the relitigation bar of 28 U.S.C. § 2254(d) from applying, the state court adjudication of Harris's application resulted in a decision that violated due process.

#### i. 28 U.S.C. § 2254(d)'s relitigation bar is a form of issue preclusion

98.    When Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, it introduced preclusion—a relitigation bar—into federal habeas corpus. Thirty years before in 1966, Congress amended 28 U.S.C. § 2254. 89 P.L. 710; 80 Stat. 1104. Section 2254(a) of the 1966 version limited federal courts to considering habeas applications from persons confined under state court judgments "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States..." Two extant paragraphs regarding exhaustion

formerly comprising all of § 2254 were renumbered (b) and (c). Section 2254(d) was created for the first time in 1966 and introduced an evidentiary presumption of correctness for state court fact-findings. It provided that "a determination after a hearing on the merits of a factual issue...evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct," unless it "appeared" that one of various circumstances existed calling into question the reliability of the state court fact-finding. If none of these circumstances existed, the petitioner had a burden to establish by convincing evidence at an evidentiary hearing that the state court's factual determination was erroneous. The 2254(d) added in 1966 was interpreted as "mandating deference" to state-court fact-findings. *See Greene v. Georgia*, 519 U.S. 145, 146 (1996); *Parker v. Dugger*, 498 U.S. 308, 320 (1991).

99.    The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials'..." *Bell*, 535 U.S. at 693. Congress intended the AEDPA to further goals of comity between state and federal courts, finality of criminal judgments, and federalism. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). The AEDPA "redesignated" subsection (d)—the "deference" provision—as subsection (e) and amended it to its present form. It also inserted the provision at subsection (d), which with two exceptions discussed below, prevents a federal court from granting habeas relief on a claim that was adjudicated on the merits by the state court regardless of the claim's merit. Thus, through § 2254(d), the AEDPA introduced preclusion for the first time based on a prior state court

adjudication. *Greene v. Fisher*, 565 U.S. 34, 39 (2011) (describing § 2254(d) as a "relitigation bar"); *Harrington*, 562 U.S. at 98-100 (same); *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc) (same).

100.    The relitigation bar of § 2254(d) is like issue preclusion, which prevents relitigation of an issue of fact or law in a different case involving a party to the prior case if the prior court decided the issue as necessary to its judgment. *Montana v. United States*, 440 U.S. 147, 153 (1979). Issue preclusion does not apply if the issues apply different legal standards. *RecoverEdge L.P. v. Pentecost, et al.*, 44 F.3d 1284, 1291 (5th Cir. 1995). Issue preclusion applies only if: (1) the issue is identical to one decided in the prior action; (2) the issue was litigated in the prior action; (3) resolution of the issue was essential to a final judgment in the prior action; and (4) the party against whom preclusion is invoked had a full-and-fair opportunity to litigate the issue in the prior action. *Johnson v. United States*, 576 F.2d 606, 611-615 (5th Cir. 1978); *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001). Issue preclusion does not apply to state-court adjudications "where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Allen v. McCurry*, 449 U.S. 90, 100 (1980). Thus, a party who had a fair-and-full opportunity to prove a claim and failed should not be permitted to go to trial on the merits of that claim a second time unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a case. *Johnson*, 576 F.2d at 614; *see Montana*, 440 U.S. at 164

n.11 ("[R]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation).

101.   The AEPDA includes two exceptions to the relitigation bar: Per 2254(d)(1), the bar does not apply if the state court adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Per 2254(d)(2), the bar does not apply if the state court adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. These exceptions "allow[] habeas petitioners to avoid the bar to habeas relief imposed with respect to federal claims adjudicated on the merits in state court." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). They "do[] not repeal the command of § 2254(a) that habeas relief may be afforded to a state prisoner 'only on the ground' that his custody violates federal law." *Id*. at 5-6. If the bar does not apply, or if an exception to it is present, the federal habeas applicant still must show an entitlement to relief, *i.e.*, demonstrate that he is in custody in violation of federal law. 28 U.S.C. § 2241(c)(3); *see Langley*, 926 F.3d at 156 ("Overcoming AEDPA's relitigation bar is necessary but not sufficient to win habeas relief.").

102.   28 U.S.C. § 2254(d) requires a threshold procedural inquiry that—where applicable—enforces a prior state court adjudication on the same issue or claim by stripping the federal court of power to grant relief. Thus, when a court undertakes a § 2254(d) analysis, it is not reviewing the merit of the claim but is making a

procedural inquiry about whether preclusion will be applied to foreclose or render moot federal review of the claim.

### ii. The due process clause limits a federal court's power to apply preclusion

103.    Although preclusion is a doctrine that protects important interests like the finality of judgments, federalism, and comity between courts, there are constitutional limits on a court's power to apply it. When a court applies preclusion based on a prior adjudication, the prior adjudication's judgment is being enforced against the party without regard to the merit of the underlying claims or defenses. The due process clause places constraints on a federal court's power to apply preclusion based upon the procedural reliability of the prior judgment being enforced by the court. The Supreme Court has recognized that it violates due process under the Fifth and Fourteenth Amendments for a court to apply preclusion and enforce a prior judgment against a litigant if doing so would be fundamentally unfair. *Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("[W]hen the judgment of a [] court, ascribing to the judgment of another court the binding force and effect of res judicata, is challenged for want of due process it becomes the duty of [the Supreme] Court to examine the course of procedure in both litigations to ascertain whether the litigant whose rights have thus been adjudicated has been afforded such notice and opportunity to be heard as are requisite to the due process which the Constitution prescribes"). *See Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 797 (1996) (Alabama court's application of preclusion violated federal due process clause); *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (application preclusion is

subject to the due process clause); *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (the federal common law of preclusion is subject to due process limitations); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481 (1982) (prior state court adjudication must comport with due process in order for federal court to apply preclusion). The Supreme Court has consistently rejected "extreme applications of the doctrine" that are "inconsistent with a federal right that is 'fundamental in character.'" *Richards*, 517 U.S. at 797.

104.   Because § 2254(d)'s relitigation bar is a preclusion provision, it is subject to these constitutional limitations. Where the prior state adjudication failed to comport with due process, it violates due process for A federal court to apply preclusion and enforce the constitutionally defective judgment against the petitioner to deny plenary federal review.

### iii. The state court adjudication of Harris's application resulted in a decision obtained in violation of due process

105.   Judicial adjudications of rights must comport with due process. This includes postconviction proceedings even though "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). While a "state...has more flexibility in deciding what procedures are needed in the context of postconviction relief," *id.* at 69, due process requires that prisoners be afforded certain procedural rights in postconviction procedures that implicate protected liberty interests. When a court adjudicates rights, the relevant question is never *whether* process is due, but *what* process is due. "[T]here is no higher duty of a court,

61

under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law," *Harris v. Nelson*, 394 U.S. 286, 292 (1969). A state court adjudicating a habeas claim must at minimum afford the applicant fundamental due process. *Osborne*, 557 U.S. at 67-69.

106.    The process due an applicant in a state habeas proceeding is higher than in *Osborne*. In *Osborne*, the Court addressed the process owed to a prisoner who invoked a state postconviction statute bestowing a right to relief from his criminal judgment if he could prove his innocence by clear and convincing, newly discovered evidence. This statute created a protected liberty interest. *Id*. at 68. The Court held that in the context of a state statute providing a postconviction right to relief that did not implicate the fairness of the trial, due process would not be violated unless the state procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or "transgresses any recognized principle of fundamental fairness in operation." *Id*. at 69. The Court reasoned that given "a valid conviction" that constitutionally deprived the prisoner of his liberty interest, the state had more flexibility in deciding what procedures were adequate than it would in a criminal trial. *Id*. In *Osborne*, however, the validity of the prisoner's conviction or lawfulness of his custody was not being challenged in the proceeding.

62

107.    Although states have no constitutional obligation to provide an avenue for collaterally challenging a criminal judgment, state statutes that provide for such relief create liberty, and in capital cases, life interests that are entitled to the procedural protections of the Fourteenth Amendment's due process clause. *Id*. "[T]here can be no doubt that at a minimum [the due process clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

### iv. The habeas corpus framework in Texas

108.    In Texas, habeas corpus in capital cases are governed only by Tex. Code Crim. Proc. Art. 11.071. *Ex parte Davis*, 947 S.W.2d 216, 222 (Tex.Crim.App. 1996). In Texas, the proceeding is criminal in nature but collateral, so it is the applicant who must file an application and has the burden of proof to establish the unlawfulness of his confinement. *See Ex parte Rieck*, 144 S.W.3d 510, 516 (Tex.Crim.App. 2004). Habeas proceedings in Texas are original to the TCCA, but the statute directs that the application be filed in the convicting court since the TCCA does not hear evidence, and most habeas applications raise claims that require the resolution of disputed factual allegations. Tex. Code Crim. Proc. Art. 11.071 § 4; *see Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues.").

109.    When an application is filed, the State must answer it, but assertions not admitted by the State are deemed denied. Tex. Code Crim. Proc. Art. 11.071 § 7(a) & (b). Then based on the application and the State's answer, the trial court

63

determines "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist." Tex. Code Crim. Proc. Art. 11.071 § 8(a). The court "shall issue a written order of the determination." *Id.* When the State denies allegations, the factual issues are "controverted." *Ex Parte Carnes*, 579 S.W.2d 249, 250 (Tex.Crim.App. 1979).

110.    Tex. Code Crim. Proc. Art. 11.071 § 8 ("Findings of Fact without Evidentiary Hearing") governs proceedings where the court determines that no material fact disputes exist, so the trial court's FFCL are based on the pleadings and as a matter of law. Tex. Code Crim. Proc. Art. 11.071 § 9 ("Hearing") governs proceedings where the trial court determines that controverted factual issues material to the legality of confinement exist. An order designating issues (ODI) must designate issues of fact that must be resolved and the manner by which they will be resolved. The statute authorizes affidavits, depositions, interrogatories, and evidentiary hearings. The Texas Rules of Evidence apply. Tex. Code Crim. Proc. Art. 11.071 § 10. A transcript must be prepared, and the court must order the parties to file proposed FFCL no later than 30 days after the transcript is filed. Tex. Code Crim. Proc. Art. 11.071 § 9(d)-(e). The court must make written FFCL that are necessary to resolve controverted facts and conclusions of law based on the fact-findings. The trial court's FFCL are transmitted to the TCCA with the rest of the record. The TCCA decides the case, often adopting the FFCL.

111.    Harris does not facially challenge Article 11.071 because on its face, it allows a proceeding that comports with due process: it provides notice of whether the

court will adjudicate facts, what fact questions the court intends to adjudicate, and how it will admit evidence to adjudicate the facts. The state court in Harris's case, however, did not adhere to these procedures and deprived Harris of a meaningful opportunity be heard.

### v. Harris was deprived of notice and a meaningful opportunity to be heard in the state court proceeding

112.   The state court's adjudication of Harris's application was not adequate for reaching correct results and violated due process because: (1) the state court appointed a state public defender agency—OCFW—that admitted it lacked the capacity to prepare and conduct the evidentiary hearing when the trial court set it, then the court refused to permit pro bono cocounsel an opportunity to adequately prepare for it; (2) the state court failed to provide sufficient notice of the manner by which it would receive evidence and arbitrarily excluded written testimony proffered by Harris; (3) the trial judge who signed the FFCL was not the judge who heard the live testimony; and (4) the state trial judge who did not hear any live testimony adopted the State's proposed FFCL almost verbatim, with only immaterial changes. Because application of § 2254(d)'s relitigation bar gives preclusive effect to a state court adjudication in which Harris's right to a meaningful opportunity to be heard was violated, its application violates due process in this case.

113.   First, the state trial court denied a continuance to permit pro bono counsel Kilpatrick Townsend sufficient time to prepare to conduct the evidentiary hearing, depriving Harris of his right to competent counsel in the proceeding in violation of due process. In 2012, the state court appointed OCFW to represent Harris

in the proceeding. Harris's Application was filed by OCFW on June 11, 2014 and was signed by Sam Farina-Henry and Ryan Kent, neither of whom were with OCFW as the hearing approached. (CR-Habeas.17-137; 138-499; 504-1058). The Application was pending for almost four years before the start of the hearing on May 29, 2018 (RR2-Habeas). In November 2017, the district court began exploring timing for setting the evidentiary hearing. OCFW Director Wolff informed the court that his office had recently lost 25% of its attorneys, including lead counsel for Harris, Jeremy Schepers. Emergency Motion to Stay Lower Court Proceedings at 8, *Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018). OCFW then had nobody on staff who had read the trial record or had familiarity with the habeas case. *Id*. at 9. Because of its caseload and staffing levels, OCFW could not reassign the case to another lawyer. *Id*. Wolff conveyed that he was seeking private pro bono counsel as cocounsel. *Id*.

114.   An audit of the OCFW published by the National Association for Public Defense on April 30, 2018—about the time that Wolff announced that his office could not continue the case without help—concluded, "The OCFW does not have adequate resources to timely meet its professional, statutory or legal responsibilities set forth by the Texas Bar's Guidelines and Standards for Texas Capital Counsel (2006), Standards for the Mitigation Function of Defense Teams in Texas Death Penalty Cases (2015), and national standards as promulgated by the American Bar Association and the National Association for Public Defense." National Association for Public Defense, Assessment of the Texas Office of Capital and Forensic Writs at 5       (April       30,       2018),       available       at

https://www.publicdefenders.us/files/2018%20Assessment%20of%20the%20Texas%2

0Office%20of%20Capital%20and%20Forensic%20Writs%20Final.pdf, last accessed

Dec. 11, 2021. The audit also found, "The workload assigned to staff is excessive, and

out of line with professional standards. The office is handling 8.5 cases per attorney

(excluding the Director), while the standard in other offices is 4 to 6 weighted cases

per attorney. There is insufficient support staff." *Id*.

115.   On December 1, 2017, the trial court held a status conference, during

which Wolff explained that it was still trying to recruit pro bono counsel to assist it

in Harris's case due recent staffing deficits. *Harris*, No. WR-80,923-01, at 10. The

trial court tentatively set a hearing for May 29, 2018. *Id*. at 11. On December 8, 2017,

the trial court held a telephonic status conference during which Wolff represented his

belief it was likely a firm will take over representation of Harris's case. *Id*.

116.   On April 5, 2018, attorney Gwendolyn Payton with Kilpatrick Townsend

moved to be admitted pro hac vice. (CR-Habeas.1266). While the motion was pending,

on April 16, 2018, Harris filed an unopposed motion to continue the evidentiary

hearing to August 14, 2018 on several grounds, including that OCFW lacked the

capacity to act as lead counsel at the hearing; an essential expert witness for Harris

was unavailable; pro bono cocounsel had preexisting scheduling conflicts that

prevented adequate preparation; and pro bono cocounsel was unavailable during that

week. (CR-Habeas.1290). Not having received a decision on the pending motions,

counsel unsuccessfully sought to schedule a hearing on the motions by contacting the

court coordinator by phone and email. On April 26, 2018, the trial court authorized

Payton's participation. (CR-Habeas.1295). On April 30, 2018, the State emailed the trial judge expressing it did not oppose the continuance motion and expressed that the parties had agreed to an alternative date of August 27, 2018. Emergency Motion to Stay Lower Court Proceedings at Exhibit I, *Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018). After receiving the State's email, the trial court denied the motion for continuance, except for permitting Harris's unavailable expert to testify at a later date.

117.    On May 1, 2018, Harris filed a motion to reconsider, alleging that OCFW could not conduct the hearing for budgetary and personnel reasons and transitioned the case to Kilpatrick Townsend, and a continuance was required to permit effective representation of Harris at the hearing by Kilpatrick Townsend. The state court denied the motion on May 4, 2018 without hearing further from the parties. (CR-Habeas.1300-1301). On May 10, 2021, Harris filed an emergency motion in the TCCA to stay the proceeding for 90 days due to the OCFW's lack of sufficient resources to effectively prepare for it. Emergency Motion to Stay Lower Court Proceedings at Exhibit I, *Harris*, No. WR-80,923-01 (Tex.Crim.App. May 10, 2018). On May 21, 2021, the TCCA denied the motion. Official Notice, *Harris*, No. WR-80,923-01 (Tex.Crim.App. May 21, 2021).

118.    On May 28, 2018, the hearing began (RR2-Habeas). No attorney from OCFW—the state office appointed to represent Harris—appeared. Payton appeared and stated that she was not prepared to conduct the evidentiary hearing because she had not had sufficient time. (RR2-Habeas.2-12). The deficient preparation by counsel

caused defects in the form in which evidence was presented, causing the court to exclude substantial evidence proffered by Harris. The trial court refused to consider written sworn testimony from Dr. Natalie Brown; Shirley Cook, Ramon Maddox, Sr., Ramon Maddox, Jr., Michael Harris, Eric Propes, Kenneth Propes, Willie Propes, and Shirley Ann Cook. The trial court ruled it would consider them only as the basis of expert opinions and not for the truth of the matters asserted. (CR-Habeas.3609-3610). Thus, Harris was deprived of due process by the denial of the competent counsel guaranteed him in the proceeding by state law.

119.    Second, the state court failed to provide sufficient notice as required by Art. 11.071 of the manner by which it would receive evidence and arbitrarily excluded written testimony proffered by Harris. In its ODI, the trial court merely identified legal issues—not factual issues—that were to be resolved and failed to specify the manner by which it would hear evidence as required by Tex. Code Crim. Proc. art. 11.071 § 9(a) ("If the convicting court determines that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist, the court shall enter an order, not later than the 20th day after the last date the state answers the application, designating the issues of fact to be resolved and the manner in which the issues shall be resolved."). The state court merely gave notice that it was designating issues "upon which it will receive evidence at a hearing to be scheduled at a date agreed to by the Court and the parties." (CR-Habeas.1110).

120.    In the FFCL adopted by the TCCA, the state court excluded from consideration certain substantive sworn testimony proffered by Harris in affidavit

69

form. Harris was given **no** notice that the state court would not admit affidavits to adjudicate disputed facts. Further, in adjudicating Harris's Application, the state court admitted some written testimony and excluded others without any principled basis for distinguishing what it admitted and what it did not. Compare CR-Habeas.3646 (considering written testimony and reports of Drs. Lewine, Wu, and Shimony) with CR-Habeas.3609-3610 (excluding sworn affidavits).

121.    Third, the judge who signed the FFCL was not the judge who heard the live testimony. Judge Fargo presided at the hearing. After the hearing, Judge Fargo lost election and Judge Anyiam assumed the bench. Despite not having heard any evidence, Judge Anyiam purported to make findings that certain testimony was credibly given. See CR-Habeas.3622 (Brad Lollar's, Doug Parks's, and Mike Howard's testimony was credible); CR-Habeas.3664 (Dr. Dydek's testimony lacks credibility); CR-Habeas.3673 (Laura Sovine's testimony not credible); CR-Habeas.3679 (Dr. Robinson's testimony not credible).

122.    These "credibility determinations" were not made by Judge Anyiam but were part of the State's wish list in the State's proposed FFCL, which Judge Anyiam adopted almost verbatim. For instance, ¶¶ 222-223 of the FFCL provide this:

(222) The trial team sought the opinion of a respected and credentialed neuropsychologist, Dr. McGarrahan, who examined Applicant and concluded he has little or no neurological impairment. (WRR8: 40-41). Dr. McGarrahan's conclusions are inconsistent with a theory that Applicant was exposed to lead as a child—or, if Applicant were exposed to lead, his neuropsychological exam as an adult shows no evidence of that exposure.

(223) Because Dr. Dydek was not provided with Dr. McGarrahan's opinion that Applicant has little or no brain impairment, Dr. Dydek's testimony, if any, suggesting Applicant may have brain damage as a result of childhood lead exposure lacks credibility.

This bare "conclusion" of McGarrahan cited in ¶222 ("WRR8: 40-41") came not from McGarrahan—who testified at the habeas hearing, but from the recollection of trial counsel, who said that he recalls that McGarrahan "tested (Harris) and told the trial team that (Harris) had very little, if any, cognitive impairment."  And these "conclusions" were based on incomplete information possessed by McGarrahan at the time she made this statement to trial counsel. McGarrahan's testimony in RR7-Habeas.60-62 provides: (1) the cognitive testing showed memory problems and there was the potential for a "brain problem"; (2) the results of Harris's cognitive testing were consistent with "a number of things that could be related to some sort of brain impairment...It could be ADHD. It could be prenatal development issues. It could be head injury..." (3) FASD could be one of the reasons for Harris's cognitive impairment; (4) when McGarrahan performed the testing, she did not know that Harris's mother had consumed alcohol during pregnancy and was denying that she drank while pregnant with Harris; (5) although McGarrahan initially reported to trial counsel that there was little cognitive impairment, she did not perform a full psychological or neurophysiological report (RR7-Habeas-95); and (6) McGarrahan was not asked to

look into lead exposure, she knew nothing about the nearby lead smelter, and she is not a toxicologist. (RR7-Habeas.71-72).

123.    The absurdity of using only McGarrahan's admittedly incomplete original opinion to discredit Dr. Dydek also ignores the MRI evidence. Dr. Lewine concluded that the DTI data and scan pattern is consistent with brain abnormalities like lead exposure and traumatic brain injury. (CR-Habeas.2801). And his neuropsychological deficits mirror deficits observed in individuals with FASD and qualify as a central nervous system abnormality required for a diagnosis of FASD. (CR-Habeas.161, ¶40). Harris was also diagnosed with two neurodevelopmental disorders that occur in individuals with FASD, and such disorders typically are caused by brain damage. (CR-Habeas.159, ¶35).

124.    A trier of fact's determination of witness credibility can be based on many factors, including the substance of the testimony, the detail and accuracy of recall of past events, whether the witness contradicts himself or herself or is contradicted by the testimony of other witnesses, how the testimony is delivered, including body language, eye contact, and whether the responses are direct or appear to be evasive, unresponsive, or incomplete. Judge Anyiam did not have the benefit of any of these factors.

125.    Fourth, the judge (Anyiam) who did not hear any of the live testimony adopted the State's proposed FFCL almost verbatim, which were adopted verbatim by the TCCA. The trial court adopted the State's proposed FFCL, with three exceptions: (1) the trial court removed references to the court's "personal knowledge

72

and experience;" (2) in FN9, the trial court added the sentence, "The Court acknowledges that Ms. Sovine may have had a draft of the affidavit" (CR-Habeas.3668; App.0091); and (3) the trial court combined proposed ¶¶ 88 and 89; 155 and 156; and 193 and 194. The FFCL adopted the same citation and typographical errors that appear in the State's proposed findings. *See* Objections to the Trial Court's Findings of Fact and Conclusions of Law at 16–21, *Ex parte Harris*, No. WR-80,923-01 (Tex.Crim.App. Oct. 7, 2020). Thus, the state court "decision" regarding the *Strickland* allegations is the litigation position of the State.

### F. The state court decision (FFCL) did not adjudicate the merits of the *Strickland* claim as it relates to the failure to investigate Harris's In-Utero Exposure to Alcohol and exposure to lead because it misconstrued the nature of the claim

126.    Trial counsel was aware pretrial that Harris's mother drank alcohol while pregnant with Harris. However, trial counsel failed to investigate the effects that this prenatal drinking had on Harris. Had trial counsel done so, they would have discovered that Harris suffers from FASD, which encompasses neurological conditions resulting from prenatal brain damage caused by maternal consumption of alcohol during pregnancy. This failure deprived the jury of significant mitigating evidence that reasonably could have influenced the verdict in Harris's punishment phase.

127.    If a claim was fairly presented to a state court, the state court decision is presumed to adjudicate its merits. *Harrington*, 562 U.S. at 99. If there is reason to think another explanation for the decision is more likely, the presumption is overcome. *Id.* at 99-100. Where a reasoned state court decision reflects that the state

court misconstrued the nature of the claim, there has not been an adjudication on the merits of the claim. *Henderson v. Cockrell*, 333 F.3d 592, 600-602 (5th Cir. 2003), *citing Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002); *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998).

128.   The state court decision here treated Harris's *Strickland* allegations related to the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead as though he was complaining about the failure to present evidence rather than a complaint about the failure to investigate these exposures. The FFCL turned on the court's assessment of trial counsel's putative decision not to **present** this evidence rather than on their failure to **investigate** the exposures.

129.   Regarding Harris's in-utero exposure to alcohol, the trial court concluded that trial counsel "were not deficient by not **presenting** a diagnosis to the jury that primarily accounts for underlying conditions" the jury heard some evidence about and were "not deficient for not **presenting** a diagnosis of ARND" when their neuropsychological expert had advised them that Harris had little cognitive impairment. (CR-Habeas.3656, ¶¶189-190) (emphasis supplied). Regarding Harris's exposure to lead, it concluded trial counsel were not "deficient for not **presenting**" evidence of lead exposure and its affects. (CR-Habeas.3666, ¶230) (emphasis supplied).

130.   Trial counsel, however, did not investigate these exposures and never retained or directed an expert to form an opinion related to the exposures. Asked whether he investigated or directed anybody to investigate FASD issues, trial counsel

answered negatively. (RR4-Habeas.136-137). Asked whether he retained a toxicologist to investigate Harris's exposure to lead, trial counsel answered negatively. (RR4-Habeas.141-142). Thus, trial counsel could not have made—and did not make—a decision not to **present** evidence they did not possess and were not aware existed.

131.    The state court did not decide whether the investigative omissions were attributable to negligence or to decisions by trial counsel. Nor did the state court decide whether decisions not to investigate the exposures—if one was made—were reasonable as required by *Strickland* and its progeny. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *see also Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994) (petition was entitled to habeas relief on his IAC claim because trial counsel's failure to investigate and interview witnesses was not reasonably professional conduct and may have prejudiced the petitioner). The standard is a "general requirement of reasonableness" of trial counsel's investigation, not "strict rules" for trial counsel's conduct. *Pinholster*, 563 U.S. at 195; *Harrington*, 562 U.S. at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."). Trial counsel's failure to hire experts in FASD and lead exposure—despite knowing about both—and instead relying on Dr. McGarrahan's initial findings despite her not knowing anything about the in-utero alcohol consumption, the extent of the lead exposure, and

her lack of expertise in both was not reasonable trial strategy and were failures to investigate issues that would have produced strong mitigation evidence.

132.   The allegations that trial counsel were deficient for failing to **investigate** the exposures—which Harris alleged were negligent omissions rather than any reasoned decision—was not adjudicated by the state court.

### G. The state court decision (FFCL) on the Strickland claim on the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is based upon an unreasonable determination of facts in light of the evidence presented

133.   The state court decision on the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is based upon an unreasonable determination of facts in several respects. First, the state court decision was based on a finding that Harris suffered from a permanent neurological condition like ARND "would have been inconsistent with the defense team's punishment theme that [Harris's] violent criminal behavior was due to his PCP-use, and such behavior would cease to be a problem in a controlled environment like prison." (CR-Habeas.3657, ¶193; App.0080). Trial counsel, however, presented evidence "inconsistent with" this theme, including that Harris's hyperactivity as a child, being abandoned, born to an emotionally distant mother, exposed to violence in the home, witnessed mental health issues, and an incarcerated father as a child were risk factors for future violence (RR66.53-54); Harris was born into a family with a history of mental illness, including schizophrenia, bipolar disorder, and depression (RR66.54); and Harris may have suffered permanent brain damage from head trauma suffered when he was two years old (RR66.47-48).

134.   A major part of mitigation case was that Harris had been neurologically and otherwise damaged as a child by forces "through no fault of his own." (RR66.51). Trial counsel argued at closing that PCP usage does not "inherently make you violent and it does not inherently make you psychotic, but when you are already predisposed to psychosis and then you add PCP, that equals violence." (RR66.55). Expert opinion testimony that Harris suffered from ARND through no fault of his own would have been compatible with—not contrary to—the defense arguments.

135.   Second, the state court decision was based on a finding that evidence showing that Harris was exposed to toxic levels of lead as a child "would have been inconsistent with the defense team's punishment theme that [Harris's] violent criminal behavior was due to his PCP use, and such behavior would cease to be a problem in a controlled environment like prison where [Harris] would not have access to the drug." (CR-Habeas.3665-3566, ¶229, App.0088). For the same reason stated above—that trial counsel's strategy was to present evidence of childhood neurological and other damage "through no fault of his own"—this finding is an unreasonable factual determination.

136.   Third, the state court decision was based on a finding that "a toxicologist's opinion that (Harris) more likely than not was exposed to toxic levels of lead as a child would have diminished [Harris's] and his trial team's credibility in front of jury" because it is "a weak claim." (CR-Habeas.3665, ¶228, App.0088). But trial counsel took a "who knows?" approach before the jury with respect to brain

damage based upon evidence that he suffered a head injury from a car wreck at age two, as counsel argued:

> Now, we did hear testimony that they didn't find any permanent damage. Who knows? I'm not saying there was, I'm not saying there wasn't. We all know the kind of medical care available to the poor and uninsured today. We all know that, so who knows?

(RR66.47). It is impossible to reconcile how testimony from a toxicology expert that Harris was exposed to toxic levels of lead as a child could be weaker than counsel's "who-knows" conjecture about brain damage from a car accident.

137.   Fourth, the state court decision was based on a finding that Dr. McGarrahan's data and notes would have had to have been disclosed if such testimony had been presented. (CR-Habeas.3659, ¶200; App.0082). This finding is unreasonable because McGarrahan's data and notes would have been required to have been provided only if she testified or if an expert who testified relied upon her data and notes. But since there would have been no requirement that trial counsel present testimony from an expert who relied upon anything McGarrahan did, it is not so that anything from McGarrahan would have had to have been disclosed. Even if trial counsel had provided a testifying expert McGarrahan's test results and raw data, they would not have needed to provide the expert her notes also. Trial counsel was free to develop and present expert opinion testimony about Harris's in-utero exposure to alcohol however they saw best, with or without Dr. McGarrahan's input.

138.   Fifth, the state court decision was based on a finding that the opinions of Dr. Davies and Dr. Mayfield regarding Harris's in-utero exposure to alcohol were influenced by confirmation bias. (CR-Habeas.3651, ¶165, App.0074). No evidence was

offered that proved or even suggested this conclusion. The State elicited testimony from Drs. McGarrahan and Falkowski about what confirmation bias was in the abstract, but neither opined that Dr. Davies's or Dr. Mayfield's opinions were affected. Further, Dr. Mayfield was specifically asked to opine only about whether Dr. McGarrahan's prior neuropsychological testing was consistent with a diagnosis of ARND. (RR6-Habeas.15). Dr. Mayfield was not asked to opine about whether Harris had ARND. (RR6-Habeas.51). Confirmation bias played no role because the test results she reviewed are either consistent with the diagnosis or they rule it out. No State expert testified that McGarrahan's test results ruled out FASD/ARND. And McGarrahan testified that FASD could be one of the reasons for Harris's cognitive impairment. (RR7-Habeas.60-62).

**H. The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is contrary to Strickland because it applied a prejudice standard that is incompatible with *Strickland*'s prejudice prong**

139. The state court decision regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is contrary to *Strickland* because it applied a prejudice standard that is incompatible with *Strickland*'s prejudice prong. The state court applied a rule that required Harris to prove a different sentencing outcome by a preponderance of the evidence: "An applicant asserting a claim of ineffective assistance of counsel has the burden to prove, **by a preponderance of the evidence**, that...the deficient performance prejudiced the defense such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (CR-Habeas.3611; App.0034)

(emphasis supplied); (CR-Habeas.3657, ¶194) (Harris "fails to demonstrate **by a preponderance of the evidence** any resulting prejudice" from deficient performance); (CR-Habeas.3657, ¶195) (emphasis supplied) (finding that the presentation of ARND evidence "would not have altered the jury's decisions in answering the special issues in the punishment phase"); (CR-Habeas.3666, ¶232) (Harris "fails to demonstrate **by a preponderance of the evidence** any resulting prejudice") (emphasis supplied).

140.    *Strickland*, however, requires showing only a reasonable probability of a different result, which is lower than a preponderance of the evidence. *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). The "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*.

141.    In *Williams v. Taylor*, 529 U.S. 362, 406-406 (2000), the Court provided an example of a state court decision contrary to clearly established federal law that supplants the "reasonable probability" standard of *Strickland* with a "preponderance of the evidence" standard: "If a state court were to reject a prisoner's claim of (IAC) (because) the prisoner had not established by a preponderance of the evidence that the result of his (trial) would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner

need only demonstrate a 'reasonable probability that...the result of the proceeding would have been different.'"). Thus, the state court decision rejecting Harris's *Strickland* claim regarding the failure to investigate his in-utero exposure to alcohol and exposure to lead was contrary to *Strickland*.

    **I.** **The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead was an unreasonable application of *Strickland* and its progeny because it unreasonably discounted mitigating evidence based upon the absence of a nexus to criminal behavior**

142.    A decision that unreasonably discounts mitigating evidence proffered in support of *Strickland* is an unreasonable application of *Strickland*. *Porter*, 558 U.S. at 43 (state court decision involved an unreasonable application of *Strickland* because the state court "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing"). A court unreasonably discounts mitigating evidence when it gives it little weight because of conflicting expert opinions, remoteness in time or the absence of a nexus to the crime, or it has aggravating components. *Id*. at 45. The state court decision regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead involved an unreasonable application of *Strickland* because it unreasonably discounted the mitigating evidence based upon the absence of a nexus to criminal behavior and the existence of conflicting expert opinions. The state court discounted mitigating evidence that Harris suffered from FASD/ARND because of allegedly conflicting expert testimony. The decision entirely discounted MRI quantitative volumetric (QV) and diffusion tensor imaging ("DTI") analyses conducted by Dr. Lewine as "not

persuasive or credible." (CR-Habeas.3649, ¶157). Such expert testimony is routinely admitted in trials, including from Dr. Lewine himself. *See, e.g., Lance Meadors v. D'Agostino*, No. 18-01007-BAJ-EWD, 2020 U.S.Dist.LEXIS 201471, at *3 (M.D.La. Oct. 29, 2020) (recognizing "clear consensus of authority" that DTI analysis is reliable and admissible expert testimony and calling defendant's attack on reliance on DTI as "simply unsupported), *citing Andrew v. Patterson Motor Freight, Inc.*, No. 6:13-CV-814, 2014 U.S.Dist.LEXIS 151234, at *9, 24-25 (W.D.La. Oct. 23, 2014) ("[i]n sum, the evidence submitted shows DTI has been tested and has a low error rate; DTI has been subject to peer review and publication; and DTI is a generally accepted method for detecting TBI"); *Roach v. Hughes*, No. 4:13-CV-00136, 2016 U.S.Dist.LEXIS 192835, at *4-7 (W.D.Ky. March 9, 2016) ("the Court finds that (the) DTI analysis is reliable. 'DTI of the brain is a proven and well-established imaging modality in the evaluation and assessment of normal and abnormal conditions of the brain.'"); *Ruppel v. Kucanin*, No. 3:08-CV-591, 2011 U.S.Dist.LEXIS 67503, at *6-14 (N.D.Ind. June 20, 2011) (Traditional MRI shows the structure of the brain and the majority of people with mild brain injury will have a normal MRI even with significant impairment. DTI is a more sensitive, three-dimensional MRI that examines the microstructure of the white matter in the brain. It can show reduction in fractional anisotropy (FA) meaning that the white matter in the brain has been damaged); *Barnett v. Natl. Contl. Ins. Co.*, No. 3:17-CV-153-JWD-EWD, 2019 U.S.Dist.LEXIS 3766, at *6, 13-14 (M.D.La. Jan. 8, 2019) (Defendants' attack on DTI is unsupported. A host of other cases have rejected Daubert challenges to the reliability of DTI); and *Ward v.*

*Carnival Corp.*, No. 17-24628-CV, 2019 U.S.Dist.LEXIS 41022, at *8 (S.D.Fla. March 14, 2019) ("[A] basic Westlaw search on the subject shows that numerous courts, facing challenges identical to the arguments set forth in Defendant's Motion, found DTI data to be reliable, helpful, and admissible.").

143.    In fact, the *D'Agostino* court found that the "[D]efendants' failure to even acknowledge this clear consensus of authority is troubling and may be justifiably deemed 'a substantial oversight; at worst, it is a violation of Defendants' duty of candor to the Court." *D'Agostino*, 2020 U.S.Dist.LEXIS 201471, at *13.

144.    The state court also entirely discounted conclusions from psychiatrist Dr. Wu that abnormalities in the QV and DTI analyses corroborated the presence of brain damage most likely due to lead toxicity, traumatic brain injury and in-utero exposure to alcohol as not "persuasive or credible." (CR-Habeas.3650, ¶159; App.0073). It also dismissed Dr. Davies's opinion that Harris suffered from ARND and Dr. Mayfield's opinion that Dr. McGarrahan's prior neuropsychological testing results was consistent with Dr. Davies's opinion as having been influenced by "confirmation bias." (CR-Habeas.3651, ¶165; App.0074).

145.    When assessing prejudice from the omitted evidence of Harris's FASD/ARND diagnosis, the state court discounted the evidence in part because, "[t]here is no direct link between ARND and [Harris's] criminal behavior." (CR-Habeas.3659, ¶199; App.0082). The absence of a "direct link" between Harris's ARND diagnosis and criminal behavior invokes the "nexus" test for constitutional relevance rejected in *Tennard v. Dretke*. 542 U.S. 274, 287-288 (2004) (In rejecting the 5th

Circuit's "nexus to crime" test, the Court explained that nothing in its prior holdings suggest that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered. Further, the Court rejected the suggestion that low-IQ evidence is not relevant mitigating evidence—and thus the *Penry* question need not even be asked—unless the defendant also establishes a nexus to the crime.). Thus, Harris's evidence may **not** be discounted on this "nexus" basis.

146.   Regarding Harris's exposure to toxic levels of lead, the state court unreasonably discounted the evidence because: (1) the expert relied on neuropsychological testing for which there were "conflicting" interpretations (CR-Habeas.3664, ¶226; App.0087); (2) there was no "medical evidence" presented in support of it; (3) it "would have been harmful to the defense punishment case in regard to the future danger special issue" (CR-Habeas.3665, ¶229, App.0088); and (4) it was a "weak claim" (*id.*, ¶¶227 & 228).

147.   In violation of established Supreme Court law, the state court unreasonably substituted its opinions about the credibility and persuasiveness of the omitted mitigating evidence—which were just the prosecution's opinions and wish list—for that of a hypothetical juror, causing it to unreasonably discount its significance on an objective factfinder. "The assessment of prejudice...should not depend on the idiosyncrasies of the particular decisionmaker." *Strickland*, 466 U.S. at 695.

**J. The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol involved an unreasonable application of *Strickland* and its progeny because it deferred "strategic" decisions by trial counsel that were not made after a thorough investigation**

148.   Clearly established Supreme Court law provides that strategic choices made "after thorough investigation of law and facts relevant to plausible options" are "virtually unchallengeable," while strategic choices made "after less than complete investigation" are reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691. The state court found that: (1) trial counsel "implemented a strategy of not having Dr. Kessner and Dr. Roache examine [Harris] in person" (CR-Habeas.3621, ¶35; App.0045); (2) "[d]etermining which witnesses to call are strategy decisions" (CR-Habeas.3622, ¶39; App.0045); (3) "[d]etermining the balance and focus of evidence between the two special issues in a death penalty case are strategy decisions" (CR-Habeas.3622, ¶40; App.0045); (4) trial counsel collectively "were qualified to formulate and execute effective trial strategies" (CR-Habeas.3622, ¶41; App.0045); (5) "[t]he decision whether to call an expert who had examined [Harris] in person is a strategy decision" (CR-Habeas.3635, ¶95; App.0058); and  "[t]he defense team's decision not to call an expert who had examined [Harris] was a strategy decision, (CR-Habeas.3635, ¶96; App.0058).

149.   Strategic decisions are presumptively unchallengeable only when supported by "thorough investigation" into the facts. *Strickland*, 466 U.S. at 690-691; *Williams*, 529 U.S. at 396 (trial counsel's failure to uncover and present mitigating evidence at sentencing could not be justified as a tactical decision to focus on

voluntary confessions because counsel had not fulfilled their obligation to conduct a thorough investigation of the defendant's background). The allegation before the state court—confirmed by testimony from trial counsel—was that no investigation into Harris's in-utero exposure to alcohol or exposure to lead occurred. Thus, decisions whether to call an expert who had personally evaluated Harris were not made after a thorough investigation. Rather, the relevant question was the reasonableness of trial counsel's decision not to investigate the exposures to in-utero alcohol and lead. The failure to keep the "focus" of the analysis on this question is an unreasonable application of *Strickland*. *See Wiggins*, 539 U.S. at 523 (trial counsel had focused on issues other than mitigation, put on a "halfhearted mitigation case," and the decision to not to introduce mitigating evidence of Wiggins's background was not reasonable).

150.    Thus, the only explanation for the state court's failure to focus on the reasonableness of the lack of investigation is because the court misconstrued the claim and adjudicated only the counterfactual whether trial counsel **would have been** deficient for making a strategic decision not to present the information if they had known it.

> **K. The state court decision (FFCL) on the *Strickland* claim regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead is contrary to or involved an unreasonable application of *Strickland* because the decision concluding that there was no prejudice was based on discrete findings for each piece of mitigating evidence considered in isolation and failed to consider the effect of the totality of the mitigating evidence omitted by trial court's deficient representation as a whole**

151.    It is clearly established Supreme Court law that when analyzing a *Strickland* claim, an attorney's errors are to be considered individually and

collectively for prejudice. *Strickland*, 466 U.S. at 696 ("Taking the unaffected findings [of the jury] as a given and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). *See Kyles v. Whitley,* 514 U.S. 419, 434, 436 (1995) (considering the cumulative effect of errors in the *Brady* context in which the *Strickland* standard for prejudice—though not the *Strickland* test ineffective assistance—was applied); *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (considering the combined effect of trial counsel's omissions); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of [counsel's] performance . . . before considering whether [petitioner] was cumulatively prejudiced thereby); *e.g.*, *Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020), *cert. denied*, 141 S.Ct. 2507 (2021) ("Where...the record shows more than one instance of deficient performance, the Sixth Amendment [and *Strickland*] requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings.").

152. Further, the "cumulative error rule" of the Fifth Circuit is satisfied: a federal habeas petitioner must show that: (1) errors occurred during the state trial court proceeding, (2) the errors are not procedurally barred, (3) the errors rise to the level of constitutional deprivations, and (4) the entire record reveals that an unfair trial resulted from those errors. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996). Harris has shown that: (1) significant errors occurred during the state trial court

proceeding regarding the failure to investigate Harris's in-utero exposure to alcohol and exposure to lead; (2) the errors are not procedurally barred, (3) the errors are constitutional deprivations under the Sixth Amendment and Strickland, and (4) the entire record shows an unfair sentencing trial resulted from the errors since by far the strongest mitigation evidence was Harris's exposure to these dangerous toxins while in-utero and as a young child through no fault of his own.

153.    The state court decision assessed prejudice only as to each piece of evidence alleged to have been omitted by trial counsel's deficient performance in isolation. It did not ever consider—*arguendo* or otherwise, the combined effect of trial counsel's investigative omissions regarding Harris's in-utero exposure to alcohol and childhood exposure to lead. There is no state court decision regarding this question to which a federal court can defer, and the Court must undertake the inquiry de novo. *Myers*, 975 F.3d at 624 ("where the state habeas court has not conducted a cumulative prejudice analysis [with respect to *Strickland* allegations], we must undertake the inquiry on our own in the first instance"); *see also, e.g.*, *Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018) *cert. denied*, 139 S.Ct. 595 (2018) (the state court decision was "unreasonable under *Strickland* because the state court failed to analyze the aggregate prejudice" from counsel's failure to object to prosecution's improper comments).

### L. Conclusion

154.    The state court's decisions that Harris did not receive IAC because trial counsel failed to investigate evidence that Harris: (1) suffers from FASD/ARND; and (2) was exposed to toxic levels of lead in utero and as a child were: (i) contrary to or

involved an unreasonable application of clearly established federal law as determined by the Supreme Court; and (ii) based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding. First, the relitigation bar of 28 U.S.C. § 2254(d) violates due process. Beyond the relitigation bar, when applying the exceptions to the bar under §2254(d)(1) & (2), the state court decision misconstrued the nature of the claim, is based upon an unreasonable determination of facts in light of the evidence presented,   applied a prejudice standard that is incompatible with Strickland's prejudice prong, unreasonably discounted mitigating evidence based upon the absence of a nexus to criminal behavior, deferred "strategic" decisions by trial counsel that were not made after a thorough investigation and was based on discrete findings for each piece of mitigating evidence considered in isolation and failed to consider the effect of the totality of the mitigating evidence omitted by trial court's deficient representation as a whole.  Harris asks this Court to grant the petition, reverse the Judgment and death sentence,  and remand the case back to the trial court for a new trial.

2. <u>Ground 2</u>: **The state court's decision that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was: (i) contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; and (ii) based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding (State Habeas Claim 3)**

A. **Facts relevant to this Ground**

i. **Testimony about the stun-belt during the trial**

155.   During the punishment phase, the State called Deputy Moorehead with the Dallas County Sheriff's Department, who was a bailiff during trial. (RR65.234). The State asked Moorehead to identify two drawings Harris made during voir dire, which were entered into evidence. (RR65.234-235; RR67.SX-164-165). During cross-examination, trial counsel elicited testimony from Deputy Moorehead establishing that he spent significant time with Harris during the 12 weeks of voir dire and Harris did not cause any trouble and was respectful. (RR65.237).

156.   After asking Moorehead questions about the drawings (RR65.238-240), trial counsel asked Moorehead to "[g]o ahead and tell them (the jury) about the elevator incident. This is when were on the judicial conference room on the second floor." (RR65.240). Moorehead explained that each morning when he and Deputy Morris picked Harris up from the jail, they placed an RACC belt (remotely activated custody control device, or "stun-belt") on Harris. (RR65.241). Trial counsel clarified, "Let me stop you right there. That is a stun belt so in case they act up, you can zap them," to which Moorehead replied, "Some people refer to it as a stun belt." (RR65.241).  Moorehead explained that the stun-belt has the capability of delivering 75,000-80,000 volts and incapacitates the person wearing it.  (RR65.241).

157.   Each day, Moorehead and Deputy Morris transported Harris to the courtroom via the elevator. One time, for reason unclear but no fault of Harris, the doors closed, leaving Harris alone on the elevator. (RR65.240-242). Harris was not in handcuffs or leg cuffs but was wearing the stun-belt. (RR65.242-243). Trial counsel again identified the stun-belt, saying, "Now, there was the stun-belt, but that's standard procedure in these types of cases," to which Moorehead replied, "He had the (stun-belt) on, yes sir."  (RR65.242-243).

158.   With Harris alone in it, the elevator went to another floor, where two court reporters entered. (RR65.243-244). Harris was not capable of stopping or starting the elevator since it requires a card key. (RR65.244). The elevator returned with Harris and the court reporters, without any incident. (RR65.245).

159.   Deputy Moorehead testified that even though Harris was on the elevator without them, "Mr. Harris knew that I could stop him (using the remote activator) at that point.  He had been told what the belt would do and I don't think there was ever a doubt in his mind that I would activate it."  (RR65.245). At no time did trial counsel object to Moorehead's identification of the stun-belt or description of how it operated.

160.   The State asked Deputy Moorehead whether Harris wore the stun-belt every day during the 12-week voir dire period, and Moorehead answered, "yes, he did." (RR65.246). Moorehead confirmed that either he or the deputy who guarded the door always had control of the remote activator and had Harris "in sight at all times." (RR65.265). Harris knew what would happen if the stun-belt were activated, and every morning he had to sign a form stating he knew what the stun-belt would do.

(RR65.246-247).  Further, Harris told Moorehead that he thought Moorhead would shock him when Harris was in the elevator alone and then with the court reporters. (RR65.247).

### ii. Testimony about the stun-belt during the habeas hearing

161.   During the habeas hearing, trial counsel testified that he elicited the evidence about the stun-belt and Harris left alone in the elevator because counsel felt it was "powerful evidence to show a jury that he (Harris) would not be a future changer once (Harris) is off PCP and like he had been for three years waiting to go to trial. We thought that was evidence that he could be trusted in that type of situation." (RR4-Habeas.111). Trial counsel admitted that Deputy Moorehead "...added some information (about the stun-belt) that (trial counsel was not) expecting." (RR4-Habeas.112).  Trial counsel's "strategy decision" was that "the jury had to know that there was some restraints on any capital murder defendant standing trial...it was obvious he was not shackled, he was not wearing handcuffs...(trial counsel) figured that they (the jury) would observe or not be surprised by the fact that (Harris is) wearing a stun belt." (RR4-Habeas.112-113).

162.   Trial counsel also said that he understood that the "presumption of innocence is gone" by the punishment phase, and the circumstances of trial in the courtroom "were very different" (during the punishment phase). (RR4-Habeas.113).

### iii. The state court decision

163.   The state court decision (FFCL) focused on the fact that the jury learned about the stun-belt during the punishment phase and not the guilt-innocence phase,

first finding that the "complained-of testimony occurred during the punishment phase of the trial...thus, the presumption-of-innocence concerns connected to circumstances in which a jury observes a defendant wearing restraints during the guilt/innocence phase of trial do not apply here. (CR-Habeas.3713, ¶423, App.0136). The FFCL also found that "the testimony indicated (Harris) wore the stun belt during the 12 weeks of voir dire, when voir dire was sometimes held in a conference room instead of a courtroom. Neither the prosecutor, the defense attorney, nor Deputy Moorehead indicated (Harris) was wearing the stun belt during the jury trial portion of the proceedings. (CR-Habeas.3714, ¶424, App.0137).

164.   The FFCL also found, "[E]vidence of the elevator incident strongly supported (trial counsel's) trial theory that (Harris) was not a danger when he was detained and had no access to PCP. Trial counsel solicited the description of the elevator incident for a strategic reason—to demonstrate (Harris) was neither a danger nor a flight risk while in custody. In a highly unusual incident, (Harris) traveled up and down an elevator in the courthouse unattended. He proved himself not to be opportunistic in the face of someone else's vulnerability. (Harris) could have stepped off the elevator when the court reporters got on or potentially accessed a parking garage and fled. From (trial counsel's) perspective, this was valuable evidence to offer to the jury in (Harris's) favor. (CR-Habeas.3714, ¶427-428, App.0137).

165.   The trial court accepted trial counsel's decision to elicit this testimony as a valid "strategy decision" based on "reasonable trial strategy." (CR-Habeas.3715,

¶430-431, App.0138). Per the FFCL, "It is highly unlikely that the jury's knowledge of the stun belt, which at worst countered the favorable evidence of the elevator incident, weight so strongly that without it, the jury would have answered one of the special issues in (Harris's) favor." (CR-Habeas.3715, ¶434, App.0138).

> **B.** ***Deck*** **prohibits a jury seeing a defendant in restraints or have knowledge of the restraints at any time unless there is a finding of a "special need" by the court**

166.   *Deck v. Missouri*, 544 U.S. 622 (2005) protects the due process rights of defendants by prohibiting the defendant from being visible to jurors in restraints unless the state shows a "special need," meaning only if necessary and case specific. *Id.* at 633.  A defendant may be restrained only if the state court makes a specific finding that the defendant's behavior is a legitimate safety concern. Absent this case-specific finding, "...the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629.

167.   Absent a finding for this special need,  "[t]he law has long forbidden…routine shackles during the guilt-phase" because "[v]isible shackling undermines the presumption of innocence and…fairness of the factfinding process." *Id.* at 625, 630. A defendant is entitled to an impartial jury, and his constitutional rights override rules of evidence or other rules if it is "fundamentally unfair" to apply them. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Green v. Georgia*, 442 U.S. 95, 97 (1979).

**C. The state court's decision (FFCL) that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court**

168.    *Deck* is clear: absent a specific finding by the trial court that Harris's behavior posed a legitimate safety concern so the stun-belt was necessary, the jury should not have known that Harris was wearing a stun-belt. *Deck*, *id*. at 633. Further, *Deck* considered whether "as a general matter, the Constitution permits a State to use visible shackles routinely in the guilt phase of a criminal trial. The answer is clear: The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Id*. at 626. Dallas County's policy of placing capital defendants in restraints is a violation of *Deck*. Although the stun-belt was not visible to the jury, trial counsel's eliciting the damaging testimony from the deputy then failing to object to it effectively made the stun-belt visible since the jury learned about it and details about how it worked and when the deputy could use it.

169.    Harris's rights under the Fifth and Fourteenth Amendments and rights to an impartial jury were violated because the jury learned about the stun-belt due to this critical mistake by trial counsel. *Deck*, *id*. at 629. *Deck* was decided on May 23, 2005. *Deck* clearly established a due-process rule against the routine use of physical restraints during a penalty-phase proceeding. In fact, in its analysis, the Supreme Court recognized the longstanding prohibition on routine use of restraints after reviewing English cases dating back to the 18th Century, various state court

decisions handed down long before *Deck* was decided, and earlier Supreme Court decisions like *Illinois v. Allen*, 397 U.S. 337, 342-343 (1970) and *Holbrook v. Flynn*, 475 U.S. 560, 567-568 (1986). *Deck*, 544 U.S. at 626-629. Thus, the Supreme Court law was clearly established when trial counsel asked Deputy Moorehead the open-ended question and was "surprised" by Moorehead's response, as though trial counsel never knew that Harris was wearing a stun-belt.

170.    Next, clearly established Supreme Court law when trial counsel elicited the testimony was that Harris was entitled to the effective assistance of counsel. *Strickland*, 466 U.S. at 687-691. Eliciting testimony about an issue that violates the due process rights of one's client is IAC, and trial counsel should have known this given that he is an experienced attorney in Texas who represents defendants accused of crimes, including Capital Murder. For instance, in *Ex parte Menchaca*, 854 S.W.2d 128, 132-133 (Tex.Crim.App. 1993), the TCCA held that where the defensive strategy turned on the defendant's credibility, there is no strategic basis for allowing jury to hear that the defendant had a prior conviction for the same offense for which he was being tried, so the trial attorney provided IAC to the defendant. In *Robertson v. State*, 187 S.W.3d 475, 484-486 (Tex.Crim.App. 2006), the TCCA held that because the defense depended on the defendant's credibility, there was no possible reasonable strategy for intentionally eliciting and opening the door to otherwise inadmissible and clearly prejudicial evidence of the defendant's incarceration on two prior convictions, one of which involved conduct like to the charged offense.    And in *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App. 1983), the TCCA discussed

the "inherently prejudicial" nature of alleged extraneous offense evidence admitted under Rule 404(b)(2). *Deck* confirmed the holding in *Holbrook*, 475 U.S. at 568 that shackling is inherently prejudicial. *Deck* clearly stated that the jury should not see or know about restraints on a defendant unless there is a specific finding for the need for the defendant to be restrained. *Deck*, *id.* at 635.

171.    Thus, trial counsel elicited inherently prejudicial testimony from Deputy Moorehead, and counsel should have known that it was inherently prejudicial given that *Deck*, *Strickland*, *Holbrook*, *Menchaca*, *Williams*, and *Robertson* all were decided long before Harris's trial. Trial counsel knew that Harris wore a stun-belt, yet he asked the open-ended question to Moorehead, "[g]o ahead and tell them (the jury) about the elevator incident. This is when were on the judicial conference room on the second floor." (RR65.240). Moorehead then explained that each morning when he and Deputy Morris picked Harris up from the jail, they placed the stun-belt on Harris. (RR65.241). Trial counsel doubled down on his ineffectiveness and prejudice to Harris when he stated, "Let me stop you right there. That is a stun belt so in case they act up, you can zap them," to which Moorehead replied, "Some people refer to it as a stun belt." (RR65.241).   Moorehead explained that the stun-belt has the capability of delivering 75,000-80,000 volts and incapacitates the person wearing it. (RR65.241).

172.    The jury was left wondering why would Harris be equipped with a stun-belt with the "capability of delivering 75,000-80,000 volts (that) incapacitates the person wearing it" if Harris was not behaving badly during the trial?  Was it just

standard procedure or what there more to it that the jury had not heard? *Deck* and its progeny give defendants the benefit of their juries not knowing about restraints, provided the defendants behave during the trial. If defendants pose a security risk, they are placed in restraints after the trial court makes the specific finding of the necessity of the restraint. Defendants who do not behave lose the benefit of juries not knowing about restraints. Thus, defendants have an incentive to behave well.

173.  Harris was not given any such benefit.  Instead, he was under the constant stress of knowing that he was one click of the remote activator away from receiving 75,000-80,000 volts.  Harris knew what would happen if the stun-belt were activated, and every morning he signed a form acknowledging as much. (RR65.246-247).  Harris told Moorehead that he thought he would shock him when Harris was in the elevator alone and later with the court reporters.  (RR65.247). This was despite Harris behaving well and never being disrespectful or causing trouble. (RR65.237).

174.  Yet trial counsel elicited testimony from Moorehead about the stun-belt with an open-ended question. Trial counsel again identified the stun-belt, saying, "Now, there was the stun-belt, but that's standard procedure in these types of cases," to which Moorehead confirmed that Harris wore the stun-belt.  (RR65.242-243).

175.  Trial counsel should not have elicited testimony about the stun-belt, and when the deputy began talking about it to the "surprise" of trial counsel, he should have objected, but he did not.  Thus, Harris received IAC because: (1) trial counsel's performance was constitutionally deficient because it fell below an objective standard

of reasonableness; and (2) Harris was prejudiced although he did not need to prove it. *Deck*, 544 U.S. at 629-631; *Strickland*, 466 U.S. at 687-691.

176.    The state court's decision that the jury learned about the stun-belt during the punishment phase and not the guilt-innocence phase was irrelevant and contrary to and involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Deck* does not differentiate between these phases of the trial like the state court decision claims. The point of the jury not seeing or knowing about a restraint is so the jury does not believe that the defendant is such an awful person that he cannot behave even during the court proceeding that will determine whether—in Harris's case—the defendant should receive the death penalty or life in prison. As explained in *Deck*, "The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Id.* at 626. There was no special need here. And Dallas County's policy of placing capital defendants in restraints was a violation of *Deck*. The FFCL's finding that the "complained-of testimony occurred during the punishment phase of the trial...thus, the presumption-of-innocence concerns connected to circumstances in which a jury observes a defendant wearing restraints during the guilt/innocence phase of trial do not apply here" (CR-Habeas.3713, ¶423, App.0136) is contrary to and involved an unreasonable application of clearly established federal law as determined by the Supreme Court in *Deck*.

177.   Finally, the state court's decision that trial counsel's eliciting testimony about the stun-belt with the open-ended question and then doubling down on the questioning instead of objecting was a valid "strategy decision" based on "reasonable trial strategy" (CR-Habeas.3715, ¶430-431, App.0138) is also directly contrary to clearly established federal law as determined by the Supreme Court in *Strickland*. Eliciting highly damaging testimony with open-ended questions and not objecting to fix one's mistake is not "reasonable trial strategy." If this can be labeled "reasonable," then any strategy may be entitled to the same label.

> **D. The state court's decision that Harris did not receive IAC because trial counsel failed to object to Harris wearing a restraint (stun-belt) that the jury learned about through testimony elicited by trial counsel was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding**

178.   Trial counsel's explanation for why he elicited the evidence about the stun-belt and Harris being left alone in the elevator was because counsel felt it was "powerful evidence to show a jury that he would not be a future danger once (Harris) is off PCP and like he had been for three years waiting to go to trial. We thought that was evidence that he could be trusted in that type of situation." (RR4-Habeas.111).

179.   Trial counsel was correct **only** that evidence showing that Harris— through no fault of his own—being left alone on an elevator that traveled several floors and returned with two court reporters showed that he could be trusted "in that type of situation." Indeed, no longer using a dangerous drug like PCP and behaving well leading up to and through trial for over three years was evidence of not being a future danger. (RR4-Habeas.111).

100

180.   However, the only evidence relevant to Harris being "trusted in that type of situation" was that he was left alone on an elevator without hand or leg shackles and he did not try to flee. The Harris was wearing a stun-belt had nothing to do with the reasons trial counsel claimed.  In fact, the jury likely concluded—as any rational jury would—the opposite of what trial counsel believed: that Harris may have **not** tried to flee only because he was wearing a stun-belt,  knowing that it had the "capability of delivering 75,000-80,000 volts and incapacitates the person wearing it." (RR65.241). Any defendant with a barely functioning brain would not try to flee knowing that he could be zapped with so much electricity that he would at minimum be incapacitated, or worse, seriously injured.  A rational jury would also believe this. This rational belief of the jury is corroborated by the fact that Harris knew that Moorehead "...could stop (Harris) (using the remote activator)....(Harris) had been told what the belt would do" and Moorehead did not think "there was ever a doubt in (Harris's) mind" that Moorehead would "activate it." (RR65.245).

181.   Further, the exchange between trial counsel and the deputy went far beyond the "powerful evidence (of Harris being left alone on an elevator without fleeing) to show a jury that he would not be a future danger once (Harris) is off PCP and like he had been for three years waiting to go to trial."  Trial counsel admitted that Moorehead "...added some information (about the stun-belt) that (trial counsel was not) expecting." (RR4-Habeas.112).  Rather than objecting to this testimony, asking an instruction for the jury to disregard it, and requesting a mistrial, trial counsel doubled down and asked Moorehead, "Let me stop you right there. That is a

stun belt so in case they act up, you can zap them," to which Moorehead replied, "Some people refer to it as a stun belt." (RR65.241).  Moorehead explained that the stun-belt has the capability of delivering 75,000-80,000 volts and incapacitates the wearer. (RR65.241). Trial counsel again spoke about the stun-belt, saying, "Now, there was the stun-belt, but that's standard procedure in these types of cases", to which Moorehead replied, "He had the (stun-belt) on, yes sir."  (RR65.242-243).

182.    Trial counsel's questioning opened the door for the State to ask about the stun-belt. The State asked Moorehead whether Harris wore the stun-belt every day during the 12-week voir dire period, to which Moorehead answered, "yes, he did." (RR65.246). Moorehead confirmed that either he or the deputy who guarded the door always had control of the remote activator and had Harris "in sight at all times." (RR65.265). Further, Harris knew what would happen if the stun-belt were activated and each morning signed a form stating he knew. (RR65.246-247).  Harris told Moorehead that he thought Moorhead would shock him when Harris was in the elevator alone and later with the two court reporters.  (RR65.247).

183.    Trial counsel's "strategy decision" was that "the jury had to know that there was some restraints on any capital murder defendant standing trial." Trial counsel also claimed that he "figured that they (the jury) would observe or not be surprised by the fact that he's wearing a stun belt." (RR4-Habeas.112-113). Trial counsel claimed that he understood that the "presumption of innocence is gone" by the punishment phase, and the circumstances of trial in the courtroom "were very different." (RR4-Habeas.113).

102

184. However, the jury could not have known that there were restraints on "any capital murder defendant standing trial."  There is no evidence of this. If the jury had not seen hand or leg restraints, then the jury could not have known as trial counsel claimed. Harris never behaved badly or disrespectfully in front of the jury or towards Deputy Moorehead and others outside the presence of the jury.  There is no reason the jury would have known about the stun-belt until trial counsel elicited the damaging testimony from Moorehead and then doubled down on its discussion.

185. Trial counsel was speculating about what the jury may have known It was trial counsel who was surprised by the response to his open-ended question, admitting that Moorehead "...added some information (about the stun-belt) that (trial counsel was not) expecting." (RR4-Habeas.112).  The state court's conclusion that "[I]t is highly unlikely that the jury's knowledge of the stun belt, which at worst countered the favorable evidence of the elevator incident, weight so strongly that without it, the jury would have answered one of the special issues in (Harris's) favor" (CR-Habeas.3715, ¶434, App.0138) is unsupported speculation and an unreasonable determination of the facts in light of the evidence presented during the proceeding.

### E. Harris met the burden of rebutting the presumption of correctness by clear and convincing evidence per 28 U.S.C. § 2254(e)(1)

186. Factual determinations made after a hearing on the merits are entitled to a presumption of correctness if fairly supported by the record considered as a whole. 28 U.S.C. § 2254(d). A petitioner may rebut this presumption with clear and convincing evidence.  Most mixed questions of law and fact that require the application of constitutional principles to historical fact receive *de novo*

review. *Thompson v. Keohane*, 516 U.S. 99, 111-112 (1995). The issues resolved by the state habeas court are questions of fact and mixed questions of law and fact that purport to apply this Court's holding in *Deck* but does so erroneously.

187.   The factual findings in the state court decision (FFCL) are not supported by the record, individually or in whole. Deputy Moorehead testified that Harris was forced to wear the stun-belt every day per Dallas County policy and without a specific finding by the trial court that it was necessary, Harris signed a form every morning stating he knew what the stun-belt would do, and Moorehead was told by Harris that he thought Moorehead would shock him when Harris was in the elevator alone and later with the court reporters (RR65.247).  The only evidence beneficial to Harris on the issue of future dangerousness was that—through no fault of his own—Harris was left alone on an elevator that traveled several floors and returned with two court reporters, showing that that he could be trusted "in that type of situation," and no longer using a dangerous drug like PCP and behaving well leading up to and through trial for over three years was evidence of not being a future danger. (RR4-Habeas.111).

188.   Otherwise, all the evidence elicited by trial counsel about the stun-belt was highly damaging to Harris and as explained in the section above, violated *Deck* and *Strickland*. Contrary to the state court decision of agreeing with trial counsel's beliefs, the stun-belt had nothing to do with the reasons trial counsel articulated. As explained above, the jury likely concluded the opposite of what trial counsel believed: that Harris may have not tried to flee only because he was wearing a stun-belt with

Harris knowing that it had the "capability of delivering 75,000-80,000 volts and incapacitates the person wearing it." (RR65.241). This rational belief is corroborated by the fact that Harris knew that Moorehead "...could stop (Harris) (using the remote activator)....(Harris) had been told what the belt would do" and Moorehead did not think "there was ever a doubt in (Harris's) mind" that Moorehead would "activate it." (RR65.245).

189.    This is clear-and-convincing evidence supporting rebuttal of the presumption. *See Wiggins*, 539 U.S. at 528 (in applying the standard under 28 U.S.C. § 2254(e), this Court found that the state court's assumption that the records documented instances of abuse has been shown to be incorrect by "clear and convincing evidence"...and reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision.). The result here is an erroneous application of the AEDPA. Contrary to the conclusions of the state court decision, it is an abdication of review rather, not deference to the state habeas findings. Harris has met the burden of rebutting the presumption of correctness per 28 U.S.C. § 2254(e)(1). Harris asks this Court to reverse the Judgment and death sentence, and remand for a new trial.

## IX.    Conclusion and Prayer

Harris's constitutional rights were violated, and he has been illegally confined and restrained since 2009. Harris prays that the Judgment and sentence of death be set aside, and this Court remand the case to the trial court for a new trial.  Harris further prays that he be released from confinement and restraint.

Respectfully submitted,

**Michael Mowla**
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Harris

**/s/ Michael Mowla**
**Michael Mowla**

## X.    Verification

Under 28 U.S.C. § 2242, I certify under penalty of perjury that based on my analysis of the record on appeal, the casefile sent to me by prior counsel, and my investigation, the factual allegations in this Petition for Writ of Habeas Corpus are true and correct.

**/s/ Michael Mowla**
**Michael Mowla**

## XI.    Certificate of Service

I certify that on December 14, 2021, a copy of this document was served upon all parties and attorneys of record via the ECF filing system.

**/s/ Michael Mowla**
**Michael Mowla**