UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROBERICK NAPOLEON HARRIS,          §
TDCJ No. 999573,                   §
                                   §
              Petitioner,          §
                                   §
v.                                 §         Civil Action No. 3:20-CV-3702-E
                                   §
BOBBY LUMPKIN, Director,           §
                                   §
              Respondent.          §

**MEMORANDUM OPINION AND ORDER**

Petitioner Roderick Napoleon Harris filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his May 2012 Dallas County conviction for capital murder and sentence of death.  For the reasons explained below, Harris is entitled to neither federal habeas corpus relief nor a Certificate of Appealability.

## I. BACKGROUND

### A. The Offense

There is no genuine factual dispute as to the facts of Harris's capital offense.  On March 17, 2009, while committing an armed robbery and home invasion of the Gallardo family residence Harris fatally shot Alfredo Gallardo and Gallardo's brother Carlos.  During the robbery a member of the family managed to escape out a window and contact a security guard who notified police. After exiting the Gallardo home, Harris ignored calls from police to surrender, exchanged gunfire with multiple Dallas police officers who had surrounded the Gallardo home, and was struck by two bullets.  He was immediately transported to a hospital and treated for his injuries.

## B. The Indictment

On June 2, 2009, a Dallas County grand jury indicted Harris on a single count of capital murder, to wit, intentionally causing the death of Alfredo Gallardo by fatally shooting Gallardo with a firearm while in the course of committing and attempting to commit the robbery of Gallardo.[1]

## C. Guilt-Innocence Phase of Trial

The guilt-innocence phase of Harris's capital murder trial commenced on May 8, 2012.[2]

## 1. The Prosecution's Evidence

The Texas Court of Criminal Appeals opinion affirming Harris's conviction on direct appeal accurately summarized the testimony of multiple Gallardo family members and other evidence introduced at the guilt-innocence phase of trial as follows:

> The evidence showed that, at about 9:00 p.m. on St. Patrick's Day, Alfredo was at home with his wife, Maria, his brother, Carlos, a son, a grandson, and his thirteen-year-old daughter, Yahaira. Alfredo was about to go out to look for Yahaira's older sister when a "black guy" burst through the door and pointed his gun at Alfredo's head. Yahaira was "shocked" and "scared," the more so when the man—appellant—told her, "Come here, bitch." Yahaira's mother started to cry as appellant pointed his gun at them and, in a loud voice, asked for money, jewelry, and drugs. Yahaira translated appellant's demands for her parents because they did not speak much English. She took her mother's purse from the counter and gave appellant all of the money inside—two dollars.
> Yahaira's father was sitting on the sofa, but when he started to stand up, appellant hit him so hard in the face with the back of his gun that his cheek started bleeding. Then, when Carlos tried to get his wallet out of his pocket, appellant hit

---

[1] Copies of the indictment of Harris appear at various places among the state court records filed by Respondent. One copy appears at ECF no. 26-13, at p. 3. Another copy appears at ECF no. 21-6, at p. 7.

[2] The verbatim transcription from the guilt-innocence phase of Harris's capital murder trial (i.e., Volume 58-60 of 67) appears in two places among the voluminous and duplicative state court records submitted by Respondent. The entire trial transcript (more than 5,000 pages) appears as a single docket entry at ECF no. 23-1. A more user-friendly set of those volumes appears at ECF nos. 24-23 through 24-25. Henceforth citations to the verbatim transcript of testimony and other proceedings from Harris's *trial* will be designated by "volume number," followed by "RR Trial," and then the page number(s) of the respective volume.

him near the eyebrow with the gun. Carlos also started bleeding. Appellant told Alfredo and Carlos to get down on the floor, and then, still pointing his gun at them, appellant took their wallets from their pants pockets.

Then he took everyone to the master bedroom, and Yahaira handed him the little bit of jewelry—a necklace and two rings—that they had. Appellant pushed them all through the bathroom and toward a closet, still pointing his gun at them. He told Yahaira to tie her uncle's hands with some belts while he tied her father's hands. He was shouting at them as he kept trying to close and lock the closet door, and Yahaira's mother was crying. Yahaira thought, "We were going to die." Appellant then asked for the keys to their red truck, but Yahaira told him that her brother Omar had them and that he was at a party.

Appellant "told us like, what kind of family like us didn't have money? And that if we didn't have money, we should do like—we should do what he did; that he didn't hurt people, he just robbed houses." Then he pointed to Yahaira's mother and said that she was to go with him because "he wanted to take her." She was crying and praying in Spanish, so appellant pointed at Yahaira and said that he was going to take her instead. When Yahaira's mother kept crying, appellant finally pointed his gun at Alfredo while telling Yahaira's mother to calm down or he would "hurt" them. Yahaira thought he would shoot them.

Then appellant grabbed Alfredo's shirt and started walking him toward the restroom, but they fell on top of the Jacuzzi "and that's when the shooting came out[.]" Appellant shot Alfredo in the face and chest. Then Carlos, Yahaira's uncle, got up as if he were trying to help, and appellant shot him in the face and shoulder. Yahaira and her mother were crying on the floor of the closet when Yahaira felt the wind from another bullet pass by her. She thought appellant had fired a total of about six bullets.

Yahaira looked back out to the bathroom and saw appellant push "my dad off of him like he was disgust[ed], because of the blood." He finally ran out the door. Yahaira heard "snoring" sounds from either her father or her uncle lying on the floor and saw her father shaking. Finally, a policeman ran in and took them out of the house.

Appellant had killed both Alfredo and Carlos.

*Harris v. State*, AP-76,810, 2014 WL 2155395, *1-*2 (Tex. Crim. App. May 21, 2014) (Footnotes

omitted).

The trauma surgeon who treated Harris immediately after his arrest testified that (1) Harris

suffered gunshot wounds to the right leg and abdomen, (2) Harris's toxicology screen was positive

for opioids but not for PCP, and (3) Harris was uncooperative during his examination and treatment.[3]  The medical examiner who conducted the autopsy of Alfredo Gallardo testified that Alfredo died as a result of multiple gunshot wounds – one of which entered at the left cheek, traveled downward through the esophagus through the right upper lobe of the lung into the right upper chest wall and the other entered the left side of the chest traveling front to back and left to right, and penetrated the bladder.[4]  The medical examiner who conducted the autopsy of Carlos Gallardo testified  Carlos died as a result of two gunshot wounds – one to the face and one to the left shoulder.[5]

### 2. The Defense's Evidence

The defense recalled Yahaira Gallardo who testified that Alfredo was wearing a white shirt at the time he was shot by Harris.[6]

### 3. The Guilt-Innocence Phase Verdict

On May 11, 2012, the jury returned its verdict at the guilt-innocence phase of trial, unanimously finding Harris guilty beyond a reasonable doubt of capital murder as charged in the indictment.[7]

### D. Punishment Phase of Trial

The punishment phase of Harris's capital murder trial commenced on May 14, 2012.[8]

---

[3] Statement of Facts from Harris's Trial (henceforth "RR Trial"), Volume 59, at 104-26.

[4] 59 RR Trial 261-88.

[5] 59 RR Trial 289-302.

[6] 60 RR Trial 80-81.

[7] 60 RR Trial 126.  The jury's verdict at the guilt-innocence phase of Harris's capital murder trial, as recorded in its verdict form, is found at ECF no. 22-8, at p. 51 (1 Supp. CR 51) and ECF no. 22-9, at p. 22 (1 Supp. CR 22).

[8] The verbatim transcription of testimony and other proceedings during the punishment phase of Harris's capital murder trial (i.e., Volumes 61-66 of 67) appears at both ECF no. 23-1 and ECF nos. 24-26 through 24-31.

**1. The Prosecution's Evidence**

The Texas Court of Criminal Appeals accurately summarized the prosecution's evidence

at the punishment phase of Harris's capital murder trial as follows:

> During the punishment phase, the State offered evidence of several other aggravated robberies, including another capital murder, that appellant had committed during the month before the charged capital murder. On February 15, 2009, appellant and his cohort confronted Luis Gonzalez at his apartment door, forced him inside, tied him up, and robbed him of his wallet with $450 in it, his watch and shoes, a set of wheel rims, a stereo, and his friend's wallet, which was hidden in the sofa, with $900 in it. Then they dragged Mr. Gonzalez into the bedroom while they ransacked his apartment. Mr. Gonzalez managed to untie himself while appellant and his fellow robber were carrying items out to their car, and he ran and locked them out of his apartment. Appellant started beating on the door, saying, "[O]pen the door, you son-of-a-you-know-what." Mr. Gonzalez did not open the door, but he couldn't call the police because appellant had stolen his cell phone. The robbers finally left in appellant's car. Appellant's DNA was on a glove left at Mr. Gonzalez's apartment.
>
> At about 10:30 p.m. on March 3, 2009, Karen De La Cruz Espinoza was walking through the parking lot of her apartment complex with her eleven-year-old son when she saw three black men coming hurriedly toward her. As she got to her front door, one of them—appellant—pushed open the door and shoved her and her son inside. Her husband and three of her four other children were already inside. The robbers immediately closed all of the shades, pointed their guns at the heads of two of her children, and told Karen that they wanted her handbag with money and that "if we didn't give them what they wanted, that they were going to kill us all." One of the robbers went to the back room, grabbed Karen's husband, pulled him into the living room, and threw him on the floor.
>
> The robbers then ransacked the bedrooms, pulling out all of the drawers and emptying the contents on the floor and beds. They took Karen's wallet with her paycheck in it, as well as her husband's wallet, her watch, an Xbox, DVDs, and other items. As two of the robbers started taking items down the stairs, Karen heard several shots and thought that the robbers had "found someone else" to hurt. The third robber immediately picked up the rest of the bags of property that they had collected, but Karen rushed forward, pushed him out the door, and locked it. They all stood back from the door because they were worried the robber would start shooting through it.
>
> Appellant then went to another apartment at the complex, that of Roberto Ramos. Roberto's 27–year–old brother, Eustacio, heard a commotion in the hallway

while he was in the bathroom talking on the phone to his grandmother in Mexico. When he looked out, he saw Roberto struggling with appellant, who had gotten inside the apartment. Roberto was trying to push him back outside, but appellant was too big and strong. When Eustacio went to help Roberto, appellant shot Eustacio in the chest from about four feet away. Roberto cried, "Oh, he shot you, he killed you, he hit you in the heart." Eustacio was "stunned" and fell backwards as he saw his brother struggling with appellant. Eustacio said, "I heard a shot and then a moment later, seconds later, I heard another shot. And I was saying, oh, God, and I was screaming to my brother. After that, I didn't know anything else."

A third brother, Martin, came into the living room and saw Roberto struggling with appellant, but when Martin came toward the door, appellant reached over Roberto's shoulder and shot him in the face. Then, as another neighbor watched from his door, Roberto "bearhugged" appellant who then shot Roberto three times—in the upper back, in the mouth, and in the left thigh. Roberto died in the apartment breezeway, but his two brothers, Eustacio and Martin, survived. Roberto's thirteen-year-old daughter, Jasmine, called 911 and then found her dead father outside: "I told him I loved him and I kissed him on his cheek." The robbers escaped.

The State also offered evidence of appellant's youthful conduct: He was assigned to a behavioral adjustment classroom for disruptive students when he was in middle school. A school resource officer testified that appellant had a poor reputation for being peaceful and law-abiding at age fourteen and recalled an incident in which appellant became "combative" when his mother reported him as a run-away. In high school, he carried a knife with a six-inch blade to school. When it was discovered, he was arrested. He was arrested the next year for possession of marijuana.

Appellant had numerous gang tattoos on his body, including "HUSTLA" on his right forearm. The State's gang expert explained that this tattoo indicated that appellant is "hustling for his money. He is hustling in life. He is hustling to get ahead," usually by selling narcotics. He also had a "Fish Trap" tattoo, stars, and the numbers 212 and 3500, which indicate that appellant is a Fish Trap Bloods gang member. The expert said that the Fish Trap Bloods are a particularly violent gang known for "murders, aggravated robberies, narcotics selling, assaults, home invasion robberies. You name it, they have done it."

The State also called several police officers who testified that they had arrested appellant in Dallas for various offenses: on December 5, 2002, for unauthorized use of a motor vehicle; on December 23, 2003, on warrants for probation violation and burglary; on September 20, 2006, for traffic violations in which he was later charged with being a felon in possession of a firearm; on April

6

17, 2007, for unauthorized use of a motor vehicle; and on December 27, 2007, for possession of marijuana.

*Harris v. State*, AP-76,810, 2014 WL 2155395, *2-*3 (Footnotes omitted).

## 2. The Defense's Mitigating Evidence

Harris's defense counsel presented numerous witnesses at the punishment phase of trial, including family members who testified regarding Harris's childhood and background,[9] a memory

---

[9] More specifically, Harris's mother, Pamela Maddox, testified that (1) Harris's biological father was Eric Dexter Propes, whom she described as having spent most of his adult life in prison; (2) Propes had very little contact with Harris during Harris's childhood; (3) she had Harris at age seventeen, when she described herself as irresponsible in that she smoked marijuana and drank alcohol including while she was pregnant with Harris; (4) the divorce of her parents destroyed her emotionally; (5) she married Ramon Maddox when Harris was two or three; (6) her marriage to Ramon Maddox was characterized by violence and abuse; (7) Harris grew up in an abusive and violent home in that Harris witnessed violence between his mother and step-father and his step-father routinely beat Harris with belts and extension cords; (8) when Harris was fifteen, she and Ramon Maddox resolved their problems without violence but Harris witnessed a great deal of violence prior to that time; (9) she sometimes abandoned Harris while she partied and Harris was left with family and friends; (10) Harris struggled in school from an early age (he was held back in first grade); (11) Harris was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), for which he was prescribed Ritalin, a medication on which he remained until he reached puberty; (12) Harris was placed in Special Education programs, which resulted in him being taunted by other students; (13) at age two, Harris was injured in a car accident that left him unconscious and with a facial laceration that required hospital treatment; (14) at age fifteen Harris stood up to his step-father and instructed Ramon Maddox not to strike his mother anymore; (15) Harris grew up feeling that he did not get enough attention and she believed she had failed to furnish Harris with emotional support growing up; (16) she was diagnosed with manic depression (including multiple suicide attempts) and bipolar disorder and her grandmother spent many years in a mental health facility; (17) Eric Propes had a family history of mental illness that included a diagnosis of schizophrenia, bipolar disorder, and chronic substance abuse; (18) Harris dropped out of school in the tenth or eleventh grade; (19) Harris subsequently fathered three children (with two women), for whom he is a good father; and (20) she denied Harris had any gang affiliation and denied that Harris is a violent person. 64 RR Trial 215-55.

Harris's younger brother Ramon Maddox, Jr. testified that (1) he got along with Harris; (2) Harris was a good older brother to his two younger half-brothers; (3) growing up, Harris witnessed domestic violence between his step-father and mother, including an incident in which Harris saw Pamela with a knife and his stepfather with a hammer; (4) their family moved a lot when Harris was growing up; (5) Harris made friends easily growing up but was also easily led by others; (6) Harris was in Special Education classes by the third or fourth grade; (7) as he grew older, Harris used alcohol and marijuana and frequently talked to himself; (8) the night Harris was arrested for capital murder, he identified himself to police using his younger brother's (Ramon, Jr.'s) name; (9) Harris is a loving father to his children; (10) when Harris smoked wet (Marijuana dipped in PCP), Harris became hyper and paranoid; (11) at times Harris chose not to come home; and (12) both their parents worked but also partied. 64 RR Trial 256-93.

Harris's stepfather Ramon Maddox, Sr., testified that (1) his own father was a heroin addict and his mother an alcoholic; (2) his own father went to prison for beating his mother; (3) he married Harris's mother in 1988 when Harris was very young; (4) their family moved a lot when Harris was growing up; (5) Harris grew up in a household where there was physical abuse; (6) he and Harris's mother fought and argued frequently; (7) he was a very strict father toward Harris; (8) he frequently beat Harris with belts and extension cords; (9) both he and Harris's mother abused alcohol and marijuana; (10) Harris had difficulty learning in school and was in Special Education classes; (11) Harris was prescribed Ritalin for his hyperactivity from age six or seven; (12) at age seven, Harris set a back room on fire; (13) Harris's mother began hallucinating and was hospitalized with a diagnosis of schizophrenia, bipolar disorder, and manic depression; (14) Harris's biological father was also diagnosed with a mental illness; (15) Harris began running away from home in his youth (around ages 13-14); (16) Harris was ridiculed by other kids for being in Special

expert who testified on the problematic nature of eyewitness identifications (Dr. Charles A. Weaver III),[10] an expert pharmacologist who testified regarding the addictive nature of alcohol and drugs (Dr. John Roache),[11] a clinical psychologist who identified the risk factors for early youth violence and hyperactivity which Harris experienced during his childhood (Dr. Gilda Kessner),[12] and a pair of experts on prison administration who testified about the means prison administrators can employ to decrease an inmate's risk of violence (James Aiken and S.O. Woods).[13]

---

Education classes; (16) Harris was a good father to his children and had begun thinking better since going to jail (which stopped his drug abuse); (17) Harris was remorseful for his crimes; and (18) Harris was not a monster. 65 RR Trial 29-63 & 69-87.

Harris's slightly younger cousin Shamy Conley testified that (1) Harris's family moved around a lot when he was growing up; (2) she grew up with Harris, who was protective of his younger cousins; (3) Harris became paranoid when he smoked wet; (4) Harris worked for a time at a company packaging baseball cards; (5) Harris was traumatized by witnessing the fatal shooting of Conley's sister Nakitha in 2005; (6) Harris had been much calmer since his arrest; (7) Harris is a good person and not a monster; (8) she allowed Harris to babysit her young daughter; and (9) Harris was a good parent to his oldest child, his daughter. 65 RR Trial 88-118.

[10] 64 RR Trial 155-214. Dr. Weaver, a psychology professor and researcher, testified regarding the difficulty of eyewitnesses under stress accurately remembering sufficient facial features to permit a reliable identification after the fact and high incidence of inaccurate identifications made across racial or ethnic groups.

[11] 65 RR Trial 119-46. On direct examination, Dr. Roache, a professor of psychiatry and pharmacology, testified about (1) the changes in brain chemistry and circuitry caused by addictive substances, (2) the fact that most addictive drugs result in increased impulsivity and impairment of frontal lobe development and functioning, (3) the fact that PCP is highly addictive and causes both a dissociative state and a high level of dependence, (4) PCP use can also result in psychosis involving paranoia and violence, (5) the fact that Dallas County Jail medical personnel diagnosed Harris with PCP/marijuana dependence, and (6) his belief that, once off PCP and marijuana, Harris would pose a significantly lower risk of violent and impulsive behavior. On cross-examination, however, Dr. Roache admitted that he had not interviewed Harris and could not testify that Harris was using PCP or marijuana at the time of his capital offense, he had no first-hand information regarding Harris's alleged addiction to PCP and marijuana, and he was relying almost exclusively on third-party reports of Harris's addiction.

[12] 65 RR Trial 152-70. Dr. Kessner, a clinical psychologist, testified that Harris faced many risk factors during his childhood, including being borne to a mother who because of her own youth and immaturity lacked good parenting skills, the inability of Harris's mother to show affection to him, the fact that Harris's biological father was a career criminal who showed no desire to be involved in Harris's life, the fact that Harris's stepfather treated Harris more harshly than the other children in the household, and the fact Harris's mother experienced mental health problems which required hospitalization. Dr. Kessner testified that all of these factors, as well as Harris's struggles academically, negatively influenced Harris's development. On cross-examination, Dr. Kessner admitted that she had not interviewed Harris or any of his family members and that the presence of Harris's mother had been a constant in Harris's life from an early age.

[13] More specifically, James Aiken, a former prison administrator with both state and federal experience, testified there is no correlation between the severity of an inmate's offense or sentence and that inmate's behavior while incarcerated and that training of prison employees is a significant factor in managing an inmate population. 65

The TCCA accurately summarized the defense's lay witness testimony at the punishment phase of Harris's capital murder trial as follows:

> In his punishment case, appellant called four family members to testify to his family history, youth, education, and good character. They said that appellant was diagnosed with attention deficit disorder at age six or seven and that he was placed in special education classes because of his behavioral problems. When he was young, appellant set a room of his family's house on fire. Family members testified that appellant's mother, who suffers from manic depression and schizophrenia, gave him insufficient attention and affection when he was young. By the time he was eleven or twelve, he was helping to care for his two younger brothers and protecting them from his parents' violence and fighting.

*Harris v. State*, 2014 WL 2155395, *4.

### 3. The State's Rebuttal Evidence

The prosecution called several members of the Gallardo family who gave compelling victim-impact testimony, as well as numerous law enforcement officers who either (1) had encountered Harris prior to the date of his capital offense, (2) had personal knowledge of Harris's behavior while incarcerated, or (3) identified various recordings of telephone conversations Harris had with others during his pretrial detention.

One such law enforcement officer was Dallas County Sheriff's Deputy Bobby Morehead, who had served as a court bailiff during jury selection in Harris's capital trial.[14]  On cross-examination by Harris' trial counsel, Morehead testified that Harris had never once been

---

RR Trial 170-92.  S.O. Woods, a retired Texas Department of Criminal Justice administrator, testified about (1) the details of TDCJ's inmate classification system, (2) the fact that, since 2005, inmates convicted of capital murder cannot be assigned a classification level less secure than G-3, and (3) the fact that the street gang with which Harris had once been associated is not considered by TDCJ to be a disruptive group inside TDCJ.  65 RR Trial 193-233.  On cross-examination, Woods admitted that since 2005 TDCJ had experienced multiple acts of violence, including three murders in February 2012 and the shanking of a guard on death row.

[14] 65 RR Trial 234-35.

disrespectful to the bailiffs during the twelve weeks of jury selection.[15]  Morehead also described

an incident that took place during jury selection: As Harris was being transported to jury selection

that morning wearing street clothes over a stun belt, the guards accompanying Harris all stepped

off the courthouse elevator in which Harris was the lone remaining occupant on the second floor;

at that moment, a pair of court employees on a higher floor punched a button which caused the

elevator doors to close and the elevator carrying Harris to rise to their floor; the two court

employees entered the elevator and punched the button to return it to the second floor; during the

ride back down to the second floor, as the two court employees discussed Harris's trial,  he politely

identified himself to them as the defendant in that case; and the elevator arrived back on the second

floor without further incident.[16]  Harris's trial counsel elicited testimony from Morehead that

Harris made no effort to flee or escape during the incident and Harris was respectful to the two

court employees he encountered during the incident.[17]

The TCCA accurately summarized the testimony of the prosecution's other rebuttal

evidence at the punishment phase of trial as follows:

> Appellant started using drugs—alcohol, marijuana, and PCP—when he was
> young. He would become paranoid and hear voices when he used drugs. Appellant

---

[15] 65 RR Trial 237.

[16] 65 RR Trial 240-45.  The court reporter's record reveals that Morehead's recitation of the incident which was referenced by the terms "the elevator incident" or "the stun belt incident," elicited laughter in the courtroom. *Id.*, at 243.  Morehead testified on cross-examination that Harris was routinely fitted with a stun belt each day of jury selection.  *Id.*, at 242-43.  On redirect examination, Morehead testified further that Harris was well aware of what the stun belt could do to him if activated and that Haris was required to sign an acknowledgement of that fact each day when he was outfitted with the stun belt.  *Id.*, at 246-47.

Harris's lead trial counsel later testified during Harris's state habeas corpus proceeding that he would have called Morehead to testify at the punishment phase of trial had the prosecution not done so – because he believed the jury would construe the incident as showing that Harris would not pose a danger of future violence while incarcerated and such evidence would support the defense's punishment-phase trial strategy of showing that Harris had not been violent during prior periods of pretrial detention or incarceration.  Testimony of Brad Lollar, verbatim transcription of Harris's State Habeas Hearing (henceforth "RR SHH"), Volume  4, at pp. 90-91, 96, 109-14.  Attorney Lollar also testified that no one testified at trial that Harris wore the stun belt at any time during trial.  *Id.*, at 115.

[17] 65 RR Trial 245.

has three children. While in jail awaiting trial, appellant told the mother of one of his children-who had accused him of not "caring" or he would not have put himself in his present situation—that he had "motherfucking bills to pay." In another phone call, appellant told a friend that when he got to prison he would "put bread in his pocket" and continue "the hustle." He was already running the jail tank by bullying other inmates and using their commissary funds.

*Harris v. State*, 2014 WL 2155395, *4.

### 4. The Punishment Phase Verdict

On May 21, 2012, the jury returned its verdict, finding (1) unanimously and beyond a reasonable doubt there was a probability Harris would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense and the defendant's character, background, and personal moral culpability, there was not a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without the possibility of parole be imposed rather than a death sentence.[18] The state trial court imposed a sentence of death.[19]

### E. Direct Appeal

Harris appealed his conviction and sentence. Attorney John Tatum filed Harris's direct appeal brief on September 3, 2013, asserting forty points of error.[20] The Texas Court of Criminal

---

[18] 66 RR Trial 103-06. The jury's punishment-phase verdict is contained in its verdict form found at ECF no. 21-7, at pp. 189-90 (2 CR 684-85) and ECF no. 22-8, at pp. 41-42 (1 Supp. CR 41-42).

[19] 66 RR Trial 107-08.

[20] Harris's state appellant's brief appears at ECF no. 21-1. Harris's state appellant's brief included (1) four *Batson* claims challenging prosecution peremptory strikes of venire members (points 1-4); (2) six points of error arguing the trial court erred in denying the defense's challenges for cause directed against six venire members (points 5-10); (3) two points arguing the jury was biased and, therefore, he was denied a fair trial (points 11-12); (4) a point of error arguing the trial court erred in denying the defense's motion for mistrial based a juror reading an article about evidence in the case (point 13); (5) a point of error arguing the trial court erred in overruling the defense's objection to the trial court's response to a jury note during guilt-innocence phase deliberations (point 14); (6) a point arguing there was insufficient evidence to support the jury's guilty verdict (point 15); (7) a point arguing the trial court erred in denying the defense's request for a jury instruction on reasonable doubt (point 16); (8) two points challenging the trial court's admission of crime scene and autopsy photos (points 17-18); (9) a point arguing the trial court erred in

Appeals affirmed Harris's conviction and sentence. *Harris v. State*, AP-76,810, 2014 WL 2155395 (Tex. Crim. App. May 21, 2014). The United States Supreme Court denied Harris's certiorari petition. *Harris v. Texas*, 574 U.S. 1080 (2015).

### F. State Habeas Corpus Proceeding

The Texas Office of Capital Writs filed Harris's state habeas corpus application on June 11, 2014, asserting numerous ineffective assistance claims for relief.[21] The state habeas trial court

---

excusing a prosecution witness from the Rule during the punishment phase of trial (point 19); (10) two points arguing the trial court erred in admitting testimony from prosecution gang expert Barrett Nelson regarding the meaning of Harris's "HUSTLA" and "Fishtrap Bloods" tattoos (points 20 & 22)); (11) a point arguing the trial court erred in admitting evidence of Harris's misdemeanor conviction in Georgia (point 21); (12) a point arguing there was insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue (point 23); (13) a point arguing the trial court erred in denying the defense's motion to disqualify the Dallas County District Attorney's Office (point 24); (14) a point arguing the administrative judge erred in recusing an elected trial judge from hearing the case (point 25); (15) a point arguing the trial court abused its discretion in denying the defense's motion to videotape voir dire (point 26); (16) a point arguing the trial court erred in denying the defense's request for a jury instruction explaining the effect of a hung jury at the punishment phase of trial (point 27); (17) a point arguing the Texas capital sentencing statute is unconstitutional because it vests the jury with too much discretion (point 28); (18) four points of error arguing the Texas capital sentencing statute's mitigation special issue is unconstitutional because it fails to place the burden of proof on the prosecution (points 29-31 & 35); (19) a point arguing the Texas capital sentencing statute's twelve/ten rule is unconstitutional (point 32); (20) a point arguing that various terms employed in the Texas capital sentencing statute's special issues are unconstitutionally vague (point 33); (21) a point arguing the Texas capital sentencing statute's mitigation special issue is unconstitutional because it fails to require the jury to consider all mitigating evidence (point 34); (22) a point arguing the mitigation special issue is unconstitutional because it affords the jury open-ended discretion (point 36); (23) a point arguing the Texas capital sentencing scheme is unconstitutional because it fails to afford a meaningful opportunity for appellate review of the jury's answers to the sentencing special issues (point 37); (24) a point arguing the trial court erred in failing to quash the indictment (point 38); and (25) two points asserting cumulative error under the federal and stater constitutions (points 39-40).

[21] Harris's state habeas corpus application appears at ECF no. 25-3, at pp. 33-153 and at ECF no. 26-13, at pp. 17-137. The Office of Capital Writs was subsequently redesignated the Office of Capital and Forensic Writs ("OCFW").

Harris's state habeas application argued (1) his trial counsel rendered ineffective assistance by failing to adequately investigate Harris's background and present available mitigating evidence showing Harris suffered from the effects of (a) Fetal Alcohol Syndrome Disorder (i.e., in utero exposure to alcohol) and (b) in utero and childhood exposure to toxic levels of lead (claim 1); (2) his trial counsel rendered ineffective assistance by failing to present testimony from a social historian showing the mitigating impact of Harris's difficult and troubled childhood (claim 1); (3) his trial counsel rendered ineffective assistance by failing to present testimony from a gang expert to refute the testimony of the prosecution's gang expert Barrett Nelson (claim 2); (4) his trial counsel rendered ineffective assistance by failing to object on hearsay grounds to testimony showing Harris wore a stun belt in an elevator outside the courtroom (claim 3); (5) his trial counsel rendered ineffective assistance by failing to object to the admission of testimony showing the results of the forensic examination of his victims other than Alfredo Gallardo (claim 4); (6) his trial counsel rendered ineffective assistance by failing to object to evidence showing the crime scene and the fact that Harris fired his weapon at police officers (claim 5); and (7) the Texas capital sentencing statute is unconstitutional

held a lengthy evidentiary hearing on May 29-31, June 1 & 16, and September 10-12, 2018, during which it heard testimony from multiple members of Harris's family, members of Harris's defense team (including his trial counsel, mitigation specialist, and court-appointed mental health expert), and many additional experts for each party.[22]

On March 31, 2020, the state habeas trial court issued an order containing its findings of fact, conclusions of law, and recommendation that Harris's state habeas application be denied.[23] On October 20, 2020, Harris filed objections to the trial court's findings, conclusions, and recommendation.[24]  The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions and denied Harris's state habeas application.  *Ex parte Harris*, WR-80,923-01, 2020 WL 8079824 (Tex. Crim. App. Dec. 16, 2020).

### G. Proceedings in this Court

Harris filed his federal habeas corpus petition in this court on December 14, 2021 (ECF no. 13), asserting claims that his state trial counsel rendered ineffective assistance (1) by failing to investigate Harris's background adequately and present available mitigating evidence showing Harris suffered from (a) Fetal Alcohol Syndrome Disorder and (b) childhood exposure to toxic lead and (2) failing to object to testimony showing that Harris wore a stun belt during trial.

---

because of the twelve/ten rule and the failure of Texas to instruct the jury on the effect of a hung jury on any of the capital sentencing special issues (claim 6).

[22] For unknown reasons, the Texas Attorney General's Office, which is responsible under Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Courts for filing the relevant portions of the state court record, filed two sets of the verbatim transcription of the hearing conducted in Harris's state habeas corpus proceeding.  These duplicate but un-chronologically ordered records appear at ECF nos. 26-2 & 25-5 through 25-14 and ECF nos. 26-1 through 26-10.

[23] Copies of the state habeas trial court's findings, conclusions, and recommendation appear at ECF no. 26-21, at pp. 182-330 and as an exhibit attached to Harris's original petition, i.e., ECF no. 13.

[24] Harris's objections to the state habeas trial court's findings and conclusions appear at no. 25-19.

Respondent filed its answer on July 6, 2022 (ECF no. 20), arguing, in part, the evidence from Harris's state habeas proceeding showed that (1) the defense's mental health expert (Dr. McGarrahan) concluded after evaluating Harris and meeting repeatedly with Harris's mother (in part to investigate Harris's in utero exposure to alcohol and drugs) that Harris suffered from no significant mental illness or cognitive impairments; (2) Dr. McGarrahan advised Harris's trial counsel against putting her or another mental health expert who had evaluated Harris on the stand because doing so would open the door to an evaluation by, and potentially devastating testimony from, a prosecution mental health expert (including testimony that Harris exhibits Antisocial Personality Disorder); and (3) Harris's trial counsel acted reasonably in relying on Dr. McGarrahan's conclusions and recommendation in developing and presenting their case in mitigation at the punishment phase of Harris's trial.

Harris filed his Reply brief on September 6, 2022 (ECF no. 30), arguing in part that the state habeas court improperly applied a preponderance of the evidence standard instead of an objective reasonableness standard in reviewing and rejecting Harris's ineffective assistance claims on the merits and that the state habeas court wrongfully refused to employ a cumulative error approach to Harris's ineffective assistance claims (thereby implicitly requesting de novo review by this court of his ineffective assistance claims).

## II. STANDARD OF REVIEW

Because Harris filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).

The legislative history of the AEDPA indicates that it was intended as a limitation upon the scope of federal habeas review, not as an enactment intended to broaden the scope of federal

habeas review or to reconfigure federal habeas courts as super state appellate courts. One of the principal purposes of the AEDPA was to reduce delays in the execution of state and federal criminal sentences, especially capital sentences. *Ryan v. Valencia Gonzales*, 568 U.S. 57, 76 (2013); *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *Rhines v. Weber*, 544 U.S. 269, 276 (2005). Another purpose of the AEDPA was to encourage litigants to pursue claims in state court prior to seeking federal collateral review. *Duncan v. Walker*, 533 U.S. 167, 181 (2001); *see also Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (the AEDPA imposes the burden on a petitioner to litigate to the maximum extent possible, including fairly presenting all available evidence supporting, his claims in state court). The AEDPA was also intended to prevent piecemeal litigation and gamesmanship. *Maywood v. Patterson*, 561 U.S. 320, 334 (2010). Thus, under the AEDPA, federal habeas review of claims is limited to the record that was before the state court that adjudicated the prisoner's claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). "The AEDPA statute of limitations promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time." *Day v. McDonough*, 547 U.S. 198, 205-06 (2006). Collectively, the provisions of the AEDPA further the principles of comity, finality, and federalism. *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007); *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Under the AEDPA standard of review, this Court cannot grant Harris federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly

16

established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21.  The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").  "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions existing at the time of the relevant state-court decision establish those principles.  *Brown*, 142 S. Ct. at 1525 ("It is not enough that the state court decision offends lower federal court precedents."); *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may

not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual

findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Before a federal court may grant a state prisoner habeas corpus relief on a claim that was adjudicated on the merits in state court, the petitioner must not only satisfy the requirements of AEDPA but must also convince the court that the error committed by the state court during its adjudication of the petitioner's criminal case was not harmless within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022). In *Shinn v. Jenkins*, 142 S. Ct. 1718, 1732 (2022), the Supreme Court held that when a federal habeas petitioner has properly exhausted state court remedies on a federal constitutional claim through direct appeal or a state habeas corpus proceeding, federal habeas review of that claim is circumscribed in that the federal court is limited to reviewing the record before the state court that resolved the claim on the merits and the petitioner must establish that, under Supreme Court precedent, no fair-minded jurist could have reached the same result as the state court. *See also Shoop v. Twyford*, 142 U.S. 2037, 2044 (2022) (where a petitioner failed to develop the factual bases for his claims in state court, he is entitled to present new evidence in support of his claims before the federal habeas court only in the two limited circumstances outlined in Section 2254(e)(2)).

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *Davila v. Davis*, 582 U.S. 521, 527 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first affording the state courts an opportunity to correct a constitutional violation); 28 U.S.C. § 2254(b)(1). Nonetheless, this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

If the state courts failed to adjudicate a claim on the merits that Harris now presents to this Court (such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or Texas rules of procedural default or (2) which Harris failed to fairly present to the state courts), then this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state court failed to address the prejudice prong of *Strickland*); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state court rested its rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

### III. INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL

### A. Overview of the Federal Claims

Harris argues in his first and second claims for federal habeas relief that his state trial counsel rendered ineffective assistance by (1) failing to adequately investigate Harris's background and present mitigating evidence showing that Harris (a) suffered the deleterious effects of in-utero exposure to alcohol, tobacco, and marijuana (resulting in Fetal Alcohol Syndrome Disorder ("FASD") and Alcohol-Related Neurodevelopmental Disorder ("ARND")) and (b) suffered from the deleterious impact of in-utero and early childhood exposure to toxic lead [ECF no. 13, at 30-61 & 73-90][25] and (2) failing to object to testimony showing that Harris wore a stun belt during trial [ECF no. 13, at 90-105].[26]

### B. State Court Disposition of *Wiggins* Claim

#### 1. State Habeas Application

In his state habeas application, Harris presented five claims of ineffective assistance by his state trial counsel. In claims one and three, Harris argued, in pertinent part, that his state trial counsel rendered ineffective assistance by (1) failing to adequately investigate Harris's background and present mitigating evidence showing Harris's in-utero exposure to alcohol and childhood exposure to lead and (2) failing to object to hearsay testimony during the punishment phase of his trial regarding Harris wearing a stun belt during the elevator incident described above in Section I.D.3. State Habeas Application, at 16-70 & 75-84.

#### 2. Evidentiary Hearing

---

[25] Harris also argues in his federal habeas corpus petition that he suffers from the negative *cumulative* impact of his in-utero and early-childhood exposure to tobacco, lead, alcohol, and marijuana. ECF no. 13, at 86-89.

[26] In addition, Harris's federal habeas corpus petition also includes a series of arguments that amount to a separate claim that he was deprived of due process during his state habeas corpus proceeding by virtue of interplay between the Texas habeas corpus statute applicable to capital cases (Texas Code of Criminal Procedure Article 11.071) and the state habeas trial court's various procedural and substantive rulings. ECF no. 13, at 61-73. This unexhausted due process claim will be addressed separately below.

The state habeas trial court reviewed extensive documentation and affidavits as well as testimony from both lay witnesses regarding Harris's background and experts regarding their opinions on a wide range of subjects.

### a. Applicant's Evidence

Harris's mother repeated much of her trial testimony describing her pregnancy with Harris and Harris's childhood but added some new details after explaining that she suffered an anxiety attack during Harris's trial and, as a result, felt she had been unable to give all the testimony she had wanted.[27]    Likewise, Harris's female cousin repeated much of her punishment phase trial testimony but added a few new details to her account of Harris's difficult childhood.[28]

---

[27] More specifically, Pamela Maddox testified during Harris's state habeas hearing that (1) Harris's biological father Eric Propes only met Harris three or four times, once when Harris was three of four years old and the next time when Harris was a teenager; (2) her parents divorced when she wad fourteen or fifteen and she becam,e pregnant with Harris when she was seventeen; (3) contrary to what she told Harris's defense team, she drank alcohol daily when a teenager, including during the first three months of her pregnancy with Harris; (4) Harris's birth was a difficult C-Section during which he suffered fetal distress due to his umbilical cord being wrapped around his neck and body; (5) her doctors were forced to resuscitate Harris at birth; (6) she received no treatment for her post-partum depression, had no support when she went home from the hospital with Harris, and had a difficult time bonding with him; (7) she was later much better able to raise the two sons she had with Ramon Maddox; (8) she often left Harris with others while she went out and partied; (9) she has been diagnosed with bipolar disorder and hospitalized three times; (10) her grandmother was hospitalized with mental health issues for many years and her sister committed suicide; (11) Harris's biological father has a family history of psychoses and mental health issues; (12) Harris grew up in an area that was later the subject of lead remediation; (13) she ate dirt while pregnant with Harris; (14) Harris was in a serious car accident at age three in which he suffered a facial laceration (which required stitches) and concussion (which required Harris to remain in the hospital for several hours under observation); (15) Ramon Maddox, an alcoholic, married her when Harris was four years old and later whipped Harris with belts and extension cords until Harris reached age fifteen, when Harris stood up to his stepfather; (16) Ramon Maddox frequently beat her in the presence of Harris; (17) she tried to protect Harris from his stepfather but Harris began running away from home at age eight or nine; (18) Ramon Maddox was much harsher with Harris than he was with their other two sons; (18) Harris had behavioral issues at school, including sleeping in class, which were complicated by the fact their family frequently moved, forcing Harris to change schools; (19) Harris was diagnosed with ADHD at an early age and prescribed Ritalin; (20) Harris was placed in Special Education classes at age six or seven; (21) Harris smoked marijuana in high school; (22) when he grew older Harris indicated an interest in seeing his biological father but Eric Propes never reciprocated Harris's interest; (23) Harris is nonetheless a good father to his daughter; and (24) she divorced Ramon Maddox in 2016.  2 RR SHH 30-82.

[28] More specifically, Shamy Conley testified during Harris's state habeas hearing that (1) she grew up in the same apartment complex as Harris until she was nine years old; (2) Harris treated her like he was her brother and was never violent as a child; (3) Harris's stepfather Ramon Maddox was mean and violent toward Harris, beating Harris with sticks and electrical cords; (4) Ramon Maddox once knocked a tooth from Pamela Maddox's mouth; (5) Harris's mother did not protect Harris from his stepfather; (6) Harris had no one to turn to for protection growing up; (7) Harris began running away from home to get away from his abusive stepfather, essentially living on the streets; (8) at one point Harris lived with her family out in the country until he got into trouble; (9) nonetheless Harris was good with

A pediatrician and expert on FASD, Dr. Julian Kent Davies, described FASD as "an umbrella term" for a number of diagnoses caused by maternal drinking of alcohol during pregnancy and testified that, after interviewing Harris and reviewing records, he had diagnosed Harris with ARND.[29]

Laura Sovine, a social worker who investigated Harris's life history, testified that Harris experienced a difficult childhood (including being abandoned by his teenage mother with multiple

---

her daughter and she had him babysit her daughter at times; and (10) Harris never received help for his drug addiction (smoking marijuana dipped in PCP). 2 RR SHH 83-103.

[29] Dr. Davies testified in pertinent part that (1) diagnoses of FASD and ARND have been around since the 1970's; (2) these diagnoses are characterized by distinctive facial features, small size at birth and developmental deficiencies, and neurodevelopmental disorders resulting from structural brain damage due to in utero alcohol exposure; (3) Harris qualified for Special Educational services in school and displayed learning disabilities, including a pronounced difficulty with mastering mathematics typical of individuals with FASD and ARND; (4) Harris was also diagnosed with ADHD at age seven – another trait common among those with FASD and ARND; (5) Haris displayed difficulties fitting into social settings with his peers, displayed a history of running away from home, and had a pattern of behavioral challenges consistent with FASD and ARND; (6) some of Harris's neuropsychological test results showed difficulties in executive functioning while others were within the average range; (7) one of the hallmarks of brain damage from in utero alcohol exposure is variability in such test results; (8) Harris scored a full scale 84 on the WAIS-IV but displayed a large gap between his nonverbal IQ test score and his math achievement score showing significant math impairment; (9) no neural imaging had been done on Harris to confirm structural brain damage; (10) while Harris's mother described to his defense team that she had only had a couple glasses of wine on the weekends during the first six weeks of her pregnancy, underestimations of alcohol intake during pregnancy are quite common and Harris's mother subsequently revealed to his state habeas counsel that she had ingested alcohol daily during the first two to three months of her pregnancy with Harris, consisting of fortified wine – which has a significantly higher alcohol content than regular wine; (11) in utero exposure to lead, as well as lead exposure during early childhood can have a multiplying effect on the deleterious impact of in utero alcohol exposure; (12) Harris also suffered from depression as a child and from witnessing, and being the victim of, acts of violence within his home; (13) Harris's low average IQ also put him at increased risk of adverse outcomes as he grew up; (14) Harris is just smart enough to make his impairments dangerous because he is capable of concealing his significant disabilities; (15) Harris did receive some academic support from his schools growing up but insufficient psychological evaluation; (16) *during his interview, Harris displayed significant difficulty with planning and other executive functioning*; (17) *during his interview, Harris displayed significant problems with anger management, was easily distracted, and displayed a high level of impulsivity*; (18) *Harris also displayed poor judgment and concrete thinking, i.e., he struggled with abstract thinking*; and (19) there is no such thing as a safe level of alcohol consumption during pregnancy.  3 RR SHH 24-77.

Dr. Davies admitted, however, that (1) fatigue, distractions, and other factors can affect a test subject's performance on neuropsychological tests; (2) in addition to the absence of any neuro-imaging confirming that Harris actually suffered brain damage typical of those with FASD, Harris does not have any of the distinctive facial features of persons with FASD, Harris's birth weight and birth size were well within the normal range; and Harris's records did not display any of the growth or physical developmental deficiencies (i.e., delays in growth or meeting developmental milestones) typical of those with FASD; (3) there was no record of any health care provider testing Harris for FASD symptoms during his childhood; (4) FASD is not included as a recognized diagnosis in the American Psychiatric Association's Diagnostic and Statistical Manual of mental Disorders but, instead, is listed as a diagnosis worthy of further examination and research; and (5) Harris admitted to using marijuana almost daily beginning around age fourteen to seventeen.  3 RR SHH 37-38, 40-41, 43, 51-52, 75, 96, 98-101.

caregivers, witnessing and being the victim of domestic violence, suffering a traumatic head injury as a child, witnessing his dog being run over by a motorcycle, being unable to form an attachment with a primary caregiver during his first three years of life, being diagnosed with ADHD and placed in Special Education classes, being diagnosed with depression and suicidal ideation at an early age, and being deprived of the psychological care he required) all of which resulted in Harris growing into an anxious, distracted, and irritable individual who displayed pathological behavior, such as drug abuse, running away from home, bringing a knife to school, and becoming involved with a street gang.[30]

A pediatric neuropsychologist with experience working with children with FASD, Dr. Joan Mayfield, testified that she believed the neuropsychologist retained by Harris's state trial defense team (Dr. Antoinette McGarrahan) should have performed additional testing of Harris's executive functioning, pointing to the fifteen-point difference between Harris's verbal and performance scores on the WAIS-IV, which is common among children with FASD.[31]

_____

[30] 3 RR SHH 112-25; 7 RR SHH 10-56.
    Ms. Sovine repeatedly criticized Harris's school officials for punishing Harris for his misbehavior instead of getting Harris the mental health counseling she believed he needed.  7 RR SHH 11-12, 24.  She admitted on cross-examination that she was unfamiliar with the facts of Harris's capital offense.  *Id.*, at 46-47.

[31] 6 RR SHH 10-37. Dr. Mayfield also testified that she believed (1) symptoms such as ADHD and learning disabilities required good educational plans; and (2) educators and parents need to help children control their behaviors.  *Id.*, at 19, 22.
    On cross-examination, Dr. Mayfield testified that (1) Harris's records showed he had engaged in chronic PCP use from ages nineteen to twenty-four and long term marijuana abuse starting in his pre-teens; (2) the causes of ADHD are unknown; (3) chronic drug abuse can affect cognitive functioning; (4) access to raw test data from neuropsychological testing is not usually made available to attorneys, even in criminal cases, but is limited to the psychologists who are asked to opine on the defendant's mental health; (5) both Dr. McGarrahan and the mental health expert appointed by the state trial court to examine Harris prior to trial (Dr. Christine Reed) agreed on a diagnosis of Antisocial Personality Disorder ("ASPD"); (6) she found no evidence of malingering in Dr. McGarrahan's test results; (7) she could not diagnose Harris with FASD because she did no testing for FASD; and (8) she believed from her view of Harris's records and Dr. McGarrahan's test results that Harris showed significant cognitive impairment.  6 RR SHH 37-63 & 67-69.
    On redirect examination, Dr. Mayfield opined that Harris's tests scores obtained by Dr. McGarrahan were consistent with a diagnosis of FASD but admitted that poor nutrition could cause childhood learning problems.  *Id.*, at 64-67.

An expert on public health and exposure to chemicals, Dr. Thomas Dydek, testified that (1) through his work with the Texas Air Control Board, he was personally familiar with the history of the lead smelting plant located in West Dallas near where Harris's grandmother resided and Harris's mother grew up; (2) the plant in question polluted a wide area of residential West Dallas with toxic levels of lead; (3) lead exposure in children can lead to significant negative effects on brain and central nervous system development, including ADHD, lack of impulse control, poor academic performance, delinquency, and violence; (4) there is no safe level of lead exposure; (5) toxic lead can be passed on in utero from mother to child; (6) lead remains in the bones even after it has left the blood stream; (7) based upon his research, it was likely Harris was exposed to lead both in utero and as a small child through the lead-contaminated soil in the neighborhood where Harris's grandmother lived and Harris's mother grew up; (8) Harris's exposure to lead in utero and as a child explains his tendency toward violence; and (9) Harris's childhood history of ADHD, depression, and behavioral problems was consistent with lead poisoning.[32]

An expert in cultural studies and education, Dr. Courtney Robinson, testified about the "school to prison pipeline," and opined that (1) school children, particularly children of color, who are disciplined in school (through in-school suspension and out-of-school suspension) tend to end up in the criminal justice system; (2) black children were far more likely to be reported for disciplinary problems in school, and to receive suspensions than white students; (3) Harris had a long history of school disciplinary problems; (4) given Harris's demonstrated depression and ADHD at an early age, he should, instead, have received immediate and aggressive intervention in the form of referral to a psychologist and testing for autism; (5) the Ritalin prescribed for Harris

---

[32] 3 RR SHH 125-62.  Dr. Dydek admitted, however that (1) a simple, non-invasive test is available to determine if an individual's bones reflect lead poisoning yet there was no record of either Harris, his mother, or his grandmother ever having been tested for lead poisoning.  *Id.*, at 153, 159.

would have treated his ADHD but not his underlying depression; (6) arrest is traumatic for children, who often do not understand the process; (7) children are often labeled or designated as gang members even when they are not involved in actual gang activity; and (8) Harris did not get the treatment he needed during his school years.[33]

Finally, Harris called attorney Richard Burr, a veteran post-conviction defense advocate, who testified that (1) in utero exposure to alcohol was a red flag for defense counsel as early as 2009; (2) FASD is associated with communications problems; (3) ASPD has evolved into a diagnosis of behaviors rather than a mental illness and can be addressed by reference to other mental health problems which explain the defendant's violent behavior; (4) the use of drugs is often associated with mental health problems; (5) by 2009 defense counsel were also aware of the deleterious effects of exposure to toxins; and (6) social history testimony can be helpful in helping a jury understand how mental health problems result from brain damage.[34]

### b. State's Evidence

The State called Dr. Christine Reed, a clinical and forensic psychologist who testified that she was appointed by the state trial court to examine Harris prior to trial (and to file a sealed report with the trial court) to be available to the prosecution in the event the defense introduced testimony

---

[33] 5 RR SHH 8-37, 60-68, & 69-70.
On cross-examination, however, Dr. Robinson testified that (1) she would not have been available to testify on Harris's behalf during his 2012 capital murder trial; (2) she had not been able to review any of Harris's Special Education records, including his Individual Educational Plans; (3) in high school, Harris had an inclusive support teacher and was working toward mainstreaming; (4) while drugs are often used to self-medicate, PCP is not a mood stabilizer; and (5) Harris checked himself out of school when he turned eighteen.  5 RR SHH 37-60, 69.

[34] 9 RR SHH 69-117 & 138-39.
On cross-examination, attorney Burr admitted that (1) he had very little experience trying criminal cases, including virtually none in the State of Texas; (2) he had not reviewed any of the records from Harris's trial court proceedings; and (3) his experience and training in mental health issues consisted of taking a single graduate level course in Florida.  9 RR SHH 117-38.

by a mental health expert who had examined Harris.[35]  Dr. Reed testified in pertinent part that (1) she conducted a clinical interview of Harris, administered several tests, and reviewed Harris's records; (2) she diagnosed Harris with psychotic disorder not otherwise specified, depression disorder not otherwise specified, substance abuse, and ASPD; (3) her findings were consistent with those reached by the defense's mental health expert, Dr. McGarrahan; (4) at the state trial court's direction, she filed a copy of her report under seal in the trial court and did not discuss Harris's case with the prosecution or furnish a copy of her report to the prosecution until 2015; (5) Harris reported starting a fire during his youth and admitted to gang membership as a youth, consisting primarily of fighting – which later ended when he withdrew from his gang; (6) Harris reported PCP use on a daily basis beginning around age fifteen-to-sixteen, usually by smoking tobacco or marijuana dipped in PCP; (7) Harris reported symptoms of depression, auditory hallucinations, and problems focusing; (8) Harris's full scale score on the WAIS-IV she administered was 92 (higher than the 84 obtained by Dr. McGarrahan prior to trial); (9) she found no significant intellectual disability and Harris's below average scores on a variety of academic skills tests were consistent with his IQ score; (10) her testing showed Harris had engaged in exaggeration – but not malingering – on the MMPI and PAI personality tests; (11) ASPD is a lifelong pattern of behavior consisting of criminal activity, aggressive behavior, irresponsibility, lack of remorse, and deceitfulness, all of which was consistent with Harris's history – which included a juvenile diagnosis of conduct disorder; (12) Harris reported auditory hallucinations dating back to age twelve – prior to the start of his PCP abuse; (13) Harris reported he had not been on any mental

---

[35] 4 RR SHH 14-16.

health medication since middle school; and (14) Harris appeared to be attempting to exaggerate his mental health problems.[36]

Dr. Fed Andrew Falkowski, a clinical and forensic neuropsychologist testified that (1) he had reviewed the results of the tests administered to Harris by Dr. McGarrahan and Dr. Reed, which he believed to be accurate; (2) he found Harris's scores to be consistent with Harris's educational background, including Harris's history of emotional disturbances, changing schools, and chronic PCP abuse; (3) he also reviewed the scoring done by Dr. Underhill, whom the defense's experts had relief upon, and found that Dr. Underhill erroneously scored a number of tests administered on July 5, 2011 by Dr. McGarrahan as "zero" when, in fact, Harris became tired and Dr. McGarrahan chose not to administer the tests in question; (4) Dr. Underhill's error interpreting McGarrahan's tests results meant Dr. Underhill's finding of significant cognitive impairment was erroneous; (5) Dr. Davies and several other experts who testified or furnished affidavits on behalf of Harris during his state habeas proceeding relied on Dr. Underhill's erroneously scored report; (6) he believed Dr. McGarrahan and Dr. Reed accurately determined Harris displayed below average academic skills consistent with Harris's IQ score and educational attainment but little cognitive impairment; (7) some of Harris's low test scores in July 2011 could likely also be attributed to fatigue, disengagement, poor education, chronic drug abuse, or lack of motivation; (8) Harris also scored poorly on a test which measured effort; (9) Harris scored in the average range on most tests of executive functioning and he did not see any reason for additional tests on that skill set; (10) he concluded that Harris's test scores indicated above average results in executive functioning given Harris's IQ and educational attainment, mild to moderate impairment in verbal learning, but no indication of neurological dysfunction or significant deficits; (11) a few

---

[36] 4 RR SHH 5-65.

low scores scattered across the testing landscape did not indicate cognitive impairment given Harris's below average IQ; (12) Harris's low math scores could be attributable to his history of disruptions in his education resulting from arrests, detention, and his move to Georgia and then back to Texas during his teen years; (13) Harris's test results were consistent with the "practice effect" in that Harris scored higher on the neuropsychological tests administered by Dr. Reed *after* Dr. McGarrahan administered her tests; (14) chronic drug abuse can cause memory impairment and neurological damage; (15) the 15-point disparity between Harris's verbal and performance IQ scores was unremarkable given that the WAIS manual reports such disparities in twenty per cent of the general population (with ten to thirteen percent of the population scoring fifteen points higher in the performance portion than on the verbal portion); and (16) he did not believe that Harris's test scores warranted testing for in utero exposure to alcohol.[37]

The defense's mental health expert at trial, forensic neuropsychologist Dr. Antoinette McGarrahan, testified that (1) that Harris's cognitive test results in July and October 2011 were consistent with a number of etiologies, including FASD, ADHD, and developmental issues such as head trauma and long term PCP abuse; (2) despite doing multiple interviews with her, it was unclear to the defense team just how much Harris's mother drank during her pregnancy; the defense team did not have information suggesting Harris's mother's alcohol intake during pregnancy was greater than that to which she testified at trial; (3) despite multiple interviews of Harris's mother and grandmother, it was unclear to the defense team just how much alcohol Harris's mother drank during her pregnancy; (4) Harris's mother denied significant alcohol consumption but emphasized her marijuana consumption; (5) she informed Harris's defense counsel that she did not believe her testimony would prove beneficial at trial, in part, because her

---

[37] 6 RR SHH 70-140.

testimony would open the door to testimony by Dr. Reed, which Dr. McGarrahan knew would prove very harmful to the defense; (6) she disagreed with the diagnosis of jail medical officials that Harris suffers from schizoaffective disorder; (7) instead, she diagnosed Harris with ASPD as the better diagnosis; (8) Harris displayed very little cognitive impairment during her testing; (9) Harris's memory problems were mild; (10) Harris does not suffer from a mental illness; (11) Harris told her that he had a good relationship with both his mother and stepfather; (12) Harris admitted a history of gang membership, running away from home frequently, daily marijuana usage starting at age thirteen, and daily PCP usage starting at age nineteen; (13) Harris reported auditory hallucinations beginning at age eighteen-to-nineteen around the time he started daily PCP use; (14) tests she conducted in October 2011 showed a high probability of malingering and she advised Harris's trial counsel to admonish Harris not to exaggerate his mental health symptoms when interviewed by Dr. Reed; (15) Harris's low average IQ did not suggest neuro-cognitive damage; (16) Dr. Underhill (whose report formed the basis for many of the opinions expressed by defense's experts during the state habeas proceeding) did not have the results of her October 2011 testing of Harris and erroneously scored a number of tests she did not administer in July 2011 as "zero," thus misinterpreting the test data; (17) Harris exhibited fatigue when she administered the California Verbal Learning test cited by several defense experts as the basis for their opinion that Harris has significant cognitive impairment; (18) Harris's responses were sloppy and he did poorly when he became fatigued; (19) she found no impairment in Harris's executive functioning – in fact Harris did rather well on tests of executive functioning in light of his IQ score; (20) Harris's scattered poor test results likely reflect his poor language skills rather than frontal lobe damage; (21) the only areas in which she found Harris displayed potential deficits were in complex memory and the test results in that area were obtained when Harris was fatigued; (22) the fifteen point difference

30

between Harris's verbal and performance IQ scores could be explained by Harris's PCP use; (23)_
Harris's low math scores could have been caused by depression, emotional influences, genetic
abnormalities, in utero lead or alcohol exposure, low socioeconomic status, or low academic skills;
(24) Harris's ADHD could have been attributable to depression, emotional influences, genetic
factors, or in utero lead or alcohol exposure; (25) there is no objective testing available to establish
FASD; (26) there was insufficient reason to recommend that Harris be given an MRI to look for
evidence of organic brain damage; (27) Harris reported regular beatings with belts from an early
age; (28) Harris witnessed his stepfather beating his mother, which resulted in the police arriving
at the home many times; and (29) Harris was teased, bullied, and not well liked as a child because
of his placement in Special Education classes.[38]

The social worker who served as a mitigation specialist for Harris's trial counsel, Brandon
Ross, testified that (1) it was difficult to get information from Harris's mother prior to trial because
Pamela Maddox was suicidal and often related conflicting information to the defense team; (2)
Harris had significant learning disabilities and dropped out of school; (3) Pamela Maddox was
heavily medicated when she testified at Harris's trial; and (4) getting information from Harris's
family was difficult and often required multiple interviews.[39]

The state habeas court also heard extensive testimony from all three attorneys who
represented Harris at trial.  Attorney Brad Lollar, Harris's lead defense counsel, testified in
pertinent part that (1) Dr. McGarrahan reported her test results to the defense team in May 2012,
reported that Harris had very little cognitive impairment, and recommended that she not be called
to testify at trial; (2) Dr. McGarrahan also reported that Harris's personality testing was likely

---

[38] 7 RR SHH 57-140.

[39] 9 RR SHH 16-64.

invalid because Harris over-represented his lifelong symptoms; (3) Dr. McGarrahan recommended that the defense consider using Harris's family and Dr. Kessner to identify mitigating aspects of Harris's background without opening the door to testimony by a prosecution mental health expert; (4) Dr. McGarrahan did not recommend that the defense explore or investigate the possibility Harris suffered from in utero alcohol or lead exposure; (5) Dr. McGarrahan did not recommend additional neuropsychological testing be performed on Harris; (6) he believed there was little value in pursuing additional mental health testing after Dr. McGarrahan reported Harris had only low reductions in performance on the tests she administered; (7) the defense opposed the State's pretrial motion for an evaluation of Harris by a prosecution expert but the trial court allowed Dr. Reed to conduct such an evaluation and then file a sealed report with the court; (8) putting a defense mental health expert on the stand who had evaluated Harris would have opened the door under applicable state evidentiary rules to testimony by Dr. Reed, whom Dr. McGarrahan had reported would likely diagnose Harris with ASPD; (9) the defense's trial strategy was premised on the recommendations of Dr. McGarrahan; (10) the defense's punishment phase trial strategy was to focus on the future dangerousness special issue and attempt to convince the jury that, based upon Harris's non-violent record during his previous incarcerations, once incarcerated and away from PCP, Harris would not pose a danger of future violence; (11) Harris's capital offense was particularly violent in light of the fact it included the murder of multiple victims, a pecuniary motive, the fact Harris threatened to take the wife and daughter of his victim hostage, and the fact Harris had been involved in a pair of prior home invasions that included multiple shooting victims (and the presence of multiple witnesses to each such shooting); (12) the defense was unable to trace Harris's mild cognitive impairments to any particular cause (whether FASD, lead exposure, or a violent childhood); (13) evidence showing Harris was impaired due to the incurable, lifelong

32

effects of lead or alcohol exposure in utero or as a child would not have been beneficial to the defense's goal of obtaining a negative jury verdict on the future dangerousness special issue; (14) evidence showing Harris sold drugs and robbed other drug dealers during his teen years would not have helped the defense – and the defense managed to keep such evidence away from Harris's jury; (15) he believed evidence of the incident on the elevator supported a finding that Harris would not pose a future danger; and (16) the jury was never informed that Harris had worn a stun belt during trial – only that he wore a stun belt during his transport to the courtroom from the jail during jury selection.[40]

Attorney Mike Howard testified in pertinent part that (1) the defense's punishment phase strategy was to focus on Harris's PCP use and to argue, based on the testimony of the defense's experts (Dr. Roache, James Aiken, and S.O. Woods), that Harris would not be a future danger once incarcerated and deprived of access to PCP; (2) Dr. Kessner's testimony showed that Harris's penchant for violence was the result his abandonment by his biological father, exposure to domestic violence, lack of supervision as a child, head injuries, and in utero alcohol exposure; (3) during jury selection, the defense encountered many potential jurors who said they did not want to hear "excuses" for why Harris was not culpable for his offense; (4) the problem with evidence showing Harris's lead exposure in utero or as a child was that Harris had only low cognitive impairment; (5) the problems with evidence of FASD were that Harris did not show any of the visible facial features distinctive of individuals with FASD, Harris's mother insisted to the defense team that she had only consumed a glass or two of wine on the weekends during the first few weeks of her pregnancy with Harris, and Harris's neuropsychological testing did not suggest FASD; (6) pursuing a weak theory such as lead exposure or FASD could cause the defense to lose

---

[40] 4 RR SHH 66-150.

credibility with the jury; and (7) Harris's grandmother told the defense team that Harris's childhood had not been that bad.[41]

Attorney Doug Parks testified that (1) Harris admitted to his defense team and Dr. Reed that he was a member of the Fish Trap Bloods, a street gang; (2) even street gangs commit criminal acts; (3) there was no evidence Harris's capital offense was gang-related; and (4) the defense believed that focusing on Harris's transitory PCP use was a better strategy than attempting to argue that Harris's minor cognitive impairments were the result of permanent brain damage caused by factors such as lead exposure or FASD.[42]

### 3. Findings, Conclusions, & Recommendation

The state trial court's Order containing its findings of fact, conclusions of law, and recommendation that Harris's state habeas application be denied included findings and conclusions that Harris's trial counsel did not render deficient performance by failing to investigate Harris's background adequately and failing to present available mitigating evidence showing Harris suffered from FASD, ARND, and lead exposure.[43] Likewise, the state habeas trial court concluded Harris was not prejudiced by the failure of his trial counsel to conduct such an investigation and to present such evidence.[44]

More specifically, the state habeas trial court's findings and conclusions regarding FASD and ARND included the following findings:

---

[41] 7 RR SHH 144-92.

[42] 8 RR SHH 10-90.

[43] FFCL pp. 37-101, ¶¶ 43-321 [Copies of FFCL appear at ECF no. 26-21 (at 182-330) and as an exhibit to Harris's original petition (ECF no. 13)]. Of particular note are the state habeas trial court's findings and conclusions with regard to deficient performance found at FFCL pp. 71-72, ¶¶ 188-93.

[44] FFCL pp. 72-74, ¶¶ 194-203.

- Harris's mother Pamela Maddox gave testimony describing her drinking while pregnant with Harris that differed significantly from the testimony she gave at trial and which she disclosed to Harris's trial counsel prior to trial.
- Harris's trial counsel were not deficient for failing to act on information which Pamela Maddox failed to disclose to them.
- Dr. McGarrahan reported to Harris's defense counsel that Harris's neuropsychological deficits were minimal.
- In closing jury arguments, Harris's defense counsel both emphasized that Harris suffered from in utero exposure to harmful substances.
- Dr. Davies' opinions and conclusions were based, in part, on the scoring report of Dr. James Underhill.
- Harris does not demonstrate the facial features or growth deficiencies typical of individuals with FASD.
- In forming her opinions, Dr. Mayfield did not review Dr. McGarrahan's raw test data and did not consider the impact of Harris's chronic marijuana and PCP abuse on his neuropsychological functioning.
- Dr, McGarrahan has extensive experience testifying in criminal proceedings and concluded after conducting seven hours of neuropsychological tests and a clinical interview with Harris that he showed little, if any, cognitive impairment.
- Dr. McGarrahan concluded that Harris exhibits problems with exaggerating and malingering his mental health symptoms during his clinical interview and meets the diagnostic criteria for ASPD.
- Dr, Reed agreed with Dr. McGarrahan's diagnosis of ASPD, as did Dr. Falkowski.
- Dr. Underhill's report did not rely on testing conducted by Dr. McGarrahan in October 2011.
- Dr. Underhill scored Harris with a "zero" on several tests which Dr. McGarrahan actually did not administer in July 2011 because Harris indicated he was fatigued and was essentially done with testing that day.
- Dr. Underhill's scoring of Harris with "zero" on these tests was erroneous and impacted all those other defense experts who later relied on his report.
- Dr. Reed concluded Harris had no gross problems with attention or memory and characterized her testing as consistent with that of Dr. McGarrahan.
- The state habeas trial court authorized an MRI examination of Harris which Dr. Joshua Shimony reported in an affidavit to have shown Harris's brain as "normal."
- The conclusions reached by Dr. Shimony were credible.
- Contrary conclusions interpreting Harris's MRI results reached by defense experts Dr. Jeffrey Lewine and Dr. Joseph Wu were unsupported by sworn affidavits and based upon highly dubious Diffusor Testing Imaging ("DTI") and Volumetrics analysis, which Dr. Shimony rejected as invalid and which the state habeas court concluded were not credible.
- Attorney Burr did not review the record from Harris's pretrial proceedings, jury selection, or trial but, instead, relied on selected information furnished by Harris's state habeas counsel.
- As of the date of his testimony before the state habeas court, attorney Burr had never tried a criminal case in Texas.

- There was no direct link between Harris's ARND and his criminal behavior.
- Harris's trial counsel did not render deficient performance by failing to present Dr. Davies's diagnosis of ARND.
- Had Harris's trial counsel presented evidence of Harris's alleged ARND, the prosecution would in all reasonable likelihood been granted access to the report and testimony of Dr. Reed, which would have included a wealth of information detrimental to Harris, included details of his adolescent gang membership and long history of criminal behavior, including robbing drug dealers at gunpoint and his own drug dealing, as well as Dr. Reed's diagnosis of ASPD.
- Harris failed to show by a preponderance of the evidence that, but for the failure of his trial counsel to present evidence of ARND, the outcome of the punishment phase of Harris's capital murder trial would have been different.[45]

The state habeas trial court's findings and conclusions regarding ineffective assistance and Harris's alleged in utero and early childhood exposure to lead poisoning (i.e., that this ineffective assistance claim was not supported by evidence showing either deficient performance or prejudice) were equally compelling and included findings that:

- Dr. Dydek, the defense's expert on lead poisoning, had never testified in a criminal trial.
- Dr. Dydek reviewed affidavits, including those of Harris's mother and grandmother but did not interview Harris or any of his family members.
- Dr. Dydek opined that "more likely than not" Harris was exposed to toxic lead levels both in utero and in early childhood.
- Recent studies indicate that in utero or early childhood exposure to lead can lead to increases in delinquency and violent behavior among teenagers and young adults.
- Recent exposure to lead is tested in the blood and long term exposure to lead is tested through bone testing.
- No evidence of blood or bone testing for Harris, his mother, or his grandmother was introduced during Harris's state habeas proceeding.
- Childhood lead exposure is only one risk factor for neuropsychological damage.
- Dr. Dydek did not review Dr. McGarrahan's conclusion that Harris showed little-to-no neuropsychological impairment.
- Harris failed to show by a preponderance of the evidence that the failure of Harris's defense team to investigate and present evidence of Harris's in utero and early childhood lead exposure amounted to deficient performance.
- There was no medical evidence (through blood or bone testing) showing that Harris suffered exposure to lead.
- Not all inhabitants of the neighborhoods surrounding the smelter in Dallas County sustained elevated blood lead levels.

---

[45] FFCL 37-73, ¶¶ 43-51,55, 57-63, 75, 80-82, 85-92, 97, 100-01, 104-14, 116-27, 129-69, 178-203.

- Haris's defense counsel believed that a weak claim could diminish the impact of the defense's remaining mitigating evidence.
- Evidence showing Harris's childhood exposure to lead and its correlation to violent behavior could have harmed the defense at the punishment phase of trial on the issue of future dangerousness.
- Calling an expert who had examined Harris to testify at the punishment phase of trial would necessarily have opened the door to potentially harmful testimony from Dr. Reed and other prosecution experts.
- Harris's defense team received a report from its mental health expert that Harris had limited cognitive impairment.
- There was no substantial likelihood that testimony from Dr. Dydek regarding Harris's possible exposure to lead in utero or in early childhood and evidence showing the link between such exposure and violent behavior would have resulted in a different verdict at trial.[46]

This court has undertaken a careful and independent review of the entire record before the state habeas court and finds all of the foregoing factual determinations were fully supported by the evidence before that court. Harris has not presented this court with any clear and convincing evidence to the contrary. Nor has Harris identified any evidence in the record before the state habeas trial court refuting the foregoing factual determinations.

With the exception of a noted clerical error, the TCCA adopted the state habeas trial court's factual findings when it rejected Harris's initial claim for state habeas relief on the merits. *Ex parte Harris*, WR-80,923-01, 2020 WL 8079824, *2 (Tex. Crim. App. Dec. 16, 2020).

### C. Clearly Established Federal Law

Harris's ineffective assistance claims reference or are premised upon his trial counsels' alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Insofar as Harris relies upon the ABA's Guidelines, those recommendations for the performance of trial counsel do not set forth the operative standard of *judicial* review for the performance of trial counsel. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009)

---

[46] FFCL 75-82, ¶¶ 207, 210-16, 218-23, 225-35.

(the ABA Guidelines are "only guides" to what reasonableness means, not its definition); *Druery v. Thaler*, 647 F.3d 535, 541 n.2 (5th Cir. 2011) ("Best practices urged by the ABA do not necessarily track the contours of the Sixth Amendment. Consequently, the guidelines do not function as 'inexorable commands' with which all capital defense counsel 'must fully comply.'").

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland v. Washington*, 466 U.S. 668, 688-89 (1984).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland*, 466 U.S. at 687:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate

decisions regarding how best to represent a criminal defendant." *Bobby*, 558 U.S. at 7 (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Thornell v. Jones*, 144 S. Ct. 1302, 1310 (2024); *Strickland*, 466 U.S. at 694. "This requires a substantial, not just conceivable, likelihood of a different result." *Jones*, 144 S. Ct. at 1310; *Pinholster*, 563 U.S. at 189.

In instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal

court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 577 U.S. 73, 77 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (Citations omitted).

### D. AEDPA Analysis of *Wiggins* Claim

### 1. No Deficient Performance

The evidence before the state habeas court was uncontroverted with regard to what Harris's mother and family members told Harris's defense team *prior to trial* about his mother's drinking and drug use during her pregnancy with Harris. As Dr. McGarrahan and Ms. Ross testified during the state habeas proceeding, Pamela Maddox repeatedly denied any history of extensive drinking, insisting instead that her primary means of relaxing on weekends was to smoke marijuana. Harris's defense team were aware that Mrs. Maddox had consumed a glass or two of wine on the weekends

40

during the first six weeks to two months of her pregnancy. It was not until Harris was convicted of capital murder and sent to Texas' death row that his mother began proclaiming that she had consumed alcohol (in the form of fortified wine) daily for the first three months of her pregnancy. Dr. McGarrahan and Ms. Ross were unable to elicit any similar information from Mrs. Maddox prior to Harris's trial, despite their suspicions that Mrs. Maddox was being less than forthcoming with them.

Dr. McGarrahan concluded after extensive evaluation of Harris that, while his IQ fell in the low average range, Harris did not display any significant cognitive impairments. She also concluded that, given his IQ score, Harris's executive functioning was a strength for him rather than a deficit. Dr. McGarrahan, an experienced forensic neuropsychologist with a great deal of familiarity with capital murder trials in Texas, advised Harris's defense team that she did not believe any further neuropsychological testing of Harris was justified. Dr. McGarrahan also advised Harris' defense team that any testimony by a defense mental health expert who had evaluated Harris might very well open the door to potentially devastating testimony regarding ASPD by Dr. Reed or another prosecution expert. Dr. Reed and Dr. Falkowski, who like Dr. McGarrahan are *forensic* neuropsychologists, agreed with Dr. McGarrahan's analysis of Harris's test results and her conclusion that Harris satisfies the diagnostic criteria for ASPD.

An MRI conducted on Harris in September 2019 showed his brain appeared to be normal. The state habeas court reasonably credited the opinion of Dr. Shimony, who furnished an affidavit on that subject, rather than the questionable reliance by Dr. Lewine and Dr. Wu on DTI and Volumetric analysis – particularly since these two defense experts did not furnish the state habeas court with live testimony, an affidavit, or a sworn declaration in support of their opinions.

41

The defense experts who testified during the state habeas proceeding that Harris displays significant cognitive impairments either (1) practice primarily in areas focused on pediatrics (e.g., Dr. Davies, Dr. Robinson, and Dr. Mayfield); (2) did not conduct a clinical interview or personally evaluate Harris (e.g., Dr. Mayfield, Dr. Dydek, Dr. Underhill, and Dr. Robinson); (3) did not furnish an affidavit or sworn statement to the state habeas court (e.g., Dr. Lewine and Dr. Wu); (4) relied upon Dr. Underhill's erroneous interpretation of Dr. McGarrahan's raw test data (e.g., Dr. Davies); or (5) did not choose to testify at the state habeas proceeding (e.g., Dr. Lewine, Dr. Wu, Dr. Brown and Dr. Underhill). It was objectively reasonable for the state habeas court to credit the live testimony of Dr. McGarrahan, Dr. Reed, and Dr. Falkowski on the issue of whether Harris's neuropsychological testing showed deficits in executive functioning and significant cognitive impairments over that of the defense's proffered experts. The State's three testifying mental health experts had considerably more real-world experience dealing with *adults* in the criminal justice system than did the defense's testifying experts, who focused their practice on pediatrics.

As of the date of Harris's capital murder trial, FASD and its kin ARND were part of a group of diagnoses that had not yet been accepted into the mainstream of the psychiatric community – as evidenced by the treatment of FASD in the American Psychiatric Association's DSM-V. Instead, FASD remained a boutique diagnosis deemed deserving of further study but not inclusion in the main body of the DSM-V.[47] Furthermore, it was undisputed during Harris's state habeas hearing that Harris displayed none of the facial features, abnormally low birth weight and size, or developmental delays in childhood typical of those diagnosed with FASD.

---

[47] See the testimony of Dr. Davies on cross-examination on this very point, 3 RR SHH 98-101.

While the deleterious effects of lead exposure – both in utero and during early childhood – may well have been established prior to the date of Harris's trial, Harris failed to present the state habeas court with any medical evidence showing that either he, his mother, or his maternal grandmother had ever tested positive, via blood or bone, for lead poisoning. It was far from clear during Harris's state habeas proceeding that everyone (or even most people) who resided in the Dallas neighborhoods affected by the lead smelter in question had tested positive for lead poisoning.[48]

Harris's trial counsel chose to focus on the future dangerousness special issue and to argue at the punishment phase of trial that, while Harris had suffered from in utero exposure to alcohol and marijuana, Harris's violent behavior was the product of the transitory effects of his PCP addiction, rather than the result of the permanent effects of FASD/ARND and/or lead poisoning. The state habeas court reasonably concluded that reliance by Harris's state trial counsel on mitigating evidence focusing the jury's attention on FASD/ARND and/or lead poisoning could harm their ability to get a favorable jury verdict on the future dangerousness special issue. Unlike the mitigation special issue, in Texas the prosecution squarely bears the burden of proving future dangerousness beyond a reasonable doubt. The state habeas court reasonably concluded that Harris's trial counsel reasonably chose a punishment phase strategy that kept the future dangerousness special issue in play rather than a strategy (asserting FASD/ARND and/or lead poisoning) which all but conceded future dangerousness.

Under such circumstances, it was objectively reasonable for the state habeas court to conclude that the decision by Harris's defense team not to investigate the possibility of Harris's in

---

[48] Dr. Dydek testified without contradiction during Harris's state habeas hearing that the lead smelter in question ceased operation a few years before Harris was born and that a cleanup effort commenced circa 1984-85. 3 RR SHH 145-52.

43

utero alcohol exposure (at least any *further* than Dr. McGarrahan and Ms. Ross were able to get

on that subject during their multiple interviews with Harris's mother) or in utero/early childhood

exposure to lead was likewise objectively reasonable.

### 2. No Prejudice

The state habeas court likewise reasonably concluded that Harris's ineffective assistance

complaints about his trial counsels' failure to further investigate and present evidence showing

Harris suffered from FASD/ARND and/or lead poisoning did not prejudice Harris within the

meaning of *Strickland.*

Harris faults the state habeas court's analysis of *Strickland*, in part, because that court found

Harris's new mitigating evidence of FASD/ARND and lead poisoning to be less than compelling

in view of (1) the state habeas hearing testimony of Dr. McGarrahan, Dr. Reed, and Dr. Falkowski

and (2) the absence of any evidence showing a causal connection between Harris's alleged ARND

and lead poisoning and Harris's capital offense. ECF no. 13, at 31-33, 76-77, 81-84.  The Supreme

Court recently emphasized, however, that a federal habeas court reviewing a *Wiggins* claim is

required to conduct a comparative analysis of the competing expert opinions before it when

balancing the weight of the new mitigating evidence against the totality of the aggravating

evidence before it.  *Jones*, 144 S. Ct. at 1310 (where a prosecution expert has furnished an opinion

contrary to those of the defense's experts, it is hard to see how the state court could decide how

much weight to give the defense expert's opinions without making a comparative analysis).

Likewise, in *Jones* the Supreme Court repeatedly noted the significance of the absence of evidence

showing a causal link between his proffered new mitigating evidence and his capital offense.  *Id.*,

at 1310-13 (recognizing that the absence of any causal link between Jones's new mitigating

evidence (of mental illness, cognitive impairments caused by childhood trauma, childhood sexual

abuse, and substance abuse) and Jones's capital offense meant his new mitigating evidence had little value). Harris's state habeas court cannot reasonably be faulted for failing to engage in the same analytical errors the Supreme Court condemned in *Jones.*

Contrary to the arguments contained in Harris's federal habeas petition, the state habeas court was not free to completely disregard the opposing mental health expert opinions presented by the State during Harris's state habeas proceeding, i.e., the opinions of Dr. Reed, Dr. Falkowski, and Dr. McGarrahan. *See Jones*, 144 S. Ct. at 1310 ("When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if 'there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded the balance of aggravating and mitigating circumstances did not warrant death.'" (quoting *Strickland*, 466 U.S. at 695)). "Determining whether a defense expert's report or testimony would have created a reasonable probability of a different result if it had been offered at trial necessarily requires an evaluation of the strength of that report or testimony. And where a prosecution expert has expressed a contrary opinion, it is hard to see how a court could decide how much weight to give the defense expert without making a comparative analysis." *Jones*, 144 S. Ct. at 1310. Likewise, contrary to the arguments contained in Harris's federal habeas petition, the Supreme Court has also held that it is *not* error for a court reviewing an ineffective assistance claim arising in the context of a capital sentencing proceeding to attach diminished persuasive value to mental health conditions when it finds no causal link between those conditions and the defendant's conduct when he committed his capital offense. *Id.*

As explained above, and as Harris's state trial counsel and the State's mental health experts pointed out during their state habeas testimony, the new mitigating evidence Harris presented of both FASD/ARND and lead poisoning was weak. In his federal habeas petition, Harris concedes

the practical difficulty of making an FASD/ARND diagnosis.  ECF no. 13, at 35-45.  Harris did not display any of the distinctive facial features of FASD or any of the other objective criteria for that diagnosis such as low birth weight and size or a history of developmental delays.  All the experts who testified during Harris's state habeas proceeding acknowledged that his birth weight and size were within the normal range and there was no evidence that he failed to timely meet his developmental goals growing up.  Likewise, despite testimony from Dr. Dydek that there is a simple, non-invasive test available to check (at the heel bone) for long term lead poisoning, Harris presented the state habeas court with no evidence suggesting that either he, his mother, or his maternal grandmother had ever tested positive for lead poisoning.  As explained above, the state habeas court reasonably credited the affidavit of Dr. Shimony stating that Harris's 2019 MRI scan showed Harris's brain was normal, as opposed to the contrary, unsworn reports of Dr. Lewine and Dr. Wu submitted by Harris.

The State's three testifying mental health experts (Dr. Falkowski, Dr. Reed, and Dr. McGarrahan), all forensic psychologists with experience in the adult criminal justice system, agreed that Harris's displayed no significant deficits in executive functioning, overall Harris's test scores were consistent with his IQ score, and Harris's low scores on some neuropsychological tests could have been attributable to fatigue or other external factors, such as long term drug abuse, malingering, or exaggeration of his mental health issues.  These three experts each independently concluded that Harris displayed ASPD and very little cognitive impairment.

As explained in detail in Section I.D.2. above, during the punishment phase of trial, Harris's trial counsel presented a substantial case in mitigation, including Dr. Kessner's testimony identifying multiple risk factors for violence Harris encountered during his unstable, chaotic, violent childhood, including his exposure to domestic violence, his mother's inability to bond with

him at an early age, his ADHD and placement in Special Education classes, and his in utero exposure to alcohol and marijuana.

In contrast, the aggravating evidence that was before the state habeas court included not only the aggravating evidence that was before Harris's capital sentencing jury, i.e., the brutal facts of Harris's capital offense (three victims shot, two of whom died, Harris's actions in terrorizing the female members of the Gallardo family, Harris's actions in firing at surrounding police officers as he left the Gallardo home, and Harris's actions in resisting arrest even after he had been twice shot and tackled to the ground) and the extensive testimony detailing Harris's participation in a pair of violent home-invasion-robberies just weeks before his capital offense (during which multiple victims were robbed and shot, one fatally). The state habeas court also had before it *new* aggravating evidence in the form of admissions by Harris's family, social worker, and examining mental health experts that Harris (1) sold drugs as a teenager, (2) obtained a gun and began robbing other drug dealers at age nineteen, (3) had a much longer and more extensive history of abusing marijuana and PCP than revealed at trial, (4) admitted to gang membership as an adolescent, and (5) had been diagnosed by both Dr. McGarrahan and Dr. Reed prior to trial as satisfying the criteria for a diagnosis of ASPD. "[W]here the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result." *Jones*, 144 S. Ct. at 1311.

Under such circumstances, the state habeas court reasonably ascribed less weight to Harris's new evidence of FASD/ARND and lead poisoning than it did to the overwhelming aggravating evidence, including the new diagnoses of ASPD presented by the State's three testifying mental health experts.

### 3. Conclusions

The state habeas court acted in an objectively reasonable manner when it concluded that Harris's first claim for state habeas relief failed to satisfy either prong of *Strickland*. The TCCA's decision to reject Harris's first claim for state habeas relief on the merits was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Harris's trial, state direct appeal, and state habeas proceedings. Under the AEDPA, Harris's initial claim herein does not warrant federal habeas corpus relief.

### E. *De Novo* Review of *Wiggins* Claim

Among the arguments Harris included in his federal habeas corpus petition is a contention that the state habeas court violated due process principles in the way it analyzed Harris's ineffective assistance claims. ECF no. 13, at 61-73. Therefore, out of an abundance of caution, this court will undertake an alternative *de novo* review of Harris's initial claim for federal habeas corpus relief.

### 1.  No Deficient Performance

In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence – such as mental illness or a history of childhood abuse – may be available. *See, e.g., Porter*, 558 U.S. at 39-40 (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the

defendant's family background and military service); *Wiggins*, 539, U.S. at 524-26 (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams*, 529 U.S. at 395-96 (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison). Such claims are commonly referred to as *Wiggins* claims.

As explained in Section I.D.2. above, Harris's trial counsel, mitigation specialist and mental health expert undertook an extensive investigation into Harris's background and presented a substantial case in mitigation at trial. The problems with Harris's *Wiggins* claim are legion. The fundamental problem with this ineffective assistance claim is Harris's fallacious assertion that his defense team was required to exhaustively interview (and present testimony from) both lay and expert witnesses who could furnish additional details about Harris's difficult childhood and new possible sources of the cognitive impairment which Dr. McGarrahan advised Harris's trial counsel prior to trial was relatively modest in nature. Harris's defense team was not obligated to engage in a wide-ranging exploration for every conceivable source of information potentially beneficial to the defense. *See Thomas v. Lumpkin*, 995 F.3d 432, 456 (5th Cir. 2021) (Duty to investigate does not force defense lawyers to "scour the globe on the off chance something will turn up." (quoting *Rompilla*, 545 U.S. at 383)). Counsel in death penalty cases have a duty to make *reasonable* investigations or to make a reasonable decision that makes particular investigations unnecessary. *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020); *Bobby*, 558 U.S. at 11-12; *Wiggins*,

539 U.S. at 521; *Strickland*, 466 U.S. at 688-91. "'In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Andrus*, 140 S. Ct. at 1881 (quoting *Wiggins*, 539 U.S. at 521-22); *Strickland*, 466 U.S. at 688-91.

As explained at length in Section III.B.2. above, Harris's mitigation specialist, mental health expert, and lead trial counsel testified during Harris's state habeas proceeding and detailed the extensive nature of their deep dive into Harris's lengthy and violent criminal history, as well as Harris's unstable and abusive childhood. Harris's defense team then presented an extensive case in mitigation.

As is readily apparent from the trial testimony of Dr. Kessner, Harris's mother, brother, stepfather, and cousin, and Dr. Roache, Harris's defense team managed to obtain a wealth of documentation and other information about Harris's background which they communicated to his mental health experts. Harris's mental health experts, Dr. Kessner and Dr. Roache, testified extensively about the external risk factors which likely impacted Harris's violent behavior as an adult, including the deleterious nature of Harris's difficult childhood and the addictive nature of the substances Harris abused. The defense presented Harris's jury with many details of Harris's unstable, violent, and abusive childhood.

Thus, Harris's trial counsel presented an extensive case in mitigation. This distinguishes his case from the scenarios the Supreme Court addressed in *Porter, Wiggins,* and *Williams*. Equally significantly, it distinguishes Harris's case from the Supreme Court's recent decision in *Andrus*, where defense counsel made no effort to investigate or present evidence of the defendant's extremely difficult childhood. Harris's defense team, in sharp contrast, discovered and presented extensive mitigating evidence showing Harris was the product of a childhood characterized not

just by physical and emotional abuse (i.e., Harris's abandonment by his biological father and the inability of his mother to bond with Harris because of her own mental health issues) but also which included Harris witnessing acts of extreme violence between his mother and stepfather.

In contrast to the jury in *Andrus*, Harris's capital sentencing jury was well aware of the difficulties Harris faced as a child. Harris's mother was described by defense experts as an unstable teenager who often left Harris in the care of others while she partied. Harris's biological father was described to the jury as a career criminal who made no effort to be a part of Harris's life. Harris's stepfather was described as physically abusive and favoring his own children over Harris. Dr. Kessner's trial testimony explained to the jury how the difficulties Harris faced as a child detrimentally impacted his conduct as an adult, particularly his penchant for violence.

Admittedly, a substantial portion of Harris's case in mitigation was presented through his expert witnesses, none of whom had evaluated Harris. But generally, the decision on whether to introduce mitigating evidence through lay witnesses versus expert witnesses lies within the sound discretion of trial counsel. *See Hummel v. Davis*, 908 F.3d 987, 991-92 (5th Cir. 2018) (recognizing the wide range of discretion counsel generally enjoy regarding how best to present mitigating evidence and holding trial counsel was not ineffective for making reasonable decisions regarding the manner in which mitigating evidence was presented, including the steps taken by defense counsel to avoid opening the door to admission of harmful rebuttal evidence). In this particular case, Harris's trial counsels' decision to rely primarily upon non-evaluating experts to build its case in mitigation was objectively reasonable.

Harris's trial counsel, mitigation specialist, and Dr. McGarrahan testified during Harris's state habeas proceeding about both (1) the difficulties the defense team encountered in seeking cooperation from Harris's mother and grandmother, the latter of whom described Harris's

51

childhood as "not that bad," and (2) the practical problems they encountered with Harris's tendency to exaggerate his mental health issues. The reasonableness of counsel's strategic decisions is substantially influenced by the defendant's own statements. *Strickland*, 466 U.S. at 691; *Carter v. Johnson*, 131 F.3d 452, 456 (5th Cir. 1997) (counsel's duty to investigate is tempered by the information provided by the defendant).

In addition, Harris's trial counsel, mitigation specialist, and Dr. McGarrahan testified that some of Harris's family interviewed by the defense team had the potential to offer testimony harmful to the defense, including family members who confirmed Harris's adolescent gang membership, history of selling drugs, and history of robbing other drug dealers. Harris's trial counsel acted in an objectively reasonable manner in choosing not to call such witnesses out of concern for what could happen on cross-examination.

An *informed* decision by trial counsel not to proceed with a particular strategy that has the potential for a double-edged outcome is objectively reasonable. *Mejia v. Davis*, 906 F.3d 307, 316 (5th Cir. 2018) (informed decision to forego a lesser-included offense instruction when defendant was entitled to same); *Chanthakoummane v. Stephens*, 816 F.3d 62, 70 (5th Cir. 2016) (informed decision not to present testimony from defendant's family because of concern that calling family members to testify could invite the prosecution to present evidence of defendant's gang affiliation and history of violence); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006) (informed decision not to present evidence that could be construed by jury as both mitigating and aggravating); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (informed decision not to present evidence showing the defendant suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and defendant's mother was severely and chronically mentally ill). *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994) (informed decision

not to present evidence of low intelligence and abusive childhood entitled to "a heavy measure of deference").

Harris has failed to allege any specific facts or furnished any evidence showing his trial counsels' decision to present mitigating evidence in the particular manner and scope they did at Harris's trial was anything other than an informed, strategic decision made after (1) an objectively reasonable investigation into Harris's background, and (2) consultation with the defense's experienced mental health expert, Dr. McGarrahan. The fact that Harris's state habeas counsel identified new experts willing to furnish different etiologies (FASD/ARND and lead poisoning) for Harris's ADHD, learning difficulties, and propensity for violence as an adult does not mean there was anything professionally deficient about the investigation undertaken by Harris's trial team.

After evaluating Harris, Dr. McGarrahan did not advise Harris's defense counsel that any additional testing or investigation into other possible sources of Harris's mild cognitive impairments was necessary. Harris has alleged no specific facts and presented no evidence showing it was objectively unreasonable for his trial counsel to rely on the information and opinions furnished by Dr. McGarrahan. On the contrary, the evidence at Harris's state habeas proceeding was clear that Harris's mother repeatedly downplayed her alcohol intake during her pregnancy with Harris when interviewed by members of the defense team.

This conclusion is further supported by the evidence presented during Harris's state habeas proceeding showing there was substantially more aggravating evidence potentially available to the prosecution which Harris's trial counsel endeavored to conceal from the prosecution.

Dr. McGarrahan and Harris's trial counsel testified that they were concerned Harris's tendency to exaggerate his mental health symptoms (as demonstrated by his jail mental health

records) might be construed by Dr. Reed as a form of malingering. Harris's defense team was also

concerned that, by presenting a mental health expert at trial who had evaluated Harris, the defense

might open the door to a new mental health evaluation by a prosecution expert (such as Dr. Reed).

The defense feared that such an evaluation could reveal Harris's admissions that he had engaged

in multiple additional bad acts and result in the jury hearing a diagnosis of ASPD.[49] Dr.

McGarrahan informed his defense counsel that she was concerned Harris would be diagnosed with

ASPD. In fact, Dr. Reed did diagnose Harris with ASPD, a diagnosis confirmed by Dr. Falkowski.

The objective reasonableness of Harris defense team's concern about avoiding a possible

ASPD diagnosis is beyond argument. Harris's trial counsel acted reasonably in choosing not to

present testimony from a mental health expert who had evaluated Harris because doing so could

have opened the door to evidence of Harris's ASPD from Dr. Reed or another prosecution mental

health expert. *See Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (trial counsel acted reasonably

---

[49] The Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") describes antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." *DSM-5*, at p. 659. Deceit and manipulation are central features of antisocial personality disorder. *Id.*

The DSM-5 defines antisocial personality disorder through the following diagnostic criteria:

A. A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:

1. Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.
2. Deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure.
3. Impulsivity or failure to plan ahead.
4. Irritability and aggressiveness, as indicated by repeated physical fights or assaults.
5. Reckless disregard for safety to self or others.
6. Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.
7. Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

B. The individual is at least age 18 years.

C. There is evidence of conduct disorder with onset before age 15 years.

D. The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.

*DSM-5*, at p. 659.

in choosing not to present mental health testimony that would have opened the door to evidence

the defendant had confessed to other offenses and could be diagnosed as ASPD). It is well-settled

under both federal and Texas law that testimony by an examining mental health expert on behalf

of a criminal defendant effectively grants the prosecution the right to have the defendant evaluated

by a prosecution mental health expert. *See Kansas v. Cheever*, 571 U.S. 87, 94 (2013) (recognizing

that introduction by the defense of mental health testimony from an expert who evaluated the

defendant requires the defendant to submit to an evaluation by a prosecution expert); *LaGrone v.*

*State*, 947 S.W.2d 602, 610-11 (Tex. Crim. App. 1997) ("[O]nce a defendant has executed a limited

waiver of the Fifth Amendment's protection by constructively testifying through an expert on the

issue of future dangerousness, the trial court may order that defendant to submit to a state-

sponsored future dangerousness examination." (citing *Soria v. State*, 933 S.W.2d 46-58-60 (Tex.

Crim. App. 1996)).

## 2.  No Prejudice

For the same reasons discussed in detail in Section III.D.2. above, this Court finds there is

no reasonable probability that, but for the failure of Harris's trial counsel to present the evidence

showing Harris suffers from FASD/ARND and/or lead poisoning which Harris presented to the

state habeas court, the outcome of the punishment phase of Harris's capital murder trial would

have been any different. When resolving the prejudice prong of *Strickland* in connection with a

*Wiggins* claim, a court must consider the totality of the evidence before the sentencing jury or

judge – both mitigating and aggravating. *Jones*, 144 S. Ct. at 1310.

The new mitigating evidence of FASD/ARND and lead poisoning presented by Harris

during his state habeas proceeding was weak for the reasons discussed above. It was also double-

edged in nature. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating

evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). The Fifth Circuit has identified several other forms of double-edged evidence. *See, e.g.*, *Broadnax v. Lumpkin*, 987 F.3d 400, 413 (5th Cir. 2021) (evidence of intoxication and defendant's troubled upbringing); *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (evidence of head injury); *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (evidence of mental illness); *United States v. Fields*, 761 F.3d 443, 459 (5th Cir. 2014) (evidence of mental illness); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (evidence of alleged brain injury); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (evidence of substance abuse).

In contrast, the evidence of Harris's propensity for violence, as demonstrated by his actions on the date of his capital offense and just weeks before, when combined with the new evidence of Harris's ASPD diagnosis and additional bad acts (dealing drugs and robbing other drug dealers at gunpoint) presented to the state habeas court, was both compelling and overwhelming. Harris's capital sentencing jury was well aware of most of the details of Harris's unstable, emotionally and physically abusive childhood, his problems with ADHD and academic deficiencies, his low average IQ, his history of substance abuse, and his exposure to domestic violence during childhood. While Harris did tell one of the officers present at the time of his arrest for his capital offense that he was sorry, Harris's profession of remorse must be viewed in the context of the fact that he violently resisted arrest after exiting the Gallardo residence, fired at officers surrounding

56

the home, attempted to flee, and continued resisting even after he had fired all the ammunition in his handgun and was twice wounded by return gunfire. The record before the state trial court showed that Harris joined with others to engage in a pattern of home-invasion-robberies in which they targeted and terrorized working-class Hispanic families and shot most of the adult males present. The victim impact testimony offered by the state included witnesses who had survived but been widowed or scarred, both physically and emotionally, by the brutality Harris demonstrated so ruthlessly during his violent pattern of criminal offenses. While Harris's trial counsel pointed at closing jury argument to Harris's PCP addiction as an explanation for Harris's violent behavior, when transported to the hospital immediately after his arrest the night of his capital offense, Harris tested positive for opioids but not PCP.

There is no reasonable probability that, but for the failure of his trial counsel to present the new mitigating evidence presented to the state habeas court, the jury would have returned different answers to either of the Texas capital sentencing special issues. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result." *Jones*, 144 S. Ct. at 1310 (quoting *Pinholster*, 563 U.S. at 189).

### 3. Conclusions

After conducting an independent, *de novo* review of the entire record from Harris's trial, direct appeal, and state habeas corpus proceedings, this Court concludes that Harris's initial ground for federal habeas relief fails to satisfy either prong of *Strickland*. Harris's first claim does not warrant federal habeas relief.

## F. AEDPA Analysis of Stun Belt/Elevator Claim

### 1. The Claim Restated

In his second claim for federal habeas relief, Harris argues that his state trial counsel rendered ineffective assistance by failing to object to Harris wearing a stun belt during trial.  ECF no. 13, at 90-105.

### 2. State Court Disposition

### a. Trial Court Proceedings

As explained in Section I.D.3. above, on cross-examination by Harris' trial counsel at the punishment phase of trial, Deputy Sheriff Bobby Morehead testified that Harris had never once been disrespectful to the bailiffs during the twelve weeks of jury selection.[50]  Morehead also described an incident that took place during jury selection: As Harris was being transported to jury selection that morning wearing street clothes over a stun belt, the guards accompanying Harris all stepped off the courthouse elevator in which Harris was the lone remaining occupant on the second floor; at that moment, a pair of court employees on a higher floor punched a button which caused the elevator doors to close and the elevator carrying Harris to rise to their floor; the two court employees entered the elevator and punched the button to return it to the second floor; during the ride back down to the second floor, as the two court employees discussed Harris's trial,  he politely identified himself to them as the defendant in that case; and the elevator arrived back on the second floor without further incident.[51]  Harris's trial counsel elicited testimony from Morehead that

---

[50] 65 RR Trial 237.

[51] 65 RR Trial 240-45.  The court reporter's record reveals that Morehead's recitation of the incident which was referenced by the terms "the elevator incident" or "the stun belt incident," elicited laughter in the courtroom.  *Id.* at 243.  Morehead testified on cross-examination that Harris was routinely fitted with a stun belt each day of jury selection.  *Id.*, at 242-43.  On redirect examination, Morehead testified further that Harris was well aware of what the stun belt could do to him if activated and that Haris was required to sign an acknowledgement of that fact each day when he was outfitted with the stun belt.  *Id.*, at 246-47.

Harris made no effort to flee or escape during the incident and Harris was respectful to the two court employees he encountered during the incident.[52]

During his testimony, Morehead volunteered that, immediately before the elevator incident, he placed Harris in a stun belt worn under Harris's clothes for the purpose of transporting Harris to the courthouse from the jail.[53]  There was no objection when Morehead volunteered this information.  Instead, Harris's trial counsel merely asked Morehead to explain to the jury that the device was a stun belt.  Harris's trial counsel then asked Morehead to explain that Harris was wearing no visible restraints on the date in question.[54]  Morehead then completed his recitation of the incident.

### b. State Habeas Application

In his third claim for state habeas relief, Harris argued that his state trial counsel rendered ineffective assistance by failing to object to hearsay testimony suggesting that Harris wore a stun belt while in an elevator.  State Habeas Application 75-84.

### c. State Habeas Hearing

Harris's lead trial counsel, attorney Brad Lollar, testified during Harris's state habeas hearing about the incident, Morehead's trial testimony, and explained that he would have called Morehead to testify at the punishment phase of trial had the prosecution not done so because the

---

Harris's lead trial counsel later testified during Harris's state habeas corpus proceeding that he would have called Morehead to testify at the punishment phase of trial had the prosecution not done so – because he believed the jury would construe the incident as showing that Harris would not pose a danger of future violence while incarcerated and such evidence would support the defense's punishment-phase trial strategy of showing that Harris had not been violent during prior periods of pretrial detention or incarceration.  Testimony of Brad Lollar, verbatim transcription of Harris's State Habeas Hearing (henceforth "RR SHH"), Volume 4, at pp. 90-91, 96, 109-14.  Attorney Lollar also testified that no one testified at trial that Harris wore the stun belt at any time during trial.  *Id.*, at 115.

[52] 65 RR Trial 245.

[53] 65 RR Trial 241-42.

[54] 65 RR Trial 242-43.

defense believed that hearing the facts of the elevator incident could help convince the jury that Harris would not pose a risk of future dangerousness if incarcerated.[55]  When asked why he chose not to object to Morehead volunteering the information that Harris wore the stun belt, attorney Lollar replied as follows:

> Well, I figured that the jury had to know that there was [sic] some restraints on any capital murder defendant standing trial.  So it was obvious he was not shackled; he was not wearing handcuffs.
> So I figured that they would observe or not be surprised by the fact that he's wearing a stun belt.  I felt the facts of the - - what could have been a very bad situation, turning out the way it did, outweighed the relation, I guess, to the jury that he was wearing a stun belt.[56]

Lollar also explained that there was no specific revelation to the jury that Harris wore a stun belt during trial.[57]

### d. Findings, Conclusions, and Recommendation

The state habeas trial court concluded that Harris's third claim for state habeas relief failed to satisfy either prong of *Strickland/*  It recommended that state habeas relief be denied.[58]  In its findings of fact in support of its conclusions, the state habeas trial court found that:

- Harris's trial counsel elicited testimony from deputy Morehead establishing that Harris had never been disrespectful toward Morehead, had never tried to assault Morehead, and made no effort to threaten or harm the two court employees with whom Harris found himself on the date in question..
- Morehead spontaneously volunteered the fact that Harris wore a stun belt during the elevator incident.

---

[55] 4 RR SHH 108-14.

[56] 4 RR SHH 112-13.

[57] 4 RR SHH 114.

[58] FFCL 125-31, ¶¶ 418-38.

- Lollar did not object but, instead, continued his cross-examination of Morehead and elicited testimony showing that Harris had made no effort to abscond when left unaccompanied on the elevator.
- Lollar testified the defense team felt the elevator incident was evidence favorable to the defense on the future dangerousness special issue.
- Morehead's testimony established only that Harris wore the stun belt during the twelve weeks of jury selection.
- Neither the prosecution, defense counsel, nor Morehead indicated to the jury that Harris wore the stun belt during the trial or inside the courtroom.
- Evidence about the elevator incident strongly supported the defense's argument that Harris was not a danger when detained and without access to PCP.
- Nothing in the record indicated the jury was aware that Harris wore the stun belt when in the jury's presence and the jury may well have believed the stun belt was utilized during the proceedings conducted in close quarters during jury selection.
- Lollar's decision not to object to Morehead's spontaneous comment about the stun belt was an objectively reasonable trial strategy.
- There was no reasonable probability that, but for the failure of Lollar to object to Morehead's spontaneous utterance, the outcome of the punishment phase of Harris's capital murder trial would have been any different.[59]

The TCCA adopted the foregoing findings and conclusions when it denied Harris's third state habeas claim on the merits. *Ex parte Harris*, WR-80,923-01, 2020 WL 8079823, *2.

### 3. AEDPA Analysis of the Stun Belt/Elevator Claim

#### a. No Deficient Performance

The state habeas court reasonably concluded that attorney Lollar acted in an objectively reasonable manner by not objecting when Morehead spontaneously commented that Harris wore a stun belt during the elevator incident, i.e., while Harris was being transported from the jail to the courthouse during jury selection. As found by the state habeas court, the evidence showed that the elevator incident took place months before the start of trial, during jury selection proceedings that were often conducted in the judge's conference room, rather than in open court. There was no testimony or other evidence

---

[59] FFCL at 126-31, ¶¶ 418, 420-22, 424-37.

suggesting the jury was ever advised that Harris wore a stun belt during trial. Under such circumstances, Lollar could reasonably have believed that an objection to Morehead's spontaneous mention of the stun belt would detract from the emphasis on the elevator incident which Lollar wished to convey to the jury through Morehead's cross-examination. The state habeas court reasonably concluded that Lollar's decision not to object to Morehead's spontaneous utterance was a reasonable trial strategy.

Strategic decisions by trial counsel are entitled to a strong presumption of reasonableness. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021); *Harrington*, 562 U.S. at 104; *Strickland*, 466 U.S. at 688-89. Harris has failed to identify any evidence in the record sufficient to overcome this presumption, i.e., to establish that Lollar's split-second decision on whether to object when Morehead made his spontaneous utterance was objectively unreasonable. "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). The state habeas court reasonably concluded Harris failed to overcome this strong presumption.

### a. No Prejudice

For the same reasons discussed at length in Sections III.D.2. and III.E.2. above, it was objectively reasonable for the state habeas court to conclude that Harris was not prejudiced within the meaning of *Strickland* by Lollar's failure to object to Morehead's spontaneous utterance regarding the stun belt. Morehead's volunteered statement added very little to the overwhelming aggravating evidence already before the jury showing (1) the brutality of Harris's capital offense (i.e., three people shot – two fatally, the pecuniary nature of the offense, the fact Harris taunted and terrorized the Gallardo family during the home invasion, and Harris's violent attempts to resist

arrest – even after he was shot twice by police); and (2) the fact Harris and others engaged in multiple violent home invasions targeting work-class Hispanic families which each involved shooting multiple victims (one fatally) in the weeks immediately before Harris's capital offense. When viewed in the context of this aggravating evidence, as well as the new aggravating evidence showing Harris's diagnosis of ASPD and his admissions that he not only dealt drugs but also obtained a gun and began robbing other drug dealers when he was nineteen, the state habeas court reasonably concluded that any potential harm to Harris from Lollar's decision not to object to Morehead's spontaneous utterance was not prejudicial within the meaning of *Strickland*. *See Jones*, 144 S. Ct. at 1311 (where the aggravating factors greatly outweigh the mitigating evidence, there may be no reasonable probability of a different result).

## F. *De Novo* Review of Stun Belt/Elevator Claim

As explained above, because Harris argues he was deprived of due process in connection with his ineffective assistance claims during his state habeas proceeding, out of an abundance of caution, this court will undertake an alternative *de novo* review of Harris's second federal habeas claim.

After independent, de novo review of the entire record from Harris's trial, direct appeal, and state habeas proceedings, this court concludes, as did the state habeas court, that the decision by attorney Lollar not to interrupt the flow of his punishment phase cross-examination of deputy Morehead by objecting to the spontaneous utterance about the stun belt was objectively reasonable. The elevator incident took place months before the start of trial. There was no evidence before the jury, and no suggestion from any attorney, that Harris wore a stun belt during trial or inside the courtroom. Under such circumstances, objecting to Morehead's comment could well have created confusion in the minds of the jury and distracted from the point Lollar was attempting to make

during his cross-examination, i.e., that Harris had made no effort to abscond despite being left unattended by bailiffs in a courthouse elevator. In fact, rather than objecting to Morehead's comment, Lollar reasonably elicited an explanation from Morehead regarding the exact nature of the device before proceeding to explore further details of the elevator incident. Harris fails to allege facts or present evidence showing that Lollar's decision fell outside the broad range of objectively reasonable trial strategy and the presumption of reasonableness afforded such strategic decisions under *Strickland*. A court analyzing the *Strickland* deficient performance standard must apply a strong presumption that trial counsel's representation was within the wide range of reasonable professional assistance. *Harrington*, 562 U.S. at 104; *Strickland*, 466 U.S. at 687. Harris has not overcome that presumption.

This court also independently concludes after *de novo* review that the failure of Lollar to object to Morehead's utterance did not prejudice Harris within the meaning of *Strickland*. Realistically, the most attorney Lollar could have hoped to obtain by making such an objection would have been a trial court instruction that the jury disregard Morehead's comment about the stun belt. There is no reasonable probability that, absent a timely objection and a trial court instruction to disregard, the outcome of the punishment phase of Harris's capital murder trial would have been any different. There is likewise no reasonable probability that the state trial would have granted a motion for mistrial based solely on Morehead's spontaneous comment about the stun belt. The elevator incident was simply too remote in time to the trial for Morehead's comment to have been prejudicial within the meaning of *Strickland* at the punishment phase of Harris's capital murder trial. Because Harris's jury never saw any shackles or other visible restraints on Harris during trial and no witness or counsel suggested Harris wore a stun belt during trial, Harris's citation to the Supreme Court's holding in *Deck v. Missouri*, 544 U.S. 622 (2005),

is unpersuasive. Finally, as repeatedly explained above, the evidence at the punishment phase of Harris's capital murder trial supporting prosecution-friendly answers to the Texas capital sentencing special issues was overwhelming. Far from that fact being altered by Harris's new mitigating evidence of FASD/ARND and lead poisoning, this court finds the balance of the aggravating versus mitigating evidence presented during Harris's state habeas proceeding to be even more overwhelmingly in favor of the prosecution than the evidence presented during Harris's trial. *See Jones*, 144 S. Ct. at 1311 (where the aggravating factors greatly outweigh the mitigating evidence, there may be no reasonable probability of a different result).

In conclusion, after *de novo* review, this court concludes Harris's second claim for federal habeas relief fails to satisfy either prong of *Strickland*. This claim does not warrant federal habeas relief.

## IV. UNEXHAUSTED DUE PROCESS CLAIM

### A. The Claim

In his federal habeas petition Harris spends considerable time and energy arguing that, in the course of rendering its findings of fact relating to his ineffective assistance claims, the state habeas trial court erroneously applied various legal principles, including those of issue preclusion, thereby depriving Harris of his constitutional right to due process. ECF no. 13 at 61-73.

### B. *De Novo* Review

For a variety of reasons, Harris's complaints about the manner in which the state habeas trial court applied applicable state procedural statutes and applied state substantive issue preclusion principles do not furnish a basis for federal habeas relief.

First it is well-settled that a state court's interpretation of state law binds a federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state

court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (a state court's interpretation of state law binds a federal court sitting in habeas corpus).

Second, it is equally well-settled that alleged errors of state law do not furnish a basis for federal habeas relief. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. at 780; *Pulley v. Harris*, 465 U.S. at 41.

> When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

Third, when reviewing a state court's rejection of a claim on the merits under the AEDPA, the federal habeas court's duty is to analyze whether the state court's ultimate decision was reasonable *not* the written opinion explaining that decision. *Russell v. Denmark*, 68 F.4th 252, 262

(5th Cir. 2023); *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  In so doing, the federal habeas court must consider not only the arguments the state court actually relied upon in reaching its ultimate decision but also all the arguments and theories it could have relied upon.  *Sheppard v. Davis*, 967 F.3d 458, 467 (5th Cir. 2020) (quoting *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017)).  Under this standard, so long as a plausible argument exists to support the state court's ruling, the federal habeas court must defer to the state court's decision even if its stated rationale was unreasonable.  *Sheppard*, 967 F.3d at 467; *Thomas v. Vannoy*, 898 F.3d 561, 569 (5th Cir. 2018); *Neal*, 286 F.3d at 246.  Thus, when reviewing a state habeas court's rejection on the merits of an ineffective assistance claim, the federal habeas court must focus on the objective reasonableness of the state court's ultimate decision reached by the state habeas court, i.e., its conclusions with regard to the dual prongs of *Strickland*, and not get bogged down in the state court's fact findings in support of those conclusions – unless the petitioner can show by clear and convincing evidence that the state habeas court's factual findings were erroneous.  *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El,* 545 U.S. at 240 ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  Harris has failed to satisfy this standard with regard to the state habeas court's fact findings identified by this court as supporting that court's rejection on the merits of Harris's ineffective assistance claims.

Finally, it is also well-settled in this Circuit that infirmities in state post-conviction proceedings do not furnish a basis for federal habeas relief. *See, e.g., In re* Palacios, 58 F.4th 189, 190 (5th Cir. 2023) (state attorney who opposed defendant's state habeas application also prepared the state habeas trial court's findings of fact and conclusions of law); *Rockwell v. Davis*, 853 F.3d 758, 761 n.5 (5th Cir. 2017) (state habeas court allegedly failed to adhere to Texas criminal procedural laws); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013) (state habeas court failed to hold an evidentiary hearing on petitioner's *Roper* claim); *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012) (state appellate court allegedly used flawed procedures to review state petitions for post-conviction review); *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (allegedly inadequate funding and staffing of the Mississippi Office of Capital Post-Conviction Counsel); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged ineffective assistance by initial state habeas counsel); *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005) (state habeas judge who issued findings of fact was not the same judge who presided over the petitioner's state habeas hearing); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (recognizing that Supreme Court precedent does not recognize a general right to effective assistance in a state post-conviction proceeding); *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (state habeas court held that an alleged violation of a petitioner's state statutory right to effective representation in an initial state habeas proceeding did not furnish a basis for relief in a subsequent state habeas proceeding); *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (petitioner denied access to the prosecution's file during state habeas corpus proceeding); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001) (state habeas court allegedly overburdened petitioner's state habeas counsel by assigning multiple state habeas cases to the same counsel at the same time); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001) (state habeas court's refusal to consider a supplemental state writ application);

*Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (state habeas court adopted the prosecution's proposed findings of fact and conclusions of law only three hours after they were filed with the state court); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) (state court policy against considering challenges to prison disciplinary proceedings in state habeas corpus proceedings); *Nichols v. Scott*, 69 F.3d 1255, 1275 n.36 (5th Cir. 1995) (state habeas judge had been the prosecutor in one of the petitioner's prior convictions that was introduced into evidence at the punishment phase of petitioner's capital murder trial, state habeas judge failed to recuse himself *sua sponte*, and state habeas judge signed prosecution's proposed findings and conclusions without change); *McCowin v. Scott*, 67 F.3d 100, 102 (5th Cir. 1995) (petitioner proceeded *pro se* and without a copy of the transcript in his state habeas proceeding and state habeas court failed to hold an evidentiary hearing); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992) (state habeas court quashed subpoenas *duces tecum* served on County District Attorney, State Attorney General, and U.S. Marshal).

This is because an attack on the procedural propriety of a state post-conviction proceeding does not challenge the validity of the underlying conviction or sentence imposed by a state trial court. *See Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (holding alleged misapplication by state habeas court of state procedural rules did not furnish a basis for federal habeas relief because "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself" (quoting *Rudd*, 256 F.3d at 320)); *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (holding an attack on a state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself and, therefore, will not furnish a basis for federal habeas relief (quoting *Nichols*, 69 F.3d at 1275)). Thus, Harris's due process challenges

to the procedures utilized by the state habeas court to make its legal conclusions and factual findings are simply not cognizable in this proceeding brought under Section 2254.

Harris's reliance upon the Supreme Court's opinion in *District Attorney's Office for the third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009), is unavailing. *Osborne* did not arise in the context of a Section 2254 federal habeas corpus proceeding. Instead, Osborne brought a Section 1983 civil action seeking the release of certain materials for post-conviction DNA testing. Whether Harris's due process complaints in this cause might hold water in an action brought in an appropriate federal court pursuant to Section 1983 challenging a Texas trial court's denial of post-conviction DNA testing under Chapter 64 of the Texas Code of Criminal Procedure is not properly before this court. For the reasons detailed above, this Section 2254 proceeding is not the proper forum for a challenge to a hypothetical adverse ruling by Texas courts on a Chapter 64 motion or win a similar state statutory proceeding. It is also not the proper forum for Harris's due process claims.

For the foregoing reasons, Harris's due process arguments contained in his federal habeas petition lack arguable merit and do not warrant federal habeas relief, even under a *de novo* standard of review.

## V. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116

F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was

correct in its procedural ruling.  *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).  This court did not dispose of any of Harris's federal habeas corpus claims on procedural grounds.  This court addressed the merits of all of Harris's federal constitutional claims.

Reasonable minds could not disagree with this Court's conclusions that (1) regardless of whether reviewed under the AEDPA or a *de novo* standard of review, all of Harris's complaints of ineffective assistance by his trial counsel fail to satisfy the prejudice prong of *Strickland*; and (2) Harris's due process claim is without arguable merit.  Harris is not entitled to a CoA from this Court.

Accordingly, it hereby **ORDERED** that (1) all relief requested in either Harris's original petition (ECF no. 13) or his Reply Brief (ECF no. 30) is **DENIED**; (2) Harris is **DENIED** a Certificate of Appealability with regard to all of his claims for relief; and (3) all pending motions are **DISMISSED** as moot.

**SIGNED November 6, 2024.**

Ada Brown
UNITED STATES DISTRICT JUDGE